Jahan C. Sagafi   (Cal. Bar No. 224887)
Rachel Dempsey (Cal. Bar No. 310424)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, California 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
jsagafi@outtengolden.com
rdempsey@outtengolden.com

Ossai Miazad*
Michael N. Litrownik*
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

*Attorneys for Plaintiff and the Proposed Class*
*(Additional Counsel Listed on Signature Page)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| EDUARDO PEÑA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | **Case No. 19-cv-04065-MMC**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1981, THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691, *et seq.*, and THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681, *et seq.***<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Eduardo Peña ("Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, brings the following allegations against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"):

## INTRODUCTION AND SUMMARY OF CLAIM

1.     Plaintiff brings this case against Wells Fargo for unlawful alienage discrimination in violation of the Civil Rights Act of 1866, as codified by 42 U.S.C. § 1981 ("Section 1981"), for failure to provide him written notice of his credit denial with an accurate statement of the reasons for the denial in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq*. ("ECOA"), and for conducting a hard credit inquiry and obtaining his consumer report without a permissible purpose for doing so in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

2.     Wells Fargo's direct auto loan line of business, as a matter of policy, treats non-United States citizens who reside in the United States and hold Deferred Action for Childhood Arrivals ("DACA") status as ineligible for auto loans even where such DACA applicants have valid Social Security numbers and federal work authorization and regardless of their creditworthiness and ability to satisfy the bank's auto loan underwriting criteria.  Wells Fargo's policy of denying aliens with DACA status the opportunity to contract for credit is discriminatory and unlawful under Section 1981.

3.     Despite treating applicants with DACA status as automatically ineligible for auto loans, Wells Fargo nonetheless conducts a hard credit inquiry upon their application, invading their privacy and damaging their credit scores.  Because Wells Fargo does not use—and knows it has no intention of using—DACA applicants' consumer reports for credit eligibility purposes, the hard credit pull is not used in connection with the transaction and leaves Wells Fargo with no permissible purpose for the hard credit inquiry.

4.     Wells Fargo also fails to provide DACA recipients who are denied auto loans a written notice of adverse action with an accurate statement of the reasons for their denial, in violation of ECOA.

5.      Wells Fargo's discriminatory auto loan policies are of a piece with the bank's broader discriminatory consumer lending policies.  Plaintiff is similarly ineligible for a Wells Fargo student loan, unsecured credit card, personal loan, and small business loan due to his status under DACA.[1]

6.      Wells Fargo has a long history of credit discrimination claims against it.  Seven years ago, the bank settled a lending discrimination case brought by the Department of Justice for $175 million.[2]  The same year, the bank paid Tennessee towns $432 million to settle lending discrimination claims.[3]  More recently, the cities of Oakland, Sacramento, and Philadelphia separately sued the bank for steering African American and Hispanic borrowers into high-cost loans even though they qualified for loans on less onerous terms.[4]

7.      And Wells Fargo's auto loan business line has come under heavy scrutiny for other reasons as well.  In 2018, the Consumer Financial Protection Bureau and Office of the Comptroller of the Currency settled a landmark case against Wells Fargo involving auto loans for $1 billion, its largest settlement ever.[5]  Most recently, Wells Fargo settled a class action involving similar issues relating to its auto loan business line for $386 million.[6]

---

[1]    Dena Aubin, *Immigrants denied credit by Wells Fargo may sue bank, judge says*, Reuters (August 4, 2017), https://www.reuters.com/article/us-wells-fargo-immigration/immigrants-denied-credit-by-wells-fargo-may-sue-bank-judge-says-idUSKBN1AK1VK.

[2]    Rick Rothacker and David Ingram, *Wells Fargo to pay $175 million in race discrimination probe*, Reuters (July 12, 2012), https://www.reuters.com/article/us-wells-lending-settlement/wells-fargo-to-pay-175-million-in-race-discrimination-probe-idUSBRE86B0V220120712.

[3]    Rick Rothacker, *Wells Fargo Settles Discriminatory Lending Suit, Pays Tennessee Towns Memphis, Shelby $432 Million*, Huffington Post (May 29, 2012), https://www.huffpost.com/entry/wells-fargo-discriminatory-lending_n_1554533.

[4]    Ben Lane, *Sacramento sues Wells Fargo over lending discrimination*, HousingWire (Feb. 28, 2018), https://www.housingwire.com/articles/42637-sacramento-sues-wells-fargo-over-lending-discrimination; Ben Lane, *Federal court: Wells Fargo must face Oakland's mortgage discrimination lawsuit*, HousingWire (July 19, 2018), https://www.housingwire.com/articles/43718-federal-court-wells-fargo-must-face-oaklands-mortgage-discrimination-lawsuit.

[5]    Bureau of Consumer Financial Protection Announces Settlement With Wells Fargo For Auto-Loan Administration and Mortgage Practices (April 20, 2018), https://www.consumerfinance.gov/about-us/newsroom/bureau-consumer-financial-protection-announces-settlement-wells-fargo-auto-loan-administration-and-mortgage-practices/.

[6]    Emily Flitter, *Wells Fargo Agrees to Settle Auto Insurance Suit for $386 Million*, The New York Times (June 7, 2019), https://www.nytimes.com/2019/06/07/business/wells-fargo-auto-insurance-lawsuit-settlement.html.

**PARTIES**

*Plaintiff Eduardo Peña*

8.      Plaintiff Eduardo Peña is a resident of Willow Springs, Illinois.  He is employed as a tax manager.

9.      Mr. Peña was born in Mexico and obtained status under DACA along with a Social Security number and federal work authorization in or around 2012.  He has since renewed his DACA status three times.

*Defendant*

10.     Wells Fargo is an American multinational banking and financial services company headquartered in San Francisco, California.  It is the fourth largest bank in the United States.

11.     Wells Fargo Bank, N.A. is a South Dakota corporation authorized to do business in this state.

12.     Wells Fargo Bank, N.A. is a national bank and the primary United States operating subsidiary of Wells Fargo.

13.     Wells Fargo Bank, N.A. offers consumers a range of financial and credit products, including private student loans, credit cards, small business loans and credit products, personal loans, auto loans, and home mortgages.

14.     Wells Fargo Bank, N.A., by soliciting, conducting, and transacting business in the state of California, engages in continuous, permanent, and substantial activity within the state.

15.     Wells Fargo Bank, N.A. is not a federal enclave and therefore is subject to Plaintiffs' Section 1981 claim.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over Plaintiffs' Section 1981, ECOA, and FCRA claims pursuant to 28 U.S.C. § 1331.  This Court also has subject matter jurisdiction over Plaintiff's ECOA claims pursuant to 15 U.S.C. § 1691e(f) and FCRA claims pursuant to 15 U.S.C. § 1681p.

17.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and Wells Fargo conducts business within this district.

19.     Intradistrict assignment:  Pursuant to N.D. Cal. Local Rules 3-2(c) and (d), intradistrict assignment to the San Francisco Division is proper because a substantial part of the events which give rise to the claims asserted herein occurred at Wells Fargo's headquarters located in San Francisco County.

## BACKGROUND

20.     On June 15, 2012, President Obama announced that the Department of Homeland Security ("DHS") would no longer remove certain young immigrants under its authority to grant deferred action as embodied in DACA.

21.     DACA's purpose, according to President Obama, was to "[stop] expel[ling] talented young people, who . . . [have] been raised as Americans; understand themselves to be part of this country . . . [and] who want to staff our labs, or start new businesses, or defend our country."[7]

22.     DACA is a form of deferred action, a discretionary grant of authorized stay by the federal government.  Deferred action granted through DACA is valid for two years and is subject to renewal thereafter.

23.     DACA mandates that persons who are granted deferred action will be eligible to obtain an Employment Authorization Document (an "EAD" or "federal work permit") and a Social Security number.  In other words, those granted deferred action and in possession of an EAD are legally authorized to work in the United States and can prove their identity.

24.     Over 800,000 individuals have been initially approved for DACA status in the United States, around 80% of whom were born in Mexico.[8]

---

[7]   President Obama, Remarks by the President on Immigration (June 15, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/06/15/remarks-president-immigration.
[8]   USCIS, Approximate Active DACA Recipients: Country of Birth As of February 28, 2019, *available at* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/2_Approximate_Active_DACA_Recipients_Demographics_-_Feb_28_2019.pdf.

25.     There is no federal or state law or regulation that restricts banks from providing financial products to customers because the customer is an alien.  Under federal law, alienage is merely one factor among many used to verify enough information to confirm the true identity of the customer.

26.     For instance, the Federal Financial Institutions Examination Council ("FFIEC") provides uniform principles and standards to offer guidance for federal regulators.  The FFIEC annually publishes the Bank Secrecy Act/Anti-Money Laundering Examination Manual for Money Services, which contains a compliance program called the Customer Identification Program ("CIP"), as required by section 326 of the USA PATRIOT Act, 31 U.S.C. § 5318.  Pursuant to CIP, institutions providing financial services, including banks, must have a written policy in place to enable them to form a reasonable belief that they know the true identity of each customer.  The goal behind this requirement is to prevent the funding of terrorism both inside and outside of the United States.[9]

27.     According to the Bank Secrecy Act/Anti-Money Laundering Examination Manual, a bank's CIP must contain account-opening procedures detailing the identifying information that must be obtained from each customer.  At a minimum, the bank must obtain the following information from each customer before opening an account: 1) name, 2) date of birth, 3) address, and 4) identification number (*e.g.*, Social Security number, taxpayer identification number or an alien identification number).[10]

28.     The bank's procedure must also describe when it will use documents, non-documentary methods, or a combination of both.  Federal banking agencies expect that banks will review an unexpired government-issued form of identification from most customers.  The identification must include evidence of the customer's nationality or residence and bear a photograph or similar safeguard.[11]

---

[9]     *See* 12 C.F.R. § 208.63(b), § 211.5(m), § 211.24(j) (Board of Governors of the Federal Reserve System); 12 C.F.R. § 326.8(b) (Federal Deposit Insurance Corporation); 12 C.F.R. § 748.2(b) (National Credit Union Administration); 12 C.F.R. § 21.21 (Office of the Comptroller of the Currency); 12 C.F.R. § 563.177(b) (Office of Thrift Supervision); and 31 C.F.R. § 103.121 (FinCEN).

[10]    Fed. Fin. Inst. Examination Council, Bank Secrecy Act/Anti-Money Laundering Examination Manual, Regulatory Requirements, Customer Identification Program (2010), *available at* https://bsaaml.ffiec.gov/manual/RegulatoryRequirements/01 (last visited July 16, 2019).

[11]    *Id.*

29.     Compliance with the CIP is to ensure that a bank verify enough information to form a reasonable belief that it knows the true identity of the customer.[12]

30.     "Opening an account" and a financial services "customer" for purposes of the Bank Secrecy Act/Anti Money Laundering Examination Manual for Money Services includes an individual who has applied for a loan.[13]

## ECOA'S ADVERSE ACTION NOTICE REQUIREMENT

31.     ECOA reflects Congress's determination that consumers applying for credit should receive notice of the reasons a creditor took adverse action on the application.

32.     Creditors such as Wells Fargo therefore must notify applicants within 30 days "after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application."[14]

33.     The "notification given to an applicant when adverse action is taken shall be in writing and shall contain a statement of the action taken; the name and address of the creditor; a statement of the provisions of section 701(a) of the Act; the name and address of the Federal agency that administers compliance with respect to the creditor; and … [a] statement of specific reasons for the action taken."[15]

34.     The statement of reasons for adverse action "must be specific and indicate the *principal reason(s)* for the adverse action."[16]

## THE FCRA'S PRIVACY PROTECTIONS

35.     Congress enacted the FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.

36.     To protect consumer privacy, the FCRA prohibits users, like Wells Fargo, from obtaining consumer reports unless the user has a permissible purpose for procuring the report, as defined in the statute.  Specifically, the FCRA, 15 U.S.C. § 1681b(f), provides:

> A person shall not use or obtain a consumer report for any purpose unless (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished

---

[12]  *Id.*
[13]  *Id.*
[14]  12 C.F.R. § 1002.9(a)(1).
[15]  *Id.* § 1002.9(a)(2).
[16]  *Id.* § 1002.9(b)(2) (emphasis added).

under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

37.     The FCRA defines a closed list of permissible purposes for the use of a consumer report. *Id.* § 1681b(a).  One permissible purpose for obtaining a credit report is for use in connection with a credit transaction involving a consumer.  *Id.* § 1681b(a)(3)(A).

38.     The FCRA also contains a catch-all "legitimate business purpose" clause in the event that the enumerated circumstances in § 1681b(a)(3)(A)-(E) do not apply.  *Id.* § 1681b(a)(3)(F)(i).

39.     The "legitimate business purpose" carve-out requires a "legitimate business need" for the consumer report, "in connection with a business transaction that is initiated by the consumer." *Id.*

40.     The FTC has provided a wealth of guidance interpreting these provisions of FCRA, including confirming the position that a request for and use of a consumer report must be governed by a reasonable relation to the underlying transaction:

> Under this subsection, a party has a permissible purpose to obtain a consumer report on a consumer for use in connection with some action the consumer takes *from which or she might expect to receive a benefit* that is not more specifically covered by subsections (A), (B), or (C). For example, a consumer report may be obtained on a consumer who applies to rent an apartment, offers to pay for goods with a check, applies for a checking account or similar service, seeks to be included in a computer dating service, or who has sought and received overpayments of government benefits that he has refused to return.[17]

41.     The FTC has also described the outer bounds of a "legitimate business need":

> [T]he *only permissible purpose for which a credit report may be obtained* in connection with a new business transaction is to determine the consumer's "eligibility"—i.e., whether the business wishes to undertake a transaction with the consumer. In this regard, we note that the legislative history indicates that Congress intended the "permissible purposes" provisions of the FCRA to cover primarily "eligibility issues" (*see, e.g.*, 116 Cong. Rec. 36,572 (statement of Rep. Sullivan)).[18]

---

[17]    16 C.F.R. c. 1, Pt. 600 App. (emphasis added).
[18]    FTC Informal Staff Opinion Letter, William Haynes (Mar. 2, 1998) (emphasis added); *see also* FTC Informal Staff Opinion Letter, David Medine (Feb. 11, 1998).

**HARD AND SOFT CREDIT PULLS**

42.     Inquiries related to transactions initiated by a consumer are known colloquially as "hard inquiries" or "hard pulls."  Inquires not related to transactions initiated by the consumer are known as "soft inquiries" or "soft pulls."

43.     Hard pulls are visible to third parties who obtain a consumer credit report.  Soft pulls are not.

44.     Each hard pull can result in a reduction of a credit score by up to five points.[19]

45.     Creditors often use the number of hard inquiries on a consumer's credit report as a basis to deny an extension of credit.

46.     A "soft pull," by contrast, is a credit inquiry that is not visible to anyone other than the consumer, and that does not affect the consumer's credit score.  Soft pulls include inquiries made when a consumer checks their own credit report, inquiries made by business with which the consumer already does business, such as a mortgage servicer reviewing the status of the consumer's account, and inquiries made by creditors to make firm offers of credit even where no transaction has been initiated by a consumer.[20]

47.     A soft pull is not visible to other users and does not affect a consumer's credit score.[21]

**STATEMENT OF FACTS**

**Plaintiff Peña**

48.     Mr. Peña is a DACA recipient with an Employment Authorization Document (an EAD or federal work permit) and a valid Social Security number.

49.     In or around November 2018, Mr. Peña submitted an online application for an auto loan through the Wells Fargo website because he and his wife wanted to purchase a second car.  When the

---

[19]     *See Harkins v. Diversified Collection Servs., Inc.*, No. 12 Civ. 1229, 2012 WL 5928997, at *1 n.1 (D. Md. Nov. 26, 2012).

[20]     "Credit Report Q&A" https://www.myfico.com/credit-education/credit-reports/credit-checks-and-inquiries (last visited September 27, 2019).

[21]     *See* "Hard and Soft Credit Inquiries, and How One Hurts Your Credit Score." https://consumerist.com/2008/12/06/hard-and-soft-credit-inquiries-and-how-one-hurts-your-credit-score/ (last visited September 27, 2019).

online application requested that he enter his citizenship status, Mr. Peña selected the option for non-resident alien.

50.     At some point after Mr. Peña submitted his application, Wells Fargo conducted a hard credit check and pull of his consumer report from one or more credit bureaus.  Plaintiff's credit score was 748.  This hard credit pull invaded Plaintiff's privacy and resulted in a derogatory mark on his consumer report.

51.     After Mr. Peña submitted his application, he received a phone call from a Wells Fargo representative to process the loan.  The Wells Fargo representative provided him with additional paperwork to complete and asked him for a copy of his Social Security card.  When Mr. Peña provided his Social Security card, the Wells Fargo representative asked him for a copy of his work permit.  When he provided his work permit, the representative told him he was ineligible for the loan because his DACA status expired within the loan period.  Mr. Peña explained that his status would be renewed and that work authorization under DACA is for two-year periods.  The representative told Mr. Peña that he could not be approved for an auto loan.

52.     Despite pulling Mr. Peña's credit bureau information, Wells Fargo did not consider his actual creditworthiness for the auto loan or his ability to meet its underwriting criteria for the loan.

53.     Mr. Peña requested that Wells Fargo send him a written explanation for his auto loan denial, but never received one that accurately stated the reason for his denial of credit.

54.     Mr. Peña suffered harm as a result of Wells Fargo's denial of his auto loan application, failure to provide him with an accurate written explanation for the denial, and placement of a hard credit inquiry on his credit report.  Wells Fargo also harmed Mr. Peña by invading his privacy through conducting a hard credit pull.

**Wells Fargo's Policies Are Unlawful and Harm Plaintiff**

55.     Wells Fargo's policy of making Plaintiff ineligible to contract for credit because Plaintiff is neither a U.S. citizen nor lawful permanent resident is a violation of 42 U.S.C. § 1981.

56.     Wells Fargo's failure to provide Plaintiff with a written notice of adverse action with an accurate statement of the reasons for his denial of credit is a violation of 15 U.S.C. § 1691 and 12 C.F.R. § 1002.9(a).

57.     Because Wells Fargo will categorically deny credit to—and knows it will deny credit to—non-citizens with DACA status, Wells Fargo has no need to determine whether the DACA applicant is otherwise eligible for credit.  Accordingly, the hard pull is not in connection with the underlying transaction and Wells Fargo has no legitimate business need for the consumer report and therefore no permissible purpose for the hard pull.

58.     By conducting a hard pull and obtaining their consumer reports, Wells Fargo has invaded DACA applicants' privacy and damaged their credit scores.

59.     Wells Fargo causes these harms to occur by failing to institute safeguards that would prevent the bank from conducting a hard pull for a consumer report it knows it will not use.

60.     Wells Fargo's lack of permissible purpose under the FCRA for obtaining Plaintiff's consumer report is a violation of the FCRA, 15 U.S.C. § 1681b(f).

61.     Having created the policy, Wells Fargo knew that it was denying loan applications from non-citizens with DACA status for reasons unrelated to their creditworthiness.  If the highest levels of Wells Fargo's leadership and legal compliance teams did not know of it before, they undisputedly became aware and on notice after *Perez v. Wells Fargo Bank, N.A.*, No. 17-cv-00454 (N.D. Cal.) was filed in January 2017, nearly two years before Plaintiff sought an auto loan.

62.     Despite the *Perez* litigation, Wells Fargo has not changed its policy of conducting a hard credit pull for DACA applicants and then not using the consumer information obtained for eligibility purposes, causing harm to numerous DACA applicants' credit scores and invading their privacy.

63.     Wells Fargo therefore intentionally or recklessly took no action to prevent pulling consumer reports it knew it would not need.  Wells Fargo's violations of the FCRA are thus willful, or, in the alternative, negligent.

64.     There is an actual and substantial controversy between Plaintiff and Wells Fargo.

## CLASS ACTION ALLEGATIONS

65.      Plaintiff brings his class allegations under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of three nationwide classes, each consisting of all non-United States citizens who resided in the

United States and held DACA status at the time they applied for a Wells Fargo auto loan ("DACA Residents") from July 16, 2017 through the date of final judgment in this action ("Covered Period").

66.     Plaintiff brings class allegations under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of DACA Residents in the Covered Period who were declined an auto loan by Wells Fargo (the "Section 1981 Class").

67.     Plaintiff also brings class allegations under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of DACA Residents in the Covered Period who were declined an auto loan by Wells Fargo and did not receive a written notice of adverse action with an accurate statement of the reasons for the denial (the "ECOA Class").

68.     Plaintiff also brings class allegations under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of DACA residents in the Covered Period who were declined an auto loan by Wells Fargo and for whom Wells Fargo conducted a hard credit inquiry (the "FCRA Class").

69.     Plaintiff is a member of the Section 1981 Class, ECOA Class, and FCRA Class (collectively, "Class Members").

70.     Class Members are so numerous that joinder of all of them is impracticable.  Wells Fargo has offices throughout the United States and is one of the largest auto lenders in the country, and over 800,000 individuals have been approved for DACA status since 2012.

71.     There are questions of law and fact common to each Class, and these questions predominate over any questions affecting only individual members.  Common questions include, among others: (1) whether Wells Fargo maintains policies that make Plaintiff and Class Members ineligible for auto loans due to Plaintiff's and Class Members' alienage; (2) whether Wells Fargo's policies as set forth above deprive Plaintiff and Class Members of the right to contract in violation of Section 1981; (3) whether Wells Fargo has failed to provide Plaintiff and Class Members with written explanations of the accurate reasons for their denial of credit in violation of ECOA; (4) whether Wells Fargo conducted a hard credit pull of Plaintiff and Class Members in violation of FCRA; (5) whether Wells Fargo had a permissible purpose to pull consumer reports in relation to applicants with no chance of approval, (6) whether alleged violations of FCRA were willful or negligent, (7) whether Plaintiff and Class Members suffered harm by reason of Wells Fargo's unlawful policies and practices; (8) whether Plaintiff and

Class Members are entitled to statutory or punitive damages, or any other type of damages; (9) whether Plaintiff and Class Members are entitled to equitable and injunctive relief, and if so, what equitable and injunctive relief is warranted; and (10) the scope of a resulting permanent injunction.

72.     Plaintiff's claims are typical of the claims of the Class Members: (1) Plaintiff was within the jurisdiction of the United States and held DACA status; (2) Plaintiff applied to Wells Fargo for an auto loan; (3) Plaintiff was declined credit because he did not meet Wells Fargo's citizenship requirements; (4) Plaintiff did not receive a written notice stating the accurate reasons for his denial of credit; and (5) Wells Fargo conducted a hard credit pull of Plaintiff's consumer report.  Each of these claims is substantially shared by every Class Member.  Each of the claims arises from the same course of conduct by Wells Fargo, and the relief sought is common.

73.     Plaintiff will fairly and adequately represent and protect the interests of the Class Members.  Plaintiff has no conflict with any Class Member.  Plaintiff is committed to the goal of having Wells Fargo change its business practices to stop discriminating against Plaintiff and others who hold DACA status and to ensure Wells Fargo's compliance with ECOA's written notification requirement and with FCRA.

74.     Plaintiff has retained counsel competent and experienced in complex discrimination and consumer class actions.

75.     The universe of people affected by Wells Fargo's unlawful policies is ascertainable through Wells Fargo's company records, logs, and data and therefore the proposed class is ascertainable.

76.     Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Wells Fargo has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory, equitable, and injunctive relief with respect to Plaintiff and the Class Members as a whole. Wells Fargo makes Class Members ineligible for auto loans due to their alienage, fails to provide Class Members with accurate written notice as to the reasons for their auto loan denials, and conducts hard credit pulls of Class Members with no permissible purpose.  The Class Members are entitled to declaratory, equitable, and injunctive relief to end Wells Fargo's common, unfair, and discriminatory policies.

77.     Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual Class Members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation since joinder of all members is impracticable.  The Class Members have been damaged and are entitled to recovery because of Wells Fargo's common, unfair, and discriminatory policies and unlawful practices.  Damages are capable of measurement on a classwide basis.  The FCRA provides for statutory damages per violation of $100 to $1,000.  The propriety and amount of statutory, punitive, and other damages are based on Wells Fargo's conduct, making these issues common to Class Members.  Plaintiffs and the Class Members will rely on common evidence to resolve their legal and factual questions, including the applicable auto loan credit and underwriting policies, the bank's policies and practices regarding the sending, or not, of written explanations of the accurate reasons for denial of credit, and the bank's policies and practices regarding conducting hard credit pulls of ineligible applicants.  There are no pending actions raising similar claims.  Wells Fargo engages in continuous, permanent, and substantial activity in California.  There will be no undue difficulty in the management of this litigation as a class action

**FIRST CLAIM FOR RELIEF**
**Alienage Discrimination**
**(42 U.S.C. § 1981)**

78.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

79.     Plaintiff brings this claim on his own behalf and on behalf of the Section 1981 Class.

80.     Plaintiff is a person within the jurisdiction of the United States.

81.     Plaintiff is an alien with DACA status.

82.     Plaintiff has the right to make and enforce contracts in the United States and is entitled to the full and equal benefits of the law.

83.     Wells Fargo intentionally discriminated against Plaintiff and the Section 1981 Class on the basis of alienage by denying them the opportunity to contract for credit.

84.     Wells Fargo's intentional discrimination against Plaintiff and the Section 1981 Class interfered with their right to make and enforce contracts for credit.

85.    Wells Fargo's policies of denying credit based on Plaintiff's and the Section 1981 Class Members' alienage harmed them and constitutes unlawful alienage discrimination in the making and enforcing of contracts in violation of 42 U.S.C. § 1981.

86.    Plaintiff and the Section 1981 Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive and equitable relief sought in this action is the only means of securing complete and adequate relief.  Plaintiff and the Class Members are now suffering, and will continue to suffer, irreparable injury from Wells Fargo's discriminatory acts and omissions.

**SECOND CLAIM FOR RELIEF**
**Failure to Provide Written Notice of Reason for Denial**
**(ECOA, 15 U.S.C. § 1691 and 12 C.F.R. § 1002.9(a))**

87.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

88.    Plaintiff brings this claim on his own behalf and on behalf of the ECOA Class.

89.    Plaintiff applied to Wells Fargo for an auto loan, was declined that loan by Wells Fargo, and did not receive a written explanation stating the accurate principal reason for the denial.

90.    Wells Fargo violated ECOA by failing to provide a notice of adverse action that accurately stated the reasons for its denial of auto loans to Plaintiff and members of the ECOA Class.

91.    Plaintiff and members of the ECOA Class are entitled to actual damages resulting from Wells Fargo's violation of ECOA, punitive damages, and equitable and declaratory relief, as well as the recovery of costs and attorneys' fees.

**THIRD CLAIM FOR RELIEF**
**Obtaining Consumer Reports Without a Permissible Purpose**
**(FCRA, 15 U.S.C. § 1681b(f))**

92.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

93.    Plaintiff brings this claim on his own behalf and on behalf of the FCRA Class.

94.    Wells Fargo conducted a hard credit pull and obtained Plaintiff's consumer report but did not use—and knew it would not use—any of the consumer or creditworthiness information obtained to determine Plaintiff's eligibility for credit.

95.    Wells Fargo instead determined Plaintiff's eligibility for credit solely based on Plaintiff's lack of U.S. citizenship.

96.     Wells Fargo's use of Plaintiff's consumer report therefore had no connection to the underlying transaction.

97.     Wells Fargo willfully violated FCRA by having neither a permissible purpose nor legitimate business need for its use of Plaintiff's consumer report.

98.     By obtaining Plaintiff's consumer report without a permissible purpose, Wells Fargo has invaded Plaintiff's privacy and harmed Plaintiff's credit score.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and Class Members pray for relief as follows:

99.     Certification of the case as a class action on behalf of the Section 1981 Class, ECOA Class, and FCRA class;

100.    Designation of Plaintiff Peña as a representative on behalf of the Section 1981 Class, ECOA Class, and FCRA Class;

101.    Designation of Plaintiff's counsel of record as Class Counsel;

102.    A declaratory judgment that the practices complained of herein are unlawful and violate Section 1981, ECOA, and FCRA;

103.    Actual damages, statutory damages, and nominal damages;

104.    A preliminary and permanent injunction against Wells Fargo and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs and usages set forth herein, and requiring them to comply with ECOA's written notice requirement;

105.    Exemplary and punitive damages in an amount commensurate with Wells Fargo's ability to pay and to deter future conduct;

106.    Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

107.    Pre-judgment and post-judgment interest, as provided by law; and

108.    Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

Dated: New York, New York
September 27, 2019

Respectfully submitted,

By:   /s/ Ossai Miazad
**OUTTEN & GOLDEN LLP**

Ossai Miazad*
Michael N. Litrownik*
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone:  (212) 245-1000
Facsimile:   (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

Jahan C. Sagafi (Cal. Bar No. 224887)
Rachel Dempsey (Cal. Bar No. 310424)
One California Street, 12th Floor
San Francisco, California 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
jsagafi@outtengolden.com
rdempsey@outtengolden.com

Brian James Shearer**
Craig L. Briskin**
**JUSTICE CATALYST LAW**
718 7th Street NW
Washington, D.C. 20001
518-732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Benjamin D. Elga**
81 Prospect Street
Brooklyn, NY 11201
518-732-6703
belga@justicecatalyst.org

*admitted *pro hac vice*
**to seek *pro hac vice* admission

***Attorneys for Plaintiff and the proposed Class***