# Exhibit D

*COPY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable ELIZABETH D. LAPORTE, Magistrate Judge

| | |
|---|---|
| MITZIE PEREZ, ANDRES ACOSTA,)<br>SERGIO BARAJAS, TERESA DIAZ )<br>VEDOY, VICTORIA RODAS, and )<br>SAMUEL TABARES VILLAFUERTE, )<br>individually and on behalf )<br>all others similarly )<br>situated, and CALIFORNIA )<br>LEAGUE OF UNITED LATIN )<br>AMERICAN CITIZENS, )<br> ) | **Discovery Hearing**<br><br><br><br><br>Pages 1 - 53 |
| Plaintiff, )<br> ) | NO. C 17-00454 MMC |
| vs. )<br> )<br>WELLS FARGO BANK, N.A., )<br> ) | |
| Defendants. )<br>_____) | San Francisco, California<br>Tuesday, December 13, 2017 |

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**
**2:19 P.M. - 2:35 P.M. and 2:41 P.M. - 3:25 P.M.**

APPEARANCES:

For PLAINTIFFS:         Outten & Golden LLP
                        One Embarcadero Center, 38th Floor
                        San Francisco, California  94111
                    BY: PATRICK DAVID LOPEZ, ATTORNEY AT LAW

For DEFENDANT:          McGuire Woods LLP
                        Tower Two-Sixty
                        260 Forbes Avenue, Suite 1800
                        Pittsburgh, Pennsylvania  15222
                    BY: K. ISSAC deVYVER,
                        ELIZABETH M. THOMAS, ATTORNEYS AT LAW

Transcribed By:         Raynee H. Mercado

(Appearances continued next page)

    Proceedings electronically recorded by FTR; transcript
produced by computer-aided transcription.

<u>**A P P E A R A N C E S (CONT'D.)**</u>

For Defendant          McGuire Woods LLP
(Telephonic):          201 N. Tryon Street, Suite 3000
                       charlotte, North Carolina  28202
                  BY:  JILL CRAWLEY GRISET, ATTORNEY AT LAW


--o0o--

| | |
|---|---|
| 1 | Tuesday, December 13, 2017                    2:19 P.M. |

**ELECTRONICALLY RECORDED PROCEEDINGS**

3  **THE CLERK:**  Calling 17 CV 4454, Perez versus Wells

4  Fargo.

5      Counsel should approach the podiums to state their

6  appearances.

7          **MR. LOPEZ:**  Good afternoon, Your Honor.  David Lopez

8  with Outten & Golden on behalf of plaintiffs.  With me is

9  Rachel Dempsey who is -- will soon enter her appearance in

10  this case, also with our firm.

11          **THE COURT:**  Thank you.

12          **MR. deVYVER:**  Good afternoon.  Isaac deVyver on

13  behalf of defendant Wells Fargo.

14          **THE COURT:**  Okay.  Thank you.  I'm sorry.  Just let

15  me make sure -- Okay?

16          **MS. THOMAS:**  Good afternoon. Your Honor.  Elizabeth

17  Thomas on behalf of Wells Fargo.

18          **THE COURT:**  Thank you.

19      And on the telephone?  Is there anybody on the phone?

20          **MS. GRISET:**  Jill Griset for Wells -- for -- from

21  McGuire Woods for Wells Fargo.

22          **THE COURT:**  Thank you.

23      All right.  Well, we'll -- I have -- I have looked at most

24  of the discovery letters, but I'm not prepared to discuss the

25  other ones in -- at all or at least not in any detail, but

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  we'll -- we will start with the first one, the November 16th

2  one.

3      First of all, going somewhat backwards, I think you -- you

4  have agreed on an ESI protocol?

5              **MR. deVYVER:**  I beg your pardon?

6              **THE COURT:**  You have agreed on a ESI protocol?

7              **MR. deVYVER:**  No, ma'am.

8                      (Simultaneous colloquy.)

9              **MR. LOPEZ:**  -- agreed on some parameters, but we've

10  not --

11              **THE COURT:**  Parameters for it.

12              **MR. deVYVER:**  Yes, ma'am.

13              **THE COURT:**  All right.  And --

14              **MR. LOPEZ:**  Yes, Your Honor.  That's still an

15  outstanding issue, and that's a very important one eleven

16  months into this case.

17                      (Off-the-record discussion.)

18              **MS. GRISET:**  We did -- This is Jill.  We did agree to

19  a form of production, and we -- we have a document that we've

20  agreed to that's got, you know, the format for production

21  and --

22                      (Off-the-record discussion.)

23              **MS. GRISET:**  -- the -- just, you know, of how we

24  would produce documents.

25              **THE COURT:**  Right.  I mean, I agree, it didn't go

1    into -- it was contemplating further meeting and conferring on

2    things like search terms or custodians or things of that

3    nature.  But you had the ESI liaison, so I believe -- for

4    example, and, you know, I thought --

5            **MS. GRISET:**  That's right.

6            **THE COURT:**  -- in general, it was a positive

7    development.  I just asked my law clerk.  I think it's still

8    in chambers.  I noticed what may or may not be a typo, so I

9    was just going to ask you that while you're here.  If we

10   have -- It would have a slight impact on the meaning.

11       It was one of the paragraphs pretty far in, along the

12   lines of we agree on the search and then if the initial search

13   reveals some basis for wanting more, we'll address that.

14   And -- And I think there was a word in there of

15   "discussing" -- but I'll -- once I see it, I want to see if

16   that's --

17           **MR. deVYVER:**  Yeah, that's not -- I mean, the issue

18   we raised in our letter, Your Honor, is really not even being

19   able to get out of the blocks.

20           **THE COURT:**  Okay.  But I don't want -- I'm not --

21           **MR. deVYVER:**  Okay.

22           **THE COURT:**  I'm -- I'm a one-thing-at-a-time person.

23           **MR. deVYVER:**  Okay.

24           **THE COURT:**  Okay?  And --

25       So let me just address this so I can get something done.

1    So -- All right.  Yeah.  Just so you know, page 3

2  paragraph 4B, it has, "If a final search protocol has been

3  agreed to and executed, a requesting party may later in good

4  faith seek to expand the scope of the search if new

5  information is discovered 'discussing' that information may

6  have been missed by the search terms."

7    I mention the word "discussing" is what you meant -- you

8  might have -- it may be a typo for "disclosing" or something.

9  I just want to -- that's a pretty minor point, but if there

10  became a controversy later, I think you'd want it to be clear.

11    It could be "discussing," but that seems like a little bit

12  of a strange formulation, so "if new information is

13  discovered, discussing that information may have been missed

14  by the search terms," well, so maybe you meant "disclosing"

15  or -- or some or similar word.

16         **MR. deVYVER:**  I'm not sure, Your Honor.  Ms. Griset,

17  who is -- is my partner at McGuire Woods, she is Wells Fargo's

18  national discovery counsel, and she was our ESI liaison --

19         **THE COURT:**  Okay.

20         **MR. deVYVER:**  -- so she may be the best person suited

21  to talk about --

22         **THE COURT:**  All right.  So just -- if you would, let

23  us know and send a revised one if that is wrong.  If it's

24  right, it's okay.  I'm just not quite sure what it means, and

25  if I had to adjudicate some dispute over that, I might have

1  trouble.

2          **MR. deVYVER:**  Understood, Your Honor.

3          **MS. GRISET:**  It does sound -- It sounds like a typo

4  to me.  We'll look at that.

5          **THE COURT:**  Right.  It think it sounds like one of

6  those auto-correct things.

7          **MR. deVYVER:**  Yeah --

8          **MS. GRISET:**  Yeah.

9          **THE COURT:**  -- that I am constantly victimized by

10  and -- and hate.

11      All right.  So yes, it isn't substantive, but it's -- it's

12  a good start.  I mean, I'm glad to see that, so -- I don't

13  think -- you haven't really -- you've just said that there

14  was -- I mean, originally you were saying that Wells Fargo

15  wouldn't even meet and confer in a meaningful way 'cause you

16  didn't see that there was going to be much in discovery.

17      So this certainly is a good -- I don't know if I'd even

18  call it a first step -- it's a little more than a first step,

19  but it's obviously not -- nowhere near getting there all the

20  way.

21      But I think -- and, of course, you should -- you have to

22  confer on the meet-and-confer checklist.  Now, maybe that's

23  what led to this, but that is a requirement of the court.

24          **MR. LOPEZ:**  Yes, Your Honor.  That has not happened.

25  I think Wells Fargo's taken the position numerous times that

1    this is not an ESI case, which is a very --

2         THE COURT:  Okay.  Well, there's no case that's not

3    an ESI case just about, other than, like, Social Security

4    records cases or something, so I -- I am not at all convinced

5    by that.

6         MR. LOPEZ:  Yeah.  And --

7         THE COURT:  So --

8         MR. LOPEZ:  And it's also very perplexing because the

9    information that has been produced so far has been in an ESI

10   format.

11        THE COURT:  Yeah.  Yeah.  No, that's a -- that's a --

12   that objection is a complete total non-starter, so --

13        MR. LOPEZ:  Yeah.

14        THE COURT:  But it seems like you've gotten past that

15   and that you have now a stipulation concerning production of

16   ESI.

17        MR. deVYVER:  Yes.

18        MR. LOPEZ:  But that's --

19        THE COURT:  So --

20        MR. deVYVER:  The --

21        THE COURT:  Go ahead.

22        MR. LOPEZ:  I'm sorry, Your Honor.

23        MR. deVYVER:  Your Honor, the issue has been -- it's

24   not whether this is an ESI case or not, 'cause as Your Honor

25   correctly points out, every case in today's age is an ESI

1   case.  The question is whether it's an email case.

2       And so when we got on the very first meet-and-confer

3   call -- and -- and if Your Honor has the letter -- you know,

4   if you look at footnote 9 of the letter -- well, when we got

5   on the very first call --

6           **THE COURT:**  I see -- I'm sorry.  Let me --

7           **MR. deVYVER:**  Yes, ma'am.  It would be on the

8   November 16th letter, footnote 9.

9           **THE COURT:**  Okay.  Let me get it in front of me.

10                  (Pause in the proceedings.)

11          **THE COURT:**  Okay.

12          **MR. deVYVER:**  So really, Your Honor, the -- the

13  disagreement between the parties, I think, is when we got on

14  the very first call, the position the plaintiffs' counsel took

15  was we'd like to know those things in -- in number 9 for every

16  part of the banks, for every line of business, for every

17  person from the -- the person who's in the call center in

18  India to --

19          **THE COURT:**  Right.  And that's drastically overbroad,

20  I agree with that.

21          **MR. deVYVER:**  Yes, ma'am.

22      And so what we did is we took the approach that of course

23  you get ESI.  And so we have produced policies and procedures.

24  Of course, we have.

25      And we have produced the plaintiffs' loan files, to the

extent we have them.  I would, you know, remind the court only that this is a case where really the issue is one of denied credit, not one of -- where people had credit relationships for the most part, so there was not a lot there.  And so if you see in the ESI letter, we say there on -- on page 5, we've never taken the position that we won't do ESI.  We don't want to talk about ESI.  We're not willing to have those discussions.

But what you have are the plaintiffs who have gone to Wells Fargo and requested credit from the bank, right?  And so is the extent to which we have any documents for these plaintiffs, we have searched for them, and we have produced them, which would be the loan files.

To the extent that there are policies and procedures that relate to these three lines of business -- and, of course, we'll talk about that with Your Honor -- we've produced those.  And we recognize those things.  And that is ESI in the sense that we are talking about it.

But what they have been urging from the very beginning is everybody's email in the bank has to be searched.  Everybody's who's in the student lending group, which we refer to as EFS, you got to search their email.

What -- The parties have been at odds at, Your Honor, is what is the connection between the kinds of things that they are asking for -- does -- does a particular person use text

1  message, what does it have to really do with the contours of

2  our case?

3      And so what we explained was, why don't you let us produce

4  the loan files, which we've done.  Let us produce the policies

5  and procedures.  We are glad to have this continued dialogue

6  with you.  But the idea that we would -- and this is what

7  they've asked of us -- go to every line of business in the

8  bank and find all of those things in footnote 9, it doesn't

9  make any sense.

10          **THE COURT:**  Okay.

11          **MR. deVYVER:**  Right?  What hard drive that that

12  customer service rep uses or where we store offsite ESI, that

13  has been the tenor of the conservations.  We don't think it's

14  appropriate.

15      And so I don't know if Jill -- Ms. Griset, who is our ESI

16  liaison -- whether, Jill, you want to add anything.

17          **MS. GRISET:**  Yeah, the -- the only thing I would add,

18  Your Honor, is that when -- when we had these discussions and

19  they were asking what databases we have that hold information,

20  I mean, Wells Fargo -- when I go to Wells Fargo and ask them

21  what databases they have, they'll say for which product line?

22      And I'll say, well, okay, home mortgage.  Well, is it an

23  equity line, 'cause that's a different -- a whole set of

24  different symptoms.  Is it a HAMP loan, 'cause there's a whole

25  set of systems that deal with that.  Is it -- Is it credit

card, 'cause there's a whole different system for that, so for me to walk into -- into a meeting like this and to say, okay, be prepared to talk about every database that could possibly in scope, I mean, that is where we were pushing back and saying we really need to limit it to the product at issue -- figure that out, what are the products at issue, and then we can walk through and have more discussions with you.

And as far as email being out of scope, you know, as Issac said, you know, email is another one where, okay, what -- what -- where do people keep email?  Well, it depends on the person.  Which custodians are we talking about?  Some custodians are journals, on journaling systems.  Some aren't. I have to do a research request for the particular people, find out what they have, where they're allowed to say the amount, and then we can talk about it.

But when we're just kind of talking in a vacuum about a company with over 260,000 employees and thousands of systems and product lines, we can't -- we can't -- really can't give that information without narrowing the scope.

        **THE COURT:**  All right.

        **MR. deVYVER:**  And all I would add is, you know, we've produced the policies and procedures.  Just like I said in the letter, I'm glad to talk to the other side.  I've not heard from them, but I'm glad to have those discussions.

        **THE COURT:**  All right.  Well, so let's -- I think --

```
1                    (Simultaneous colloquy.)

2         THE COURT:  I'll hear from you in a second, but I --

3    let me speak, please.

4         I -- I think that the scope of what needs to be disclosed

5    ultimately about the way electronic data is kept does depend

6    on the scope of discovery substantively that we -- is the

7    first two issues, so I think we should address those first,

8    and then it's going to be commensurate with that.

9         And in general, let me say that in -- usually -- I'm not

10   saying in every -- every aspect of this case, but often what

11   I'm going to be in favor of is start -- a starting point then

12   you see what you get, and then there may be a basis for more,

13   there may not.

14        But -- In other words, you know, if we -- if it -- if

15   we -- we're going to discuss the scope of which lines of

16   business -- for example, one of your disputes -- discovery on

17   them and what.  And then that should help guide where the

18   ESI -- what -- what is the relevant ESI, where is it kept, who

19   are the custodians and/or the systems or the databases,

20   et cetera, should flow from that.

21        MR. LOPEZ:  Your Honor, I just want to make sure I

22   draw a distinction between substantive discovery issues and

23   the Northern District's guidelines on meeting and conferring

24   with respect to ESI.

25        We can't even assess -- and I think it's very unfair for
```

1  Wells Fargo to come in here and talk about burden when they

2  haven't even given us the information to allow us to have a

3  conversation with respect to burden.

4      And so -- Wells Fargo stated numerous sometimes that this

5  is not an ESI case.

6      All we are asking is to follow the Northern District's

7  guidelines with respect to the meet-and-confer process.  And

8  we understand that down the line, there may be some disputes

9  with respect to whether certain things are discoverable, but

10  you can't have a conversation about burden if you don't know

11  what you don't know.

12      **THE COURT:**  Well, I mean, there's -- there's -- I

13  mean, we're -- we're talking about a chicken-and-egg problem,

14  and I think some of that's true and some of it's not.

15      I don't know if you're aware that I was the chair of that

16  committee that developed these things, so --

17      **MR. LOPEZ:**  Okay.

18      **THE COURT:**  -- I feel as if I know what they are and

19  I know what we meant.  Maybe you don't know what we meant by

20  them, but I do.

21      And so what -- and -- and they're, I think, very careful

22  to be saying not one size fits all, and the scope of your

23  discussion and what you need to know in what detail about

24  databases does depend on substantively what are you trying to

25  find out.

1      So I mean, if there were things like -- I don't know --

2   the kinds of credit that plaintiffs would never ever in a

3   million years apply for -- and then nothing comes to mind

4   right now.  I don't know what that would be, but -- maybe to

5   build a factory in Russia or something.  I don't know.  But

6   I'm just trying to think of something.  Or go to Mars.  I

7   don't know.  But you wouldn't need to know what the ESI is

8   that would address that subject, so --

9           **MR. LOPEZ:**  Right.

10          **THE COURT:**  That's just to give an extreme example,

11  but let's -- let's start back now with the disputes that

12  you're talking about in -- in order.

13      So the scope of class discovery.  I think a -- a good

14  starting point is the divisions -- I understand there were two

15  divisions that handle the type of loans that the named

16  plaintiffs applied and were rejected for, one being personal

17  loan and credit and the second one small business credit.  Is

18  that correct?  Those are the two divisions?

19          **MR. deVYVER:**  And then the third one would be student

20  loans or what we would call EFS.

21          **THE COURT:**  Student loans.

22          **MR. deVYVER:**  So it was -- it was three, card --

23  credit card, I don't -- and we sort of shorthand refer to as

24  card -- business direct, which is small business, and then

25  student.

1    **MR. LOPEZ:** And, again, Your Honor, the division

2  classification is still unclear based on the information we

3  have, because we know, for instance, that Educational

4  Financial Service is a subset of private alternative loans, so

5  there's different structures there, and we're not able to get

6  a handle on that without the information that we've asked for.

7      And that sort of anticipates the next question. I know

8  you don't want to go there. But I'm just saying that even

9  having this preliminary discussion requires some basic

10  information that just hasn't been provided -- provided to us.

11     **THE COURT:** Okay. So I am left in the fog because

12  I've heard these divisions described differently and the names

13  differently and so forth, but I -- I think my --

14     **MR. LOPEZ:** And we're in a fog, too. That's why we

15  requested it --

16     **THE COURT:** Okay. Okay. I'm going to take a recess

17  for five minutes. I cannot be interrupted and --

18     **MR. LOPEZ:** I'm sorry.

19     **THE COURT:** -- not able to complete my thoughts --

20     **MR. LOPEZ:** I apologize.

21     **THE COURT:** -- so just -- you can calm down.

22      (Recess taken at 2:35 P.M.; proceedings resumed at 2:41

23  P.M.)

24     **THE COURT:** -- specifically and let me express my

25  thoughts without interruption and try to go through them

1    rather than have overarching, what -- what -- I mean, they

2    won't do what I want them to do, they're not doing enough,

3    they're doing too little, this is wrong.  That doesn't -- I

4    can't decide things that way.  So it has to be -- we have to

5    go through actual nitty-gritty.  And that's going to take a

6    long time.  We're already -- used up a lot of time without

7    actually achieving anything, so let's try to be specific here.

8         So what I was trying to get at is that, okay.  I

9    understand the types of -- I think the specific types of loans

10   the plaintiff applied for were credit card, student loan, and

11   then I think you called it business direct?

12             **MR. deVYVER:**  Yes, ma'am.

13             **THE COURT:**  Okay.  And I don't know what business

14   direct really means.

15             **MR. deVYVER:**  It would be small -- small business

16   line.

17             **THE COURT:**  Okay.  And then what I was trying to get

18   at is those are housed, as I understand it, in I think two

19   divisions of Wells Fargo.  But maybe more that they -- in

20   other words are part of -- in the organizational structure

21   those loans come under certain divisions.

22        Is that true or not true?  Or are they their own

23   stand-alone divisions?

24             **MR. deVYVER:**  It's -- to the best of my knowledge,

25   they are their own stand-alone divisions.  I mean, business

1    direct may be under something, but I'm -- I was pretty certain

2    that card and EFS were stand-alone, but -- but, Your Honor,

3    I'm not positive.

4         **THE COURT:**  Okay.  All right.

5         So I -- I guess what I'm trying to get at is I think

6    obviously discovery on those three types of loans is -- is

7    directly relevant as it pertains to -- and then I need to get

8    to --

9         What -- what -- how are you classifying the plaintiffs?

10   Now, as I understand it, they're all DACA people; that is to

11   say, they're -- they were given the deferred action?

12        **MR. LOPEZ:**  Our class is comprised of --

13        **THE COURT:**  Well, not the class, but the named

14   plaintiffs.  What are they?

15        **MR. LOPEZ:**  The named plaintiffs are DACA's --

16        **THE COURT:**  Okay.  So deferred action.

17        And what the plaintiffs have pointed out, they're not sure

18   how Wells Fargo classifies them.  As a -- foreign nationals?

19   As undocumented, whatever or -- or what?

20        **MR. deVYVER:**  So if -- if you -- if you go through

21   the policies, what you'll see is -- is that there's some

22   reference to DACA, so, for instance, for the student lending

23   or EFS policy there was --

24        **THE CLERK:**  Forgive the interruption.  Can you speak

25   directly into the microphone, sir.

1          MR. deVYVER:  I'm sorry.

2          THE COURT:  Either -- Yes, the podium is fine.

3          MR. deVYVER:  So, Your Honor, it's going to depend.

4    So some of the policies are going to refer to -- student

5    lending in particular will specifically refer to DACA

6    participants.  And then the other two policies will really --

7    they'll either refer to it as either undocumented or really

8    more likely non-resident alien.

9          THE COURT:  Okay.

10         MR. deVYVER:  And so --

11         THE COURT:  But not as foreign nationals.

12         MR. deVYVER:  No, ma'am.

13    May I -- There's sort of three buckets that Wells

14    Fargo's -- that these three policies really -- people who are

15    not U.S. citizens fall into three buckets.  There are

16    permanent resident aliens.  So think green card.  There are

17    foreign nationals.  Think student visa.  And then there are

18    either DACA or non-resident aliens.  And so those are sort of

19    the three buckets of non-U.S. citizens.

20         THE COURT:  And are DACA and non-resident aliens used

21    interchangeably?

22         MR. deVYVER:  Your Honor, no -- yes and no.

23    Because -- because the different lines of business set their

24    own credit policies, right, they -- they don't use,

25    unfortunately, the same terminology for everything.

1     But as -- as you sort of comb through policy, that is the

2     conclusion that you -- you reach.

3          **THE COURT:**  'cause -- When you say "foreign

4     nationals" are the student loan category, but there could be

5     DACA people.  And if they're not foreign nationals, they still

6     could get student loans potentially unless Wells Fargo doesn't

7     give them because they're DACA.

8          **MR. deVYVER:**  Wells Fargo does not offer student

9     loans to DACA participants.

10          **THE COURT:**  Okay.

11          **MR. deVYVER:**  Right?

12     It does offer the other two lines of credit to DACA

13     participants, but not student loans.

14          **THE COURT:**  Okay.  So --

15          **MR. deVYVER:**  And --

16          **THE COURT:**  So -- And the other -- the other -- okay.

17     And the other two lines being the card and the business

18     direct?

19          **MR. deVYVER:**  Yes, ma'am.  The -- The one thing that

20     is consistent throughout is Wells Fargo does use the term

21     "foreign national" consistently throughout the three policies.

22          **THE COURT:**  Okay.  And -- but that is not applicable

23     to the plaintiffs.

24          **MR. deVYVER:**  No ma'am.  That would be -- A foreign

25     national -- like I said, that would be, like, a student visa.

1    It's someone who can stay in the country but only temporarily.

2        It's sort of -- the way I think of it is permanent

3    residence alien is someone who's not a U.S. citizen but has

4    the right to stay here long term.

5        A foreign national is not a U.S. citizen but has a limited

6    term for how long they can stay.

7        And student visa is the most common one, Your Honor,

8    because, you know, someone will be here to go to medical

9    school or --

10       And then the last one would be DACA or non-resident alien,

11   and those are individuals who have no right to stay in the

12   country.

13           **THE COURT:**  So -- And they can get -- they can't get

14   student loans, but they could potentially get --

15           **MR. deVYVER:**  Secured credit cards.

16           **THE COURT:**  Secured credit cards only, not the

17   business direct.

18           **MR. deVYVER:**  Well, business direct is -- so business

19   direct is not set up in terms of -- of -- sort of based on

20   necessarily on these criteria -- what I mean by that -- I'm

21   sorry.  I don't mean to -- it's a little tricky.

22       So business direct is -- is set up by, are you a

23   foreign-owned business, right?  So if you were a foreign-owned

24   business, Wells Fargo will not lend to a foreign-owned

25   business.

 1          And that is really related to ideas of -- so U.S.A.

 2     Patriot Act stuff, Your Honor, right?  The bank is not allowed

 3     by federal regulations to lend to certain foreign entities.

 4          **THE COURT:**  And "foreign-owned" means, what?  That

 5     foreigners own it?  Or the foreign government owns it?  Or

 6     both?

 7          **MR. deVYVER:**  If you are a non-U.S. citizen and you

 8     own a certain stakehold in a foreign-owned business --

 9          **THE COURT:**  Um-hmm.

10          **MR. deVYVER:**  -- or in a business, it will transform

11     it into a foreign-owned business, so --

12          **THE COURT:**  A majority?  Or even minority.

13          **MR. deVYVER:**  I believe it's up to 24 percent.

14          **THE COURT:**  Okay.

15          **MR. deVYVER:**  So once I think -- I believe it's once

16     you hit that 25 percent threshold, you would then become a

17     foreign-owned business.  And -- And I -- you know, forgive me.

18     I've read the policies and talked to the bank.  I don't

19     purport to be an expert.  But I'm sort of giving Your Honor my

20     understanding.

21          **THE COURT:**  Um-hmm.  Um-hmm.  All right.

22          And let me ask the plaintiffs but -- succinctly and

23     briefly, what -- what other types of loans than the ones that

24     plaintiffs -- named plaintiffs actually applied for do you

25     think are -- and I don't want the answer "every."  You may

1    think "every," but what other types of loans -- let's say

2    you've got to pick two, three, four, five -- are of the most

3    interest to you?

4         **MR. LOPEZ:**  Your Honor, we don't know what other

5    products they have.

6         **THE COURT:**  Well, that -- I mean, you can go on a

7    website and find out what they have.  What -- For example, we

8    know they have --

9         **MR. LOPEZ:**  We --

10        **THE COURT:**  We know -- That's just not completely

11   true.  You don't know everything that they have

12   comprehensively.

13        **MR. LOPEZ:**  Right.

14        **THE COURT:**  But actually there's a lot of public

15   information about what they have.  But thinking about what

16   most -- I mean, there could be all sorts of exotic loans that

17   very few people in the world ever apply for.

18        **MR. LOPEZ:**  Yeah.

19        **THE COURT:**  But then there could be kinds of loans

20   that ordinary people apply for a lot.  Take auto loans.

21        **MR. LOPEZ:**  What we --

22        **THE COURT:**  That seems to me may be the most obvious.

23     But I'm asking you if you had to prioritize as a starting

24   point, and it could be the ending point or it might not be, to

25   see whether there's any similarities to test with a few other

1  types of loans, what would you pick?

2      **MR. LOPEZ:**  Mortgage loans, auto loans.

3      **THE COURT:**  Um-hmm.

4      **MR. LOPEZ:**  Because I think those are on the website

5  and discussed on the website.

6      **THE COURT:**  Right.

7          (Simultaneous colloquy.)

8      **THE COURT:**  All right.  And because it seems to me

9  that -- although I -- I think that -- I'm not going to be

10  deciding whether there's class certification and if there is,

11  what the scope of the class is.

12    Ninth Circuit precedent is fairly -- fairly liberal in

13  terms of the scope of discovery to -- to -- if it's shown to

14  be likely to lead to establishment of a class, so I'm inclined

15  to allow the plaintiff a little more latitude than strictly

16  the information about the three types of loans that they

17  applied for.

18    On the other hand, I'm not at all inclined to open the

19  door, at least at this point without a better showing, which I

20  don't think there is, to discovery of every type of loan

21  that's ever made, like, you know, large-scale commercial real

22  estate development, for example, which I think none of the

23  plaintiffs would probably be able to be a class of.

24    But in any event, I don't think we need to get there.  So

25  I think that it -- it may be -- it may be that there's some

1  reason to allow some discovery, for example, of those two type

2  of loans, mortgage loans.

3      Now, again, I don't know -- you know you're probably going

4  to say, I could imagine, there's jumbo loans.  There's, you

5  know, buying multi-unit apartment buildings versus, you know,

6  where you're going to live in one unit versus there's, you

7  know, single-family dwellings, or whatever.

8      So, you know, exactly what -- what that should be, I don't

9  know.  But it seems to me -- and auto loans, I think is a --

10  pretty obviously the type of one that -- even students

11  sometimes need cars to get to school.  And, you know,

12  people -- that -- the plaintiffs, you know -- and there is

13  this whole issue -- I mean, nobody raised this, but there --

14  at least last I knew -- even if they didn't try to get

15  something, they could have been deterred from trying to get

16  it.

17      And I would think -- you know, you could say, well, Wells

18  Fargo wouldn't even give me a loan for, you know, a student or

19  a credit card, why should I bother applying with them for an

20  auto loan.  So I think -- I think there could be some reason

21  to allow some additional discovery of other types of loans,

22  and those are the kinds that I have in mind.

23          **MR. deVYVER:**  May I --

24      So I guess what I would ask the court to indulge, if Your

25  Honor's going to order that, would be I would ask that it

1    be -- 'cause you've -- you've put your finger on the problem

2    with mortgage.  So there's FHA mortgages, VA mortgages, jumbo

3    mortgages, HELOC's, so what we proposed when Your Honor said

4    what would be next, we proposed something that would be called

5    personal lines of loans, which is sort of if you went to go

6    and get a personal loan.  And those are with secured or

7    unsecured products.

8            THE COURT:  And what are personal loans?

9            MR. deVYVER:  It'd be literally like if you went to

10   the bank and said, I'd like to get a personal loan for $5,000

11   to -- and it would be sort of non-specific.  Maybe you might

12   get it to pay your bills.

13           THE COURT:  Well, I think that -- that is another

14   category I would agree with.  But I'm also thinking -- and I

15   think that is a good one.  But it could also be -- I think I

16   would be inclined to expand it a little bit, as I say, auto

17   loans, for example.

18           MR. deVYVER:  So auto would be --

19           THE COURT:  And -- And then maybe some set -- subset

20   of mortgage loans.

21           MR. deVYVER:  Auto was going to be my other

22   suggestion, for that reason.  And mortgage if -- I mean,

23   obviously, we don't think it should be broader.  But if it is

24   going to be -- if we could at least put a bracket on the

25   mortgage component.

1            **THE COURT:** Right.

2            **MR. deVYVER:** You know, residential mortgages

3 below -- you know, I think jumbo is 500,000, something like

4 that.

5            **THE COURT:** I mean, I would think something like

6 that. Of course, California, that barely gets a hovel, but --

7 you know, might buy something where you're from. I don't

8 know.

9            **MR. deVYVER:** You get a lot in Pittsburgh.

10            **THE COURT:** Wherever that is, but -- so I mean, this

11 is the kind of thing that I'm talking about. And, again, it

12 would be -- if, you know, then you found, you know, that in

13 the policy, it says, and we want to treat these exactly the

14 way we treat student loans and this and that, which I doubt,

15 you know, that might open the door to more.

16        And on the other hand, you might not find anything more

17 but I -- I think these would be probably the most relevant

18 types of loans to the type of plaintiff you're talking about.

19            **MR. LOPEZ:** Your Honor --

20            **THE COURT:** Or that you have.

21            **MR. LOPEZ:** Again, back to -- well, we -- we also

22 have an organizational plaintiff, LULAC.

23            **THE COURT:** True.

24            **MR. LOPEZ:** And so, you know, our class is defined as

25 U.S. -- non-U.S. citizens and is not limited to DACA

1    recipients, so that would include individuals who are on

2    temporary protective status, individuals who are on U visas,

3    and -- and arguably, they would have a applied for a variety

4    of products at Wells Fargo --

5         **THE COURT:**  Well, you know, but the problem is you're

6    coming in here -- you should know.  I mean, LULAC should have

7    told you.  They should have done some research and be saying,

8    you know, our membership or the people that we try to

9    represent -- there may not members -- they're really hurt by

10   this.  Not arguably, they may have applied.  Well, anybody may

11   have applied for anything.

12        We're now talking about you have the burden of showing

13   something is likely to lead to relevant class -- to a class

14   cert under *Manta Lead* and now under the 2015 rules amendments

15   also, there's proportional now -- you know, a fair amount of

16   discovery could potentially be proportional, but it's -- its

17   got to be relevant and likely to lead.

18        And so to just say, well, LULAC maybe they did this or

19   that, that's not good enough.  They -- maybe some of them

20   wanted to buy an airplane or, you know, a fleet of airplanes,

21   but we don't know anything about that.

22        **MR. LOPEZ:**  Well, let me -- let me just say, Your

23   Honor, what Mr. deVyver explained is not necessarily the

24   documents that have been produced.

25        So Exhibit 1 to -- to defendants supplemental briefing is

1  all we really have with respect to what Mr. deVyver said.  And

2  as we explained in our papers, you know, the whole issue of

3  undocumented alien and foreign national is still very

4  ambiguous based on the information that they've provided us.

5  And that really, I think, is enough to suggest an inference

6  that the policies with respect to foreign nationals and

7  undocumented aliens potentially cover the class as has been

8  defined in this case.

9  **THE COURT:**  Well, I'm not sure that "potentially" and

10  "suggest" and all those things are enough to meet your burden,

11  first of all.

12  But I -- I -- Well, let me -- let me start with this.  I

13  know it's really the core of issue No. 4 -- or letter No. 4,

14  which deals with the redactions, but --

15  **MR. LOPEZ:**  Yes.

16  **THE COURT:**  -- I do not think redactions based on

17  relevance are -- I don't permit them.  I won't permit them.

18  All of -- And looking at what you did produce for me after the

19  court asked for it, 1 through 9, they're much to heavily

20  redacted.

21  So the only thing -- redactions would be for truly

22  privileged information, not irrelevant information.  There's a

23  protective order in place in this.  So all of these things

24  have to be unredacted, and -- if you have something in -- and

25  I don't think any of these policies, there could possibly be

1   an attorney-client privilege or work product, I don't think

2   because you're disseminating them in the company to be used.

3   But you obviously have to have a privilege log for

4   anything that you're not producing.  But I won't allow all

5   those redactions, and they need to be fixed right away.

6   **MR. deVYVER:**  Understood.

7   **THE COURT:**  I could -- I could barely read them

8   myself.

9   **MR. deVYVER:**  Understood.

10  **THE COURT:**  So -- So that might eliminate or reduce

11  some of the confusion.  But I do think, you know, there has to

12  be more clarity -- I agree with that -- of what the plaintiffs

13  are saying.  I mean, that's what I been trying to ask you

14  about, is trying to understand the difference between these

15  different definitions and what they apply to where.

16  But I -- what I'm trying to get and I'm -- I'm feeling --

17  I'm trying explain to you how I would go about it, and I'm

18  giving you examples of additional things you could get.  And,

19  instead, I'm just hearing, well, we still don't understand

20  anything, or arguably this.

21  And so we're not -- we're not making progress on getting

22  concrete.  I'm offering you more things.  And, instead, you're

23  telling me, well, I still don't know anything.

24  **MR. LOPEZ:**  Um-hmm.  Well --

25  **THE COURT:**  So -- Or I still want everything.  Well,

1    I'm not going to give you everything for --

2           **MR. LOPEZ:** I understand, Your Honor.

3           **THE COURT:** -- for reasons that you haven't met your

4    burden, and also because I think we should phase it and start

5    with the things that are more core. And then if there's good

6    reason to go further, then we should do that.

7           **MR. LOPEZ:** Thank you, Your Honor. No, I appreciate

8    that.

9           **THE COURT:** So --

10           **MR. deVYVER:** Your Honor, it's very -- I mean, I am

11    glad to walk through the policies, and I have -- I've even

12    written down the Bates numbers to sort of explain -- I guess

13    where we're coming -- and it sounds like Your Honor's made her

14    mind up, but if I could indulge for just a second, the way

15    that the -- the -- the three categories of -- of non-U.S.

16    citizens, the ones that I've talked about, are treated is very

17    different among the business lines, and so --

18           **THE COURT:** All right.

19           **MR. deVYVER:** I guess at its core, the way --

20           **THE COURT:** Well, I know that's your argument, and I

21    just think they get to test it a little bit more.

22           **MR. deVYVER:** Well, I -- I guess at its core, Your

23    Honor, the way I think about is it, if you -- if you take one

24    of the named plaintiffs, if you take Mitzie Perez, who was the

25    very first named plaintiff. If she came to Your Honor and she

said, Your Honor, I would like to sue Wells Fargo because I
think that their mortgage policies are discriminatory and they
discriminate against me and then you said to Ms. Perez, did
you get a mortgage loan?  And she said no, you would throw her
out because -- because she wouldn't have standing.

I think that that standing --

**THE COURT:**  That's not right.

**MR. deVYVER:**  Well, sure, she doesn't -- she couldn't
have -- if she never sought a mortgage, she can't sue Wells
Fargo --

**THE COURT:**  Oh, if she never sought it.

**MR. deVYVER:**  Yes, ma'am.

**THE COURT:**  But -- but, look --

**MR. deVYVER:**  And so that -- that standing
requirement is embedded in the typicality --

**THE COURT:**  Okay.  Well, there is a circularity.
I've dealt with this with other cases, including just
recently, between the standing issues and class cert, and it's
not as black and white as you're saying at all.

And there is authority for deferring the standing issue
until after you've reached the class cert.  And Judge Chen has
a very erudite opinion about that in which he goes through a
lot of Ninth Circuit authority and I just happen to have been
dealing with that in other cases, so I'm actually very, you
might think wrong, but very steeped some of these very

1  complicated issues.

2      But I was getting back to a practical matter of talking

3  about how are we going to solve this conundrum here about --

4  where you have so many disputes and your papering this with

5  letters of dispute every single day, and I'm trying to give

6  you some guidance and have a fair, I think, you know,

7  you're -- Wells Fargo is doing a little too much stonewalling

8  but the plaintiff is -- is not -- is asking for overbroad

9  things and not making a sufficiently precise showing.

10     And so I'm trying to -- with both of those unhelpful

11 positions, I'm trying to come up with something that makes

12 sense, so --

13         **MR. deVYVER:**  Understood.

14         **THE COURT:**  So I think that the plaintiffs in this

15 case were -- did apply for loans and were turned down,

16 correct?

17         **MR. deVYVER:**  Yes, ma'am.

18         **THE COURT:**  Okay.  So that hypothetical that what if

19 somebody came and hadn't even applied is not here.

20     But there is such a thing, I believe, under Ninth Circuit

21 law but it's highly relevant right now but there -- but it

22 could be, which is if you're deterred from applying, for

23 example, you've already been turned down for other things, you

24 might say, well, what's the point of applying for an auto

25 loan, for example, so I'm not sure how -- nobody really

1  briefed that, but it is a doctrine that, at least in the past,

2  been adopted.

3      So I would like to see you all have a more productive

4  discussion about, first of all, lowering the redactions,

5  figuring out -- and I asked you about this, you know, a --

6  a -- and I think it would an sample.  It wouldn't be just by

7  declaration -- by actual document production of some of -- of

8  auto loans, of some homeowner -- like we discussed on -- and I

9  guess, you know, relatedly, there's the organizational

10  charts -- I mean, again, I don't think you need organizational

11  charts, for example, for, you know, large-scale commercial

12  real estate development.  That's -- never heard any basis for

13  that.

14      But -- but for the lines we're talking about, how do these

15  fit within the organization above?  You know, what are the

16  lines of authority going all the way up and down to them?  I

17  think there's -- that's a good idea, to produce those, and

18  that couldn't possibly, for the relevant period, be very

19  burdensome.  Organizational charts with names,

20  responsibilities.  You know, what would be the burden for

21  those?

22          MR. deVYVER:  Our issue with it is it's -- well, if

23  you limit it to those -- just those three lines.

24          THE COURT:  Well, those three lines, but also the

25  ones I'm talking about now that would be auto and some

```
 1    mortgage.
 2            MR. deVYVER:  The issue is, Your Honor, it's not
 3    going to tell them anything.  I mean, it will tell them who
 4    the head of marketing is or who the head of human resources
 5    is.
 6            THE COURT:  Well, they want to know that, and I think
 7    there's no harm to it and it gives them a better idea of how
 8    pieces fit together and as they said of, you know, how you
 9    talk about things, how it's organized, who -- who's in the
10    chain of command, who makes decision, how these apologies got
11    set.
12            MR. deVYVER:  Okay.
13            THE COURT:  So -- And it's -- it's of so -- it's of
14    some relevance and such little burden that I think it passes
15    muster.
16            MR. LOPEZ:  Your Honor, if I may?
17            THE COURT:  Um-hmm.
18            MR. LOPEZ:  I think you also mentioned personal loans
19    as another category.
20            THE COURT:  Yes, I did.  Right.  You're right.
21            MR. LOPEZ:  And I'm assuming that once we're able to
22    review the documents in unredacted form, we have -- we believe
23    we have a basis to come back to Your Honor --
24            THE COURT:  Yes.
25            MR. LOPEZ:  -- we would do so.
```

1         **THE COURT:** I mean, if there were a few things that

2 withheld from you and then you get them and they provide --

3 you may, yes.

4     What I would like to see is the parties both start to work

5 more productively together in the meet-and-confer. So I

6 think, you know, this shouldn't be that the court has to be

7 constantly dealing with, you know, all the possible disputes

8 in this.

9     And I'm trying to give you ideas about how I look at

10 things and how I would try to strike a balance and, again,

11 also doing things I think always with the -- without prejudice

12 to seeking more but without any guarantee that you will get

13 more either.

14         **MR. LOPEZ:** Right.

15         **THE COURT:** You know, that it's -- that's -- you find

16 out what you -- what -- what does the information you already

17 have show. I mean, I think with the redactions, it's very

18 hard to tell what -- what actually -- what you've already

19 produced shows, so I think unredacting it may help.

20     I do think, you know, if you're -- if you're talking about

21 scope again, I think you need to do some analysis of what, if

22 anything, the organizational plaintiff does add. But that

23 would require both looking at, you know, what additional

24 things they represent, but you on your side or the plaintiffs'

25 side would have to be looking at what really does impact

1     their -- the members or the people they purport to represent.

2         I mean, is it mainly low-income people?  Is it -- you

3     know, is it Marco Rubio?  I mean, who -- who are we talking

4     about?  You know, I mean, there's -- there's a range in the --

5     the community, but it's not -- you know, there's a -- some

6     things are going to be more important to that organization

7     than others.  And to what extent does that give them -- you

8     know, what -- you have to have the ability to not just invoke

9     them in general but more specifically.  You know, what's --

10    what's harmed there the people they represent?

11        So -- but, you know, given the division of labor that is

12    Judge Chesney who's going to decide this, I am reluctance to

13    too drastically curb class discovery to the point where it's a

14    self-fulfilling prophecy, whereas she might have had in mind,

15    you know, that she would be open to a larger class.

16        So I don't -- I don't want be strangled at birth because

17    of no discovery.  On the other hand, it's -- it's not an open

18    sesame just because you have purported class that you get

19    everything there, because you have to meet the proportionately

20    and the likelihood that it's going to lead to class cert.

21        And there is certainly some strength to the defendants'

22    argument that the end of the day, if the named plaintiffs only

23    have certain kind of loans, that's all you're going to get in

24    the end.  But that may or may not be true.

25        So it depends on common policy, and it does also depend on

1   what you really didn't brief, which is what does the

2   organizational plaintiff add, if anything.  And like I say,

3   does the doctrine of deterrence still apply.

4       But it may be that fighting over these things is not worth

5   it, if you -- you might all save money and time by instead

6   agreeing on doing certain things.

7              **MR. deVYVER:**  Understood.

8              **MR. LOPEZ:**  Thank you, Your Honor.

9              **THE COURT:**  So what -- I mean, that's the first

10  dispute and the fourth.  I -- No more redactions for

11  relevance, just for generally privileged information that goes

12  on a privilege log.

13      So what else is there to discuss?

14             **MR. LOPEZ:**  Your Honor, I think the second dispute

15  you -- you referred to is organizational --

16             **THE COURT:**  Right, and I think I'm saying -- yeah,

17  and I think I'm basically granting relief.  But I think that

18  what you have to do now I've told you that is you have to hash

19  out the nitty-gritty.

20      I -- I've defined -- we've talked about five lines of

21  business, I think, and the organizational charts that pertain

22  to those and on up from them, the pyramid essentially above

23  them.

24             **MR. deVYVER:**  Understand.

25             **MR. LOPEZ:**  If I may, Your Honor, I think it was six?

1          **THE COURT:**  Well, what I -- the three the plaintiffs

2     applied for, personal loans, mortgage, and auto.  Right?

3        Okay.  And then you should try to refine the mortgage

4     more.

5          **MR. LOPEZ:**  Thank you.

6          **THE COURT:**  So what else is there?

7          **MR. deVYVER:**  So we -- we've -- wrote a letter, and I

8     don't know if Your Honor was ready to take them up -- on the

9     plaintiffs' discovery responses.

10          **THE COURT:**  I don't think so, but let me just --

11          **MR. LOPEZ:**  I know we still have a ESI issue, Your

12     Honor.

13          **THE COURT:**  Well -- yeah, we discussed at the

14     beginning, so we better go back to that.  I mean, the ESI

15     issues, I can't -- I -- it's very unclear to me what it is

16     exactly that's being asked for.  I think you -- we've got

17     this -- the six lines, I guess, of business now, although we

18     haven't fully defined the mortgage one, so that puts some

19     brackets on the kind of ESI that you would need to know about.

20        So I'd say, things that are not related to those lines of

21     business, I don't think you do need to know about.

22          **MR. LOPEZ:**  Yes, Your Honor.  In Exhibit B we

23     attached a proposed order with respect to the dispute in the

24     issues.  And, again, I mean, I think there is --

25                    (Off-the-record discussion.)

 1          MR. LOPEZ:  -- an issue of, you know, substance to

 2     the ESI discovery.  But what we're basically asking for, Your

 3     Honor -- and I think, given your role in drafting the district

 4     guidelines, certainly our understanding is that a checklist

 5     was developed by the court for the parties with respect to

 6     ESI.  And, you know, we certainly would like an order

 7     requiring the parties to meet and confer with respect to the

 8     checklist.  We can't --

 9          THE COURT:  Do you have that order handy?  I don't

10     have it.

11          MR. LOPEZ:  Exhibit B to --

12               (Off-the-record discussion.)

13          MR. LOPEZ:  May I?

14               (Pause in the proceedings.)

15          MR. deVYVER:  I have one.  Thank you.  That's

16     something different.

17        I have one.  Thank you.

18          MR. LOPEZ:  You have that?

19               (Pause in the proceedings.)

20          THE COURT:  Well, I haven't gone through your request

21     for production --

22          MR. LOPEZ:  Right.

23          THE COURT:  -- so I don't -- I mean, some of them

24     struck me as probably very overbroad, so I wouldn't authorize

25     ESI discovery to overbroad requests for production.  So

1    there's a circularity problem here.

2         **MR. deVYVER:**  My issue with the order, Your Honor,

3    is -- I mean, if you -- if you have -- I don't know if

4    you're -- if Your Honor has the order, within two weeks, which

5    is the fourth line of the second paragraph, I'm to do all of

6    the things below, which is tell them every source of

7    information -- that's emails, text messages, mobile devices,

8    hard drives, shared directories, Wiki sites, websites.  Within

9    two weeks, I'm supposed to do all of that for apparently the

10   six lines of business and tell them whether it has information

11   that's responsive to discovery, as Your Honor pointed out,

12   some of which there's disputes of, and then provide that

13   information to them.

14       I mean, that's sort of the -- the problem we're having.

15   We're not against ESI obviously.  We've produced policies and

16   procedures.  We've produced the loan files.  It's the emails

17   issue, I think, is the big one.

18         **THE COURT:**  So the email -- number one, emails

19   systems including type, back-up, and archival processes?

20         **MR. deVYVER:**  Yeah, because -- look, we've asked

21   them, are there particular custodians you're looking for?

22   What -- What are you looking for?

23       And the answer has been, for student lending, it's

24   everyone.  So the idea that I would search everyone in student

25   lending for plaintiff Mitzie Perez will who was denied an

1  application -- and this is all the executive -- they've even

2  asked us to search lawyers -- to do all of those things, it

3  doesn't make any sense, because it's not connected to anything

4  in the case.

5  We have the loan files, they have the loan files.  The

6  policies and procedures, to the extent that those reference

7  email, or to the extent that those have any -- anything in

8  there, or I think with one of the loan files, we produced the

9  loan notes, if there's a specific person, I'm glad to have

10  that discussion.  But that's not what this order asks for.

11  **MR. LOPEZ:**  Your Honor, if I may.  You know, the --

12  the two weeks is really based on the fact that we're 11 months

13  into this case, and we don't believe that we've had a real

14  conversation with respect to what I believe the court expects

15  in terms of meet-and-confer on ESI.

16  We understand, again, that there may be differences with

17  respect to what's produced.  But what we're trying to do is

18  we're trying to establish a process where we talk about what

19  systems they have so we can --

20  **THE COURT:**  Okay.

21  **MR. LOPEZ:**  -- understand it.

22  **THE COURT:**  Yeah.  I mean, this order is for sources

23  of information.  It's not to go search those emails --

24  **MR. LOPEZ:**  Yes.

25  **THE COURT:**  -- for Mitzie Perez or anybody else, but

```
 1    it's -- they're trying to find out about sources.
 2             MR. deVYVER:  Well, it's --
 3             THE COURT:  But --
 4                     (Simultaneous colloquy.)
 5             THE COURT:  Okay.  You both just interrupted me at
 6    the same time --
 7                     (Simultaneous colloquy.)
 8             THE COURT:  -- so I guess you also interrupted each
 9    other, but --
10             MR. LOPEZ:  Sorry.
11             THE COURT:  It's a new low.
12        So -- I think -- I mean, some of this is pertinent, some
13    of it maybe isn't.  I -- for example, loan application
14    databases for the lines we talked about for the relevant
15    period, I think you should be disclosing information about
16    that.
17        Whether -- I guess I think the defendant has a point.  I
18    mean, it -- it may be that a few people -- it -- it may be
19    that decision-makers related to either the policies about
20    restricting lending, for example, to DACA people or others in
21    the putative class or -- and then actual decision-makers on
22    those loans, you might -- some of them to could become
23    custodians.  Some of them you might need to search their email
24    about, you know, whether they made decisions on these people
25    or something like that.
```

1    Others you wouldn't need to know about.  So everything

2    that they ever did with mobile devices for everybody in

3    these -- is -- is over -- is not necessary to know all those

4    things at this point.

5    So on the other hand, just having a general understanding

6    of these -- so it's -- it's an iterative process of both

7    understanding what the sources of information are, how they

8    kept, how they changed is also related to -- to what extent

9    are you going to be likely to go to any of those sources, and

10   is it to them a hundred percent or some subset.

11   So I think there's -- is some -- the defendant has a valid

12   point up to a point.  On the other hand, to just say no, we

13   won't do any of this is also really extreme.  And it's -- this

14   has a lot to do, too, with level of detail, so I mean, I think

15   that the guidelines -- for checklist, they -- I think we tried

16   to build in a strong dollop of common sense so you -- you

17   know, you would not need to know every single detail about

18   every email system they had during this entire period for all

19   six lines of business when it's probably more about policy

20   than it is about individual communications for email.

21   On the other hand, individual communications, if they

22   related to should we turn down this -- this applicant's loan

23   or not, do they fit within this category or that category

24   another, it might turn out that something like that is

25   relevant, but I don't know yet.

1          So whether two weeks is enough or not -- so, I mean,

2     again, I think you're both taking really extreme positions

3     here.

4          **MR. deVYVER:**  May I propose that we take what you've

5     told us today and meet and confer?

6          **THE COURT:**  I mean, I think that's a good idea.  I

7     think your -- your meet-and-confers have just so far -- you

8     need to turn over a new leaf on those and do a lot better job

9     that's more productive.

10          **MR. LOPEZ:**  May I modify the proposal and say that we

11     meet and confer consistent with the district guidelines?

12          **THE COURT:**  Well, I mean that -- I don't even need to

13     order that.  You have to meet and confer --

14          **MR. LOPEZ:**  Thank you.

15          **THE COURT:**  -- with respect to the district

16     guidelines.  They're required in the case management order,

17     right?

18          And I've tried to explain to you, I think, you know,

19     general information about -- at a pretty high level perhaps on

20     all of these, you could do fairly easily.  But detailed

21     information, for example, probably the loan application

22     databases, you probably need to disclose a fair amount, or

23     they're not even going to -- so they can understand it.

24          Certainly your retention policy may be relevant.

25          Do you -- Do you still have -- what do you still have from

1    this time period?  I don't know.  What is the relevant time

2    period?

3              **MR. deVYVER:**  It's four years from the filing of the

4    complaint --

5              **MR. LOPEZ:**  Four years.  Yes.

6              **MR. deVYVER:**  -- I think.

7              **THE COURT:**  And is it through the present?

8              **MR. LOPEZ:**  Yes.

9              **THE COURT:**  So, you know, things before that aren't

10   really relevant, but maybe there's a little bit of relevance

11   for context or how do we develop these policies historically

12   or something, but for the most part they're not going to be.

13       So yeah, I mean, I think you need -- you do need to meet

14   and confer.  And, of course, it has to be consistent, but

15   that's -- it's already been ordered in the case management

16   order, that it's got to be.

17       So -- All right.  What -- What else is there?

18             **MR. deVYVER:**  There was -- as I said, we had some

19   issues with plaintiffs' discovery responses.

20             **THE COURT:**  But that's a separate letter, isn't it?

21             **MR. deVYVER:**  Yes, ma'am.  I think you've covered

22   everything in the -- the November 16th letter.

23             **THE COURT:**  Okay.  And in the -- and in the --

24             **MR. deVYVER:**  Redaction letter.

25             **THE COURT:**  -- redaction letter for -- so -- I've

1  looked at the second, but I don't think I'm really ready to

2  address it in any detail.  But let me ask you about the one --

3  well, actually, there's a letter -- I think the second letter

4  deals with a non-party subpoena on Eric Samandeego

5  (phonetic) -- I can't -- I don't know his -- the cosigner for

6  plaintiff Rodas?  Samaniego maybe is the right --

7          **MR. deVYVER:**  Yes.

8          **THE COURT:**  So let me just -- I'm not necessarily

9  ready to fully address that, but I think you both -- both

10  by-passed the issue that normally under Rule 45, it has to be

11  the issuing court or the court where -- where compliance is

12  required, which is Los Angeles, the Central District not me.

13      Now, that judge can decide to send the dispute to me.  You

14  could probably stipulate that it should be decided by me.  And

15  sometimes -- and I -- very often, those -- but that's the way

16  the rule is written right now, that I am not -- in the first

17  instance, it's the -- a motion to squash would go to the

18  Central District.

19      So what do you think about that?

20          **MR. deVYVER:**  I've never had a -- a -- someone who

21  wasn't a party to a subpoena object before, so I wasn't --

22          **THE COURT:**  Well, I mean, there is an issue about

23  standing to do that, and -- usually there isn't, but possibly

24  there could be under certain circumstances.

25      But it is also true what the plaintiffs say, that the

1     court would have an independent obligation on its own to make

2     sure that there was not an undue burden on a third party

3     because third parties are supposed to be much more protected

4     from discovery.

5         So, for example, in general, anything that you could get

6     from a party, you shouldn't try to get from a non-party.

7         But the threshold issue is that I -- enforcement in the

8     first instance would be for that court.  Now, I think, you

9     know, it may be a somewhat archaic rule, and it's pretty

10    inefficient because the other court probably would like

11    nothing better than to have me decide it.  But -- But I don't

12    know how you want to handle that.

13        **MR. LOPEZ:**  I think we could talk about it.

14        **MR. deVYVER:**  Yeah.

15        **MR. LOPEZ:**  But I think at that -- I think that would

16    probably be the best, I think, for this matter, for us to go

17    to the issuing court first.

18        **THE COURT:**  Yeah, I mean, they may -- you know, often

19    those courts have the -- have the option of transferring it,

20    and that -- that just happened in another case I had in --

21    last week or so, but -- but you could also perhaps withdraw

22    resolve it yourself.  I mean, I think that any court would say

23    that a third party should be protected and unless they have

24    information -- if you can get the same things from the

25    plaintiff or you have them in your own records, you shouldn't

1　go bothering a third party.

2　　　So I don't know what it is potentially that this third

3　party would uniquely have, but, again, I don't -- not -- you

4　know, I'm not deciding that now.

5　　　　**MR. deVYVER:**  I agreed on the meet-and-confer call,

6　I'll agree in court, it could be on the record -- to the

7　extent that the third party has documents that are already in

8　our possession, but because they were produced by

9　plaintiffs --

10　　　　**THE COURT:**  Or in a position -- right.

11　　　　**MR. deVYVER:**  Or because we have them, I don't want

12　them.  I don't want to burden the third party.  But -- But no

13　one has spoken to the third party.  He did not objection and I

14　don't know what he does or does not have.

15　　　And so I have no problem stipulating right now that I

16　won't ask the third party to produce anything that Wells Fargo

17　has on its own or that the plaintiff has.  And I said that on

18　the meet-and-confer call.

19　　　　**THE COURT:**  All right.  Well, and there may be

20　things, again -- you know, again, I'm -- I'm not deciding this

21　because I think you skipped over the Rule 45 issue, but, you

22　know, if there's things about him that are personal to him and

23　don't relate to the plaintiff's loan, obviously that wouldn't

24　be fair game either.

25　　　And just in general, the burden on the -- a third party is

1  supposed to be kept to -- much lower than to the parties.

2      But --

3                    (Pause in the proceedings.)

4          THE COURT:  And I don't know.  Did Wells Fargo try to

5  get his credit report?

6          MR. deVYVER:  We're not allowed under the Fair Credit

7  Reporting Act.  And that's why we asked for the authorization.

8          THE COURT:  So even for a potential cosigner?

9          MR. deVYVER:  Well, at the time, no, because -- I

10 don't think we got his credit report --

11                  (Off-the-record discussion.)

12         MR. deVYVER:  At the time, we did not because the

13 reason was denied.  We can't get it as of today because we're

14 not allowed.

15         THE COURT:  So what is the relevance of the credit

16 report now then?

17         MR. deVYVER:  Well, because it -- it will show a

18 credit history to be -- to qualify for a student loan, you --

19 you have to have a credit worthy cosigner, and so -- I mean,

20 one of the positions we're going to take in this case is

21 whether you want to take it from our perspective of liability

22 or take it from our perspective damages, if you -- if you

23 applied for a loan and you take the position that you were

24 denied because you were not a U.S. citizen, but you would not

25 otherwise qualify for that loan --

1          **THE COURT:** Um-hmm.

2          **MR. deVYVER:** -- then -- then we would argue that's a

3   defect.  So, again, you could say it's damages, you could put

4   it in terms of liability.  That's the reason we ask for the

5   credit information for the --

6          **THE COURT:** Well, anyway, I think you should meet and

7   confer about that, and -- and you'll have to address this

8   jurisdictional issue.

9          **MR. deVYVER:** Okay.  Thank you.

10          **THE COURT:** Yeah.  All right.  So that's the second

11   letter.

12      I was not planning to address the third letter today.

13   I'll just see if I have -- I think I'm really not ready to,

14   but I'll see if I have any comments.

15               (Pause in the proceedings.)

16          **THE COURT:** Yeah, I'm really not ready on that,

17   but -- yeah, so I think we'll have to defer that to a

18   different day.

19      So you -- I think you handed me these things, so --

20          **MR. LOPEZ:** Thank you.

21          **THE COURT:** So I'll have to get ready on that, and

22   then we'll -- we'll probably have to set a further time.

23          **MR. LOPEZ:** Thank you, Your Honor.

24          **MR. deVYVER:** Understood.

25          **THE COURT:** So -- but I really would like to see -- I

1     mean, what I prefer that rather than continuing to come to me

2     for disputes -- obviously, you can if you can't resolve them,

3     but that you would take all the -- the approaches that I've

4     tried to outline today and start using them in your future

5     meet-and-confers.

6          **MR. deVYVER:**  Understood.

7          **MR. LOPEZ:**  Thank you, Your Honor.

8          **THE COURT:**  Yeah.  So -- I mean, I -- again, I do

9     think the plaintiffs are entitled to somewhat more than Wells

10    Fargo's been giving.  And, you know, I think no more

11    redactions of non-privileged information.  You know, more

12    meaningful meet-and-confers, where, you know, I think -- it --

13    be in -- for Wells Fargo to be more forthcoming about -- in

14    informal exchanges of information --

15         **MR. deVYVER:**  Understand.

16         **THE COURT:**  -- which may help.  And then at the same

17    time, I think -- I mean, I think you all need to come to grips

18    more with what, if anything, does the institutional plaintiff

19    add.

20        You may not agree, but there'll be some case law that

21    nobody's really referenced.  And, again, it's both what they

22    could bring in theory and then what in practice -- did they

23    really -- you know, what is really harming their members or --

24    I don't know if they're a membership organization or if it's

25    more, you know, the constituencies or the people they're

1    trying to represent.

2        Are they a membership organization?

3            **MR. LOPEZ:**  Yes.

4            **THE COURT:**  Yeah.  So what is it really that their

5    members -- you know, they've even suffered, they've gotten

6    complaints about, or they have programs about?  You know, so

7    like I say, it's probably not primarily things like large

8    commercial real estate projects and loans, but -- but -- you

9    know, I can't be sure, but -- you know, so trying to -- I

10   think all of you could -- you know, shouldn't need me to say,

11   well, they're more likely that they're looking for auto loans,

12   or they're -- you know, personal loan, I think that's right.

13   That probably is -- and then some kinds of mortgages probably.

14       And then you see what you find on that.

15           **MR. deVYVER:**  Okay.

16           **MR. LOPEZ:**  Thank you, Your Honor.

17           **THE COURT:**  All right?  Thank you.

18           **MR. LOPEZ:**  Thank you.

19           **THE CLERK:**  This court is now adjourned.

20          (Proceedings were concluded at 3:25 P.M.)

21                          --o0o--

22

23

24

25

CERTIFICATE OF TRANSCRIPTION OF ELECTRONIC RECORDING

I, RAYNEE H. MERCADO, hereby certify that the foregoing is a true and correct transcription to the best of my ability of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

_____

Raynee H. Mercado

Wednesday, December 20, 2017