Jahan C. Sagafi   (Cal. Bar No. 224887)
Rachel Dempsey (Cal. Bar No. 310424)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, California 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
jsagafi@outtengolden.com
rdempsey@outtengolden.com

Ossai Miazad*
Michael N. Litrownik*
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

*Attorneys for Plaintiff and the Proposed Class*
*(Additional Counsel Listed on Signature Page)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| EDUARDO PEÑA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 19-cv-04065-MMC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1981, THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691 *et seq.*, and THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681 *et seq.***<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Eduardo Peña ("Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, brings the following allegations against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"):

## INTRODUCTION AND SUMMARY OF CLAIM

1. Plaintiff brings this case against Wells Fargo for unlawful alienage discrimination in lending violation of the Civil Rights Act of 1866, as codified by 42 U.S.C. § 1981 ("Section 1981"); for falsely and inaccurately stating the reason for his credit denial in the adverse action notice in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* ("ECOA"); and for obtaining his consumer report without a permissible purpose for doing so in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

2. Wells Fargo's direct auto loan line of business, as a matter of policy, treats non-United States citizens who reside in the United States and are recipients of Deferred Action for Childhood Arrivals ("DACA") as ineligible for auto loans even where such DACA applicants have valid Social Security numbers and federal work authorization and regardless of their creditworthiness and ability to satisfy the bank's auto loan underwriting criteria. Wells Fargo's policy of denying non-citizens with DACA the opportunity to contract for credit is discriminatory and unlawful under Section 1981.

3. Despite treating applicants with DACA as automatically ineligible for auto loans, Wells Fargo nonetheless obtains their consumer reports in violation of FCRA, thereby invading their privacy and damaging their credit scores.

4. In its direct auto loan applications, Wells Fargo collects information that indicates whether an applicant is a U.S. citizen, legal permanent resident ("LPR"), or "non-resident alien." Non-resident alien applicants must enter their Social Security number ("SSN") at the beginning of the application process.

5. But unbeknownst to them, Wells Fargo will only consider their applications and potentially extend them credit if they have U.S. visas. This undisclosed eligibility requirement excludes recipients of DACA and temporary protected status ("TPS") from the opportunity to obtain direct auto loans, and negates any permissible purpose Wells Fargo might have, as required by FCRA, to obtain consumer reports for such applicants. Moreover, Wells Fargo makes no effort whatsoever to screen

DACA or TPS recipients out of the application process or inform them that they are categorically ineligible for credit before they submit their applications.

6.     As a result, Wells Fargo obtains consumer reports for every DACA and TPS applicant, even though it has no intention of using the information contained within the report to assess their eligibility for credit.  Because Wells Fargo knows that DACA and TPS applicants do not have visas and therefore cannot meet its eligibility policy, it has no permissible purpose to obtain their consumer reports.  And because Wells Fargo knows its application process will lead to the bank impermissibly obtaining their consumer reports but takes no steps to avoid such result, it has acted recklessly.  At bottom, the bank knew it would not have a permissible purpose to obtain consumer reports on a large pool of applicants, one of which happened to be Plaintiff Mr. Peña.

7.     Wells Fargo, in violation of ECOA, then provides false and inaccurate written adverse action notices to DACA applicants like Mr. Peña who are denied auto loans.  Wells Fargo claims that Mr. Peña and DACA applicants were denied credit because their "United States residency status can't be verified."  This is demonstrably false.  Mr. Peña and other DACA applicants are easily able to verify their United States residency status and Mr. Peña in fact did so: he promptly provided Wells Fargo his U.S. address, SSN, and the fact that he had DACA and federal work authorization.  Nonetheless, Wells Fargo denied him and other class members credit because they had DACA.

8.     Wells Fargo's discriminatory auto loan policies are of a piece with the bank's broader discriminatory consumer lending policies.  In addition to being ineligible for an auto loan, Plaintiff is similarly ineligible for a Wells Fargo student loan, unsecured credit card, personal loan, and small business loan because he has DACA.[1]

9.     Wells Fargo has a long history of credit discrimination claims against it.  Seven years ago, the bank settled a lending discrimination case brought by the Department of Justice for $175 million.[2]  The same year, the bank paid Tennessee towns $432 million to settle lending discrimination

---

[1]     Dena Aubin, *Immigrants denied credit by Wells Fargo may sue bank, judge says*, Reuters (August 4, 2017), https://www.reuters.com/article/us-wells-fargo-immigration/immigrants-denied-credit-by-wells-fargo-may-sue-bank-judge-says-idUSKBN1AK1VK.

[2]     Rick Rothacker and David Ingram, *Wells Fargo to pay $175 million in race discrimination probe*, Reuters (July 12, 2012), https://www.reuters.com/article/us-wells-lending-settlement/wells-fargo-to-

claims.[3]  More recently, the cities of Oakland, Sacramento, and Philadelphia separately sued the bank for steering African American and Hispanic borrowers into high-cost loans even though they qualified for loans on less onerous terms.[4]

10.    And Wells Fargo's auto loan business line has come under heavy scrutiny for other reasons as well.  In 2018, the Consumer Financial Protection Bureau and Office of the Comptroller of the Currency settled a landmark case against Wells Fargo involving an insurance program related to its auto loans for $1 billion, its largest settlement ever.[5]  Most recently, Wells Fargo settled a class action involving similar issues relating to its auto loan business line for $386 million.[6]

## PARTIES

### Plaintiff Eduardo Peña

11.    Plaintiff Eduardo Peña is a resident of Willow Springs, Illinois.  He is employed as a tax manager.

12.    Mr. Peña was born in Mexico and obtained DACA along with a Social Security number and federal work authorization in or around 2012.  He has since renewed his DACA status three times.

### Defendant

13.    Wells Fargo is an American multinational banking and financial services company headquartered in San Francisco, California.  It is the fourth largest bank in the United States.

---

pay-175-million-in-race-discrimination-probe-idUSBRE86B0V220120712.

[3]    Rick Rothacker, *Wells Fargo Settles Discriminatory Lending Suit, Pays Tennessee Towns Memphis, Shelby $432 Million*, Huffington Post (May 29, 2012), https://www.huffpost.com/entry/wells-fargo-discriminatory-lending_n_1554533.

[4]    Ben Lane, *Sacramento sues Wells Fargo over lending discrimination*, HousingWire (Feb. 28, 2018), https://www.housingwire.com/articles/42637-sacramento-sues-wells-fargo-over-lending-discrimination; Ben Lane, *Federal court: Wells Fargo must face Oakland's mortgage discrimination lawsuit*, HousingWire (July 19, 2018), https://www.housingwire.com/articles/43718-federal-court-wells-fargo-must-face-oaklands-mortgage-discrimination-lawsuit.

[5]    Bureau of Consumer Financial Protection Announces Settlement With Wells Fargo For Auto-Loan Administration and Mortgage Practices (April 20, 2018), https://www.consumerfinance.gov/about-us/newsroom/bureau-consumer-financial-protection-announces-settlement-wells-fargo-auto-loan-administration-and-mortgage-practices/.

[6]    Emily Flitter, *Wells Fargo Agrees to Settle Auto Insurance Suit for $386 Million*, The New York Times (June 7, 2019), https://www.nytimes.com/2019/06/07/business/wells-fargo-auto-insurance-lawsuit-settlement.html.

14.     Wells Fargo Bank, N.A. is a South Dakota corporation authorized to do business in this state.

15.     Wells Fargo Bank, N.A. is a national bank and the primary United States operating subsidiary of Wells Fargo.

16.     Wells Fargo Bank, N.A. offers consumers a range of financial and credit products, including private student loans, credit cards, small business loans and credit products, personal loans, auto loans, and home mortgages.

17.     Wells Fargo Bank, N.A., by soliciting, conducting, and transacting business in the state of California, engages in continuous, permanent, and substantial activity within the state.

18.     Wells Fargo Bank, N.A. is not a federal enclave and therefore is subject to Plaintiffs' Section 1981 claim.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over Plaintiffs' Section 1981, ECOA, and FCRA claims pursuant to 28 U.S.C. § 1331.  This Court also has subject matter jurisdiction over Plaintiff's ECOA claims pursuant to 15 U.S.C. § 1691e(f).

20.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and Wells Fargo conducts business within this district.

22.     Intradistrict assignment:  Pursuant to N.D. Cal. Local Rules 3-2(c) and (d), intradistrict assignment to the San Francisco Division is proper because a substantial part of the events which give rise to the claims asserted herein occurred at Wells Fargo's headquarters located in San Francisco County.

# BACKGROUND

## *DACA and U.S. Visas*

23. On June 15, 2012, President Obama announced that the Department of Homeland Security ("DHS") would no longer remove certain young immigrants under its authority to grant deferred action as embodied in DACA.

24. DACA's purpose, according to President Obama, was to "[stop] expel[ling] talented young people, who . . . [have] been raised as Americans; understand themselves to be part of this country . . . [and] who want to staff our labs, or start new businesses, or defend our country."[7]

25. DACA is a form of deferred action, a discretionary grant of authorized stay by the federal government. Deferred action granted through DACA is valid for two years and is subject to renewal thereafter.

26. "Like recipients of other forms of deferred action, DACA recipients enjoy no formal immigration status . . . . DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General." *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1058-59 (9th Cir. 2014) (citing 8 U.S.C. § 1182(a)(9)(B)(ii); 8 C.F.R. 214.14(d)(3)).

27. DACA mandates that persons who are granted deferred action will be eligible to obtain an Employment Authorization Document (an "EAD" or "federal work permit") and a Social Security number. In other words, those granted deferred action and in possession of an EAD are legally authorized to work in the United States and can prove their identity.

28. Over 800,000 individuals have been approved under DACA in the United States, around 80% of whom were born in Mexico.[8]

---

[7] President Obama, Remarks by the President on Immigration (June 15, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/06/15/remarks-president-immigration.

[8] USCIS, Approximate Active DACA Recipients: Country of Birth As of February 28, 2019, *available at* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/2_Approximate_Active_DACA_Recipients_Demographics_-_Feb_28_2019.pdf.

29.     According to the United States Department of State, United States visas are permits for foreign citizens to lawfully travel to, enter, and remain in the United States.[9]

30.     By definition, DACA recipients, because they must have come to the U.S. before the age of sixteen, have been living in the U.S. when DACA was announced, and have continuously resided in the U.S. for at least the previous five years, do not have U.S. visas.[10]

***Federal Requirements for Lending***

31.     There is no federal or state law or regulation that restricts banks from providing financial products to customers because the customer is an alien. Under federal law, alienage is merely one factor among many used to verify enough information to confirm the true identity of the customer.

32.     For instance, the Federal Financial Institutions Examination Council ("FFIEC") provides uniform principles and standards to offer guidance for federal regulators. The FFIEC annually publishes the Bank Secrecy Act/Anti-Money Laundering Examination Manual for Money Services, which contains a compliance program called the Customer Identification Program ("CIP"), as required by section 326 of the USA PATRIOT Act, 31 U.S.C. § 5318. Pursuant to CIP, institutions providing financial services, including banks, must have a written policy in place to enable them to form a reasonable belief that they know the true identity of each customer. The goal behind this requirement is to prevent the funding of terrorism both inside and outside of the United States.[11]

33.     According to the Bank Secrecy Act/Anti-Money Laundering Examination Manual, a bank's CIP must contain account-opening procedures detailing the identifying information that must be

---

[9]     U.S. Department of State, What is a U.S. Visa?, *available at*: https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/frequently-asked-questions/what-is-us-visa.html (last visited January 17, 2020).

[10]     *See* Napolitano Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), *available at*: https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (last visited January 17, 2020); *see also Ariz. Dream Act Coalition*, 757 F.3d at 1058-59 (discussing the requirements for DACA and noting that "DACA recipients enjoy no formal immigration status").

[11]     *See* 12 C.F.R. § 208.63(b), § 211.5(m), § 211.24(j) (Board of Governors of the Federal Reserve System); 12 C.F.R. § 326.8(b) (Federal Deposit Insurance Corporation); 12 C.F.R. § 748.2(b) (National Credit Union Administration); 12 C.F.R. § 21.21 (Office of the Comptroller of the Currency); 12 C.F.R. § 563.177(b) (Office of Thrift Supervision); and 31 C.F.R. § 103.121 (FinCEN).

obtained from each customer. At a minimum, the bank must obtain the following information from each customer before opening an account: 1) name, 2) date of birth, 3) address, and 4) identification number (*e.g.*, Social Security number, taxpayer identification number or an alien identification number).[12]

34.     The bank's procedure must also describe when it will use documents, non-documentary methods, or a combination of both. Federal banking agencies expect that banks will review an unexpired government-issued form of identification from most customers. The identification must include evidence of the customer's nationality or residence and bear a photograph or similar safeguard.[13]

35.     Compliance with the CIP is to ensure that a bank verifies enough information to form a reasonable belief that it knows the true identity of the customer.[14]

36.     "Opening an account" and a financial services "customer" for purposes of the Bank Secrecy Act/Anti Money Laundering Examination Manual for Money Services includes an individual who has applied for a loan.[15]

**ECOA'S ADVERSE ACTION NOTICE REQUIREMENT**

37.     ECOA reflects Congress's determination that consumers applying for credit should receive notice of the reasons a creditor took adverse action on the application.

38.     Creditors such as Wells Fargo therefore must notify applicants within 30 days "after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application."[16]

39.     The "notification given to an applicant when adverse action is taken shall be in writing and shall contain a statement of the action taken; the name and address of the creditor; a statement of the provisions of section 701(a) of the Act; the name and address of the Federal agency that administers compliance with respect to the creditor; and . . . [a] statement of specific reasons for the action taken."[17]

---

[12]   Fed. Fin. Inst. Examination Council, Bank Secrecy Act/Anti-Money Laundering Examination Manual, Regulatory Requirements, Customer Identification Program (2010), *available at* https://bsaaml.ffiec.gov/manual/RegulatoryRequirements/01 (last visited Jan. 17, 2020).
[13]   *Id.*
[14]   *Id.*
[15]   *Id.*
[16]   12 C.F.R. § 1002.9(a)(1).
[17]   *Id.* § 1002.9(a)(2).

40.     The statement of reasons for adverse action "must be specific and indicate the *principal reason(s)* for the adverse action."[18]

41.     The "statement of reasons meets the requirements of [ECOA] only if it contains the specific, accurate reasons for the adverse action taken.[19] "The specific reasons disclosed . . . must relate to and accurately describe the factors actually considered or scored by a creditor" in order to comply with ECOA.[20]

## FCRA'S PRIVACY PROTECTIONS

42.     Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.

43.     To protect consumer privacy, FCRA prohibits users, like Wells Fargo, from obtaining consumer reports unless the user has a permissible purpose for procuring the report, as defined in the statute.  Specifically, FCRA, 15 U.S.C. § 1681b(f), provides:

> A person shall not use or obtain a consumer report for any purpose unless (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

44.     FCRA defines a closed list of permissible purposes for the use of a consumer report.  *Id.* § 1681b(a).  One permissible purpose for obtaining a credit report is where the requestor "intends to use the information in connection with a credit transaction involving he consumer . . . ." *Id.* § 1681b(a)(3)(A).

45.     FCRA also contains a catch-all "legitimate business purpose" clause in the event that the enumerated circumstances in § 1681b(a)(3)(A)-(E) do not apply.  *Id.* § 1681b(a)(3)(F)(i).

46.     The "legitimate business purpose" carve-out requires a "legitimate business need" for the consumer report, "in connection with a business transaction that is initiated by the consumer."  *Id.*

---

[18]  *Id.* § 1002.9(b)(2) (emphasis added).
[19]  15 U.S.C. § 1691(d)(4).
[20]  12 CFR pt. 1002, Supp. I, section 1002.9, para 9(b)(2).2, Official Interpretation.

47. The FTC has provided a wealth of guidance interpreting these provisions of FCRA, including confirming the position that a request for and use of a consumer report must be governed by a *reasonable relation* to the underlying transaction:

> Under this subsection, a party has a permissible purpose to obtain a consumer report on a consumer for use in connection with some action the consumer takes *from which he or she might expect to receive a benefit* that is not more specifically covered by subsections (A), (B), or (C). For example, a consumer report may be obtained on a consumer who applies to rent an apartment, offers to pay for goods with a check, applies for a checking account or similar service, seeks to be included in a computer dating service, or who has sought and received overpayments of government benefits that he has refused to return.[21]

48. The FTC has also described the outer bounds of a "legitimate business need":

> [T]he *only permissible purpose for which a credit report may be obtained* in connection with a new business transaction is to determine the consumer's "eligibility"—i.e., whether the business wishes to undertake a transaction with the consumer. In this regard, we note that the legislative history indicates that Congress intended the "permissible purposes" provisions of the FCRA to cover primarily "eligibility issues" (*see, e.g.*, 116 Cong. Rec. 36,572 (statement of Rep. Sullivan)).[22]

## HARD AND SOFT CREDIT PULLS

49. Inquiries related to transactions initiated by a consumer are known colloquially as "hard inquiries" or "hard pulls." Inquires not related to transactions initiated by the consumer are known as "soft inquiries" or "soft pulls."

50. Hard pulls are visible to third parties who obtain a consumer credit report. Soft pulls are not.

51. Each hard pull can result in a reduction of a credit score by up to five points.[23]

52. Creditors often use the number of hard inquiries on a consumer's credit report as a basis to deny an extension of credit.

---

[21] 16 C.F.R. c. 1, Pt. 600 App. (emphasis added).
[22] FTC Informal Staff Opinion Letter, William Haynes (Mar. 2, 1998) (emphasis added); *see also* FTC Informal Staff Opinion Letter, David Medine (Feb. 11, 1998).
[23] *See Harkins v. Diversified Collection Servs., Inc.*, No. 12 Civ. 1229, 2012 WL 5928997, at *1 n.1 (D. Md. Nov. 26, 2012).

53.     A "soft pull," by contrast, is a credit inquiry that is not visible to anyone other than the consumer, and that does not affect the consumer's credit score.  Soft pulls include inquiries made when a consumer checks their own credit report, inquiries made by businesses with which the consumer already does business, such as a mortgage servicer reviewing the status of the consumer's account, and inquiries made by creditors to make firm offers of credit even where no transaction has been initiated by a consumer.[24]

54.     A soft pull is not visible to other users and does not affect a consumer's credit score.[25]

## STATEMENT OF FACTS

**Plaintiff Peña**

55.     Mr. Peña is a DACA recipient with a federal work permit and a valid SSN.

56.     As a DACA recipient, Mr. Peña does not hold and has never held any U.S. visa.

57.     On November 29, 2018, Mr. Peña submitted an online application for a direct auto loan through the Wells Fargo website because he and his wife wanted to purchase a second car.  When the online application requested that he enter whether he was a U.S. citizen, LPR, or non-resident alien, Mr. Peña selected the option for non-resident alien.

58.     The two primary categories of non-resident aliens with valid SSNs who do not have U.S. visas are DACA recipients and TPS recipients.

59.     Nationwide, there are currently around 650,000 people in DACA.[26]  There are about 315,000 people with TPS.[27]

---

[24]   "Credit Report Q&A" https://www.myfico.com/credit-education/credit-reports/credit-checks-and-inquiries (last visited Jan. 17, 2020).
[25]   *See* "Hard and Soft Credit Inquiries, and How One Hurts Your Credit Score." https://consumerist.com/2008/12/06/hard-and-soft-credit-inquiries-and-how-one-hurts-your-credit-score/ (last visited Jan. 17, 2020).
[26]   *See* USCIS, Approximate Active DACA Recipients: As of September 30, 2019, *available at:* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Receipts_since_Injunction_Sep_30_2019.pdf (last visited Jan. 17, 2020).
[27]   Pew Research Center, Many Immigrants With Temporary Protected Status Face Uncertain Future in U.S. (Nov. 27, 2019), *available at:* https://www.pewresearch.org/fact-tank/2019/11/27/immigrants-temporary-protected-status-in-us/.

60. By comparison, there are approximately 1.4 million people with work visas in the United States.[28]

61. After Mr. Peña submitted his application, he was contacted by Wells Fargo Bilingual-Inbound Sales Specialist Leticia Benitez Lopez to process the loan application. Mr. Peña's email exchanges with Ms. Benitez Lopez are attached hereto as **Exhibit A**.[29]

62. On November 29, 2018, at 7:08 p.m., Ms. Benitez Lopez requested that Mr. Peña submit through Wells Fargo's SecureMail portal a copy of his Social Security card and a completed SSA-89 form.[30] *See* Ex. A at E_PENA000005-06.

63. On the same date, at 8:13 p.m., Mr. Peña submitted an electronically signed SSA-89 form and a copy of his Social Security card.[31] *See* Ex. A at E_PENA000006.

64. On November 30, 2018, at 11:58 a.m., Ms. Benitez Lopez requested that Mr. Peña resubmit the SSA-89 form with a manual signature, which Mr. Peña did a little over an hour later, at 12:45 p.m. See Ex. A at E_PENA000003-04; **Exhibit B** (manually signed SSA-89 form).[32]

65. A little over an hour later, at 1:54 p.m. on the same date, Ms. Benitez Lopez requested that Mr. Peña submit a "COPY OF VISA WITH EXPIRATION DATE, PLEASE ATTACH TO EMAIL OR FAX TO 800-862-8290. LOAN TERM MUST NOT EXCEED EXPIRATION DATE OF VISA." *See* Ex. A at E_PENA000001-02.

---

[28] Economic Policy Institute, Temporary foreign workers by the numbers (March 7, 2017), *available at:* https://www.epi.org/publication/temporary-foreign-workers-by-the-numbers-new-estimates-by-visa-classification/.

[29] Wells Fargo uses SecureMail, an encrypted portal, to exchange emails and documents with loan applicants like Mr. Peña. Mr. Peña has produced these email exchanges and the attachment to the extent that they are in his possession, custody, or control. The nature of Wells Fargo's SecureMail configuration, however, is such that Mr. Peña can only view images and does not have access to the underlying message files, including certain attachments. As such, Mr. Peña has produced images from this source to the extent possible.

[30] An SSA-89 form is a form provided by the Social Security Administration that, when completed, authorizes the Social Security Administration to release Social Security number verification. *See* https://www.ssa.gov/forms/ssa-89.pdf (last visited Jan. 17, 2020).

[31] Mr. Peña had a restricted SSN, as reflected on his Social Security card, which reads: "VALID FOR WORK ONLY WITH DHS AUTHORIZATION." According to the Social Security Administration website, these cards are issued to "people lawfully admitted to the United States on a temporary basis who have DHS authorization to work."

[32] Mr. Peña whited out his SSN on this form before providing it to counsel. Wells Fargo is in possession of the same manually signed SSA-89 form with Mr. Peña's SSN intact.

66.     Because Mr. Peña did not have a visa, he responded 20 minutes later, at 2:09 p.m., to Ms. Benitez Lopez:

> Leticia, I am currently under DACA that requires me to renew my permit every two years. Does this disqualify me? I know Wells Fargo was doing mortgage loan[s] for DACA. I don't understand why they would[n't] for auto loans. Could you please clarify. *See* Ex. A at E_PENA0000001.

67.     Shortly before and after Mr. Peña sent this email, to the best of Plaintiff's recollection, he and Ms. Benitez Lopez spoke by phone.  Ms. Benitez Lopez told Mr. Peña that he was ineligible for the loan because his DACA status expired within the loan period.  Mr. Peña explained that his status would be renewed and that work authorization under DACA is for two-year periods.  Ms. Benitez Lopez told Mr. Peña that he could not be approved for an auto loan because of his DACA status.

68.     Mr. Peña then memorialized their telephone call with an email, stating:

> Hi Leticia. Per our call today, since I will be rejected could I please get a written response explaining my rejection? Thank you, Eddie.
> Ex. A at E_PENA000001.

69.     As this email exchange confirms, Wells Fargo will not extend direct auto loans to non-resident alien DACA recipients like Mr. Peña, i.e., to non-resident aliens who do not have U.S. visas.

70.     But Wells Fargo does not inquire whether non-resident alien applicants have U.S. visas *before* obtaining their consumer report.

71.     Wells Fargo did not ask Mr. Peña whether he had a U.S. visa before obtaining his consumer report on November 29, 2018.

72.     Wells Fargo does not publicize or disclose on its website or at the start of the online application that non-resident aliens with DACA are ineligible for direct auto loans.  Specifically, when Mr. Peña selected "non-resident alien" as part of the application process, Wells Fargo *did not* inform him that he would *only* be eligible for credit *if* he had a U.S. visa, which is the bank's policy.

73.     Wells Fargo could easily disclose and publicize its non-resident alien eligibility policy for direct auto loans on its website, so applicants can understand whether they are eligible for such loans before they decide to apply.  For example, Wells Fargo discloses its eligibility policy for unsecured personal loans and credit cards on its website.  For personal loans, Wells Fargo's "Personal Credit Application Checklist" website explicitly discloses that, "For unsecured products, all applicants must be

a US Citizen or Permanent Resident Alien."[33]  For credit cards, Wells Fargo's landing page for credit cards discloses, at the bottom of the page, that, "All credit cards are available only to citizens and permanent resident aliens of the U.S."[34]

74.    Wells Fargo does not disclose its U.S. visa requirement for non-resident aliens *until after* the bank has obtained the applicant's consumer report.

75.    Mr. Peña's credit score was 748 when Wells Fargo pulled his consumer report.

76.    Wells Fargo's failure to ascertain whether non-resident aliens like Plaintiff have U.S. visas *before* obtaining their consumer reports, together with the fact that Wells Fargo collects applications from non-resident aliens and does not publicize or disclose its visa requirement to non-resident alien applicants, guarantees that Wells Fargo will obtain a significant number of consumer reports from non-resident alien applicants with valid SSNs without having any need whatsoever to use the information in the report for credit eligibility purposes.

77.    While Wells Fargo may not know specifically whether any individual non-resident alien applicant has a visa when it obtains his or her consumer report, because it does not ask whether the applicant has a visa at the time it inquires whether the applicant is a non-resident alien, the bank does know that a significant number of applicants who select "non-resident alien" do *not* have visas.  Wells Fargo's willful ignorance as to each individual non-resident alien applicant's visa status is a problem entirely of its own making because it neither tells applicants that they must possess a visa if they are a non-resident alien nor screens for visa status before it obtains their consumer reports.

78.    Mr. Peña and other DACA recipients do not know that they are ineligible for Wells Fargo direct auto loans until *after* their consumer reports have been obtained.

79.    It is Wells Fargo's obligation under FCRA to not pull applicants' consumer reports without a permissible purpose.  It is not a permissible purpose for Wells Fargo to obtain consumer reports for all non-resident alien applicants with valid SSNs who apply for auto loans even though the bank knows that many such applicants, like Mr. Peña, will not have visas, and will therefore be facially ineligible for such loans.  In other words, Wells Fargo's conduct guarantees that it will obtain consumer

---

[33]  *See* https://www.wellsfargo.com/personal-credit/checklist/ (last visited Jan. 17, 2020).
[34]  *See* https://www.wellsfargo.com/credit-cards/?linkLoc=fn (last visited Jan. 17, 2020).

reports for DACA and TPS applicants even though it knows that it will not use the reports for credit eligibility purposes.

80. As an analogy, Wells Fargo only offers direct auto loans to applicants in Illinois, where Mr. Peña lives, who are at least 18 years of age. In other words, Wells Fargo has an age eligibility policy, and it ascertains an applicant's age by asking for the applicant's date of birth when filling out the online application. If the applicant is not able to meet the age eligibility policy because their date of birth means they are not at least 18 years of age, Wells Fargo will not process their application and obtain their consumer report. Wells Fargo does not obtain minors' consumer reports because it makes them facially ineligible for direct auto loans and therefore knows it has no permissible purpose to obtain their consumer report. Non-resident aliens without visas, like Mr. Peña and other DACA and TPS recipients, are accordingly akin to minors and Wells Fargo should not permit them to submit completed applications and then obtain their consumer report when it knows that it makes them facially ineligible for such the loans they apply for.

81. At some point after Mr. Peña submitted his application, Wells Fargo conducted a hard credit check and pull of his consumer report from one or more credit bureaus. This hard credit pull invaded Plaintiff's privacy and resulted in a derogatory mark on his consumer report. Mr. Peña did not receive any further communications from Wells Fargo about his loan application until December 27, 2018, when he received an adverse action notice stating that his loan had been denied because "United States residency status can't be verified." This notice is attached hereto as **Exhibit C**.

82. Despite pulling Mr. Peña's credit bureau information, Wells Fargo's policy meant that his actual creditworthiness for the auto loan or his ability to meet its underwriting criteria for the auto loan were not relevant to its lending decision.

83. The adverse action notice Mr. Peña received from Wells Fargo misrepresented the principal reasons that Wells Fargo denied him credit. Mr. Peña was denied credit by Wells Fargo for two interrelated reasons, which are in effect two sides of the same coin. Mr. Peña was denied credit because he had DACA. Because having DACA means an individual is a non-resident alien without a U.S. visa, this is the same as being denied credit because an applicant is a non-resident alien who did not have a U.S. visa. Wells Fargo's adverse action notice did not state either of those reasons as the reason

for Mr. Peña's denial. Instead it provided the false reason that it could not verify his U.S. residency status. This is false because Wells Fargo verified or was informed that Mr. Peña lived in the U.S., had a valid SSN, and had DACA and federal work authorization. Therefore, the adverse action notice Mr. Peña received was false and inaccurate.

84. Wells Fargo therefore falsely stated the reasons Mr. Peña was denied a direct auto loan.

85. Mr. Peña suffered harm as a result of Wells Fargo's denial of his auto loan application, failure to provide him with an accurate written explanation for the denial, and placement of a hard credit inquiry on his credit report. Wells Fargo also harmed Mr. Peña by invading his privacy through conducting a hard credit pull.

**Wells Fargo's Policies Are Unlawful and Harm Plaintiff**

86. Wells Fargo's policy of making Plaintiff ineligible to contract for credit because Plaintiff is not a U.S. citizen, lawful permanent resident, or non-resident alien with a U.S. visa is a violation of 42 U.S.C. § 1981.

87. Wells Fargo's failure to provide Plaintiff with a written notice of adverse action with an accurate and truthful statement of the reasons for his denial of credit is a violation of 15 U.S.C. § 1691 and 12 C.F.R. § 1002.9(a).

88. Because Wells Fargo (1) denies credit to—and knows it will deny credit to—non-resident alien applicants without U.S. visas, including DACA and TPS recipients, but (2) does not inform these non-resident aliens that a visa is a prerequisite for eligibility before they apply, and (3) pulls a consumer report immediately, before inquiring whether the applicant has a U.S. visa, Wells Fargo has created a system that pulls consumer reports on a significant percentage of non-resident alien applicants with valid SSNs for whom it never assesses creditworthiness. Accordingly, Wells Fargo obtains consumer reports that it has no permissible purpose to pull.

89. By obtaining DACA and TPS applicants' consumer reports, Wells Fargo has invaded their privacy and damaged their credit scores.

90. Wells Fargo causes these harms to occur by knowingly creating a series of policies, procedures, and processes that together cause it to obtain a significant number of consumer reports for

non-resident aliens who are facially ineligible for direct auto loans and whose credit information Wells Fargo will not use it connection with any transaction.

91. Wells Fargo's lack of permissible purpose under FCRA for obtaining Mr. Peña's consumer report is a violation of FCRA, 15 U.S.C. § 1681b(f).

92. Having created the policy that only non-resident aliens with U.S. visas were eligible for direct auto loans, and that DACA and TPS recipients were therefore ineligible for such loans, Wells Fargo knew that it was denying loan applications from DACA and TPS applicants for reasons unrelated to their creditworthiness. If the highest levels of Wells Fargo's leadership and legal compliance teams did not know of it before, they undisputedly became aware and were on notice after *Perez v. Wells Fargo Bank, N.A.*, No. 17 Civ. 454 (N.D. Cal.) was filed in January 2017, before the class period.

93. Despite the *Perez* litigation, which challenged the same DACA ineligibility policy in four other consumer credit lines, Wells Fargo has not changed its policies, procedures, and processes for direct auto loans. It knowingly continues to pull consumer reports for which it has no permissible purpose, causing harm to numerous DACA applicants' credit scores and invading their privacy.

94. Wells Fargo therefore intentionally or recklessly obtained consumer reports it did not need in connection with any transaction to determine eligibility for credit. Wells Fargo's violations of FCRA are thus willful.

95. There is an actual and substantial controversy between Plaintiff and Wells Fargo.

**CLASS ACTION ALLEGATIONS**

96. Plaintiff brings his class allegations under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of three nationwide classes, each consisting of all non-United States citizens who resided in the United States and held DACA status at the time they applied for a Wells Fargo direct auto loan ("DACA Residents") from July 16, 2017 through the date of final judgment in this action ("Covered Period").

97. Plaintiff brings class allegations under Fed. R. Civ. P. 23(a) and (b)(2) on behalf of DACA Residents in the Covered Period who were declined an auto loan by Wells Fargo (the "Section 1981 Class").

98. Plaintiff also brings class allegations under Fed. R. Civ. P. 23(a) and (b)(2) on behalf of DACA Residents in the Covered Period who were declined an auto loan by Wells Fargo and received a

written notice of adverse action with an inaccurate statement of the reasons for the denial (the "ECOA Class").

99.     Plaintiff also brings class allegations under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of DACA residents in the Covered Period who were declined an auto loan by Wells Fargo and whose consumer reports were obtained by Wells Fargo (the "FCRA Class").

100.     Plaintiff is a member of the Section 1981 Class, ECOA Class, and FCRA Class.

101.     Class members in the Section 1981 Class, ECOA Class, and FCRA Class (collectively, "Class Members") are so numerous that joinder of all of them is impracticable. Wells Fargo has offices throughout the United States and is one of the largest auto lenders in the country, and over 800,000 individuals have been approved under DACA since 2012.

102.     There are questions of law and fact common to each Class, and these questions predominate over any questions affecting only individual members. Common questions include, among others: (1) whether Wells Fargo maintains policies that make Plaintiff and Class Members ineligible for direct auto loans due to Plaintiff's and Class Members' alienage; (2) whether Wells Fargo's policies as set forth above deprive Plaintiff and Class Members of the right to contract in violation of Section 1981; (3) whether Wells Fargo provides Plaintiff and Class Members with inaccurate written explanations of the reasons for their denial of credit in violation of ECOA; (4) whether Wells Fargo obtained the consumer reports of Plaintiff and Class Members in violation of FCRA; (5) whether Wells Fargo had a permissible purpose to obtain consumer reports in relation to applicants who were not eligible for direct auto loans with no chance of approval; (6) whether alleged violations of FCRA were willful; (7) whether Plaintiff and Class Members suffered harm by reason of Wells Fargo's unlawful policies and practices; (8) whether Plaintiff and Class Members are entitled to statutory or punitive damages, or any other type of damages; (9) whether Plaintiff and Class Members are entitled to equitable and injunctive relief, and if so, what equitable and injunctive relief is warranted; and (10) the scope of a resulting permanent injunction.

103.     Plaintiff's claims are typical of the claims of the Class Members: (1) Plaintiff was within the jurisdiction of the United States and held DACA status; (2) Plaintiff applied to Wells Fargo for an auto loan; (3) Plaintiff was declined credit because he did not meet Wells Fargo's citizenship

requirements; (4) Plaintiff did not receive a written notice stating the accurate reasons for his denial of credit; and (5) Wells Fargo obtained Plaintiff's consumer report. Each of these claims is substantially shared by every Class Member. Each of the claims arises from the same course of conduct by Wells Fargo, and the relief sought is common.

104. Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff has no conflict with any Class Member. Plaintiff is committed to the goal of having Wells Fargo change its business practices to stop discriminating against Plaintiff and others who hold DACA status and to ensure Wells Fargo's compliance with ECOA's written notification requirement and with FCRA.

105. Plaintiff has retained counsel competent and experienced in complex discrimination and consumer class actions.

106. The universe of people affected by Wells Fargo's unlawful policies is ascertainable through Wells Fargo's company records, logs, and data, and therefore the proposed class is ascertainable.

107. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Wells Fargo has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory, equitable, and injunctive relief with respect to Plaintiff and the Class Members as a whole. Wells Fargo makes Class Members ineligible for auto loans due to their alienage, fails to provide Class Members with accurate written notice as to the reasons for their auto loan denials, and obtains Class Members' consumer reports with no permissible purpose. The Class Members are entitled to declaratory, equitable, and injunctive relief to end Wells Fargo's common, unfair, and discriminatory policies.

108. Class certification is also appropriate for the proposed FCRA Class pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual Class Members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation since joinder of all members is impracticable. The Class Members have been damaged and are entitled to recovery because of Wells Fargo's common, unfair, and discriminatory policies and unlawful practices. Damages are capable of measurement on a

classwide basis. The FCRA provides for statutory damages per violation of $100 to $1,000. The propriety and amount of statutory, punitive, and other damages are based on Wells Fargo's conduct, making these issues common to Class Members. Plaintiffs and the Class Members will rely on common evidence to resolve their legal and factual questions, including the applicable auto loan credit and underwriting policies, and the bank's policies and practices regarding obtaining consumer reports of non-resident alien applicants. There are no pending actions raising similar claims. Wells Fargo engages in continuous, permanent, and substantial activity in California. There will be no undue difficulty in the management of this litigation as a class action

**FIRST CLAIM FOR RELIEF**
**Alienage Discrimination**
**(42 U.S.C. § 1981)**

109. Plaintiff incorporates by reference the allegations in all preceding paragraphs.

110. Plaintiff brings this claim on his own behalf and on behalf of the Section 1981 Class.

111. Plaintiff is a person within the jurisdiction of the United States.

112. Plaintiff is an alien with DACA, a valid SSN, and federal work authorization.

113. Plaintiff has the right to make and enforce contracts in the United States and is entitled to the full and equal benefits of the law.

114. Wells Fargo intentionally discriminated against Plaintiff and the Section 1981 Class on the basis of alienage by denying them the opportunity to contract for credit.

115. Wells Fargo's intentional discrimination against Plaintiff and the Section 1981 Class interfered with their right to make and enforce contracts for credit.

116. Wells Fargo's policies of denying credit based on Plaintiff's and the Section 1981 Class Members' alienage harmed them and constitutes unlawful alienage discrimination in the making and enforcing of contracts in violation of 42 U.S.C. § 1981.

117. Plaintiff and the Section 1981 Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive and equitable relief sought in this action is the only means of securing complete and adequate relief. Plaintiff and the Class Members are now suffering, and will continue to suffer, irreparable injury from Wells Fargo's discriminatory acts and omissions.

## SECOND CLAIM FOR RELIEF
### Failure to Provide Accurate Written Notice of Reason for Denial
### (ECOA, 15 U.S.C. § 1691 and 12 C.F.R. § 1002.9(a))

118.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

119.    Plaintiff brings this claim on his own behalf and on behalf of the ECOA Class.

120.    Plaintiff applied to Wells Fargo for a direct auto loan, was declined that loan by Wells Fargo, and received a written explanation that did not state the accurate, principal reason for the denial.

121.    Specifically, Wells Fargo informed Plaintiff that he was declined an auto loan because his "United States residency status can't be verified," which was false and inaccurate.

122.    Wells Fargo did in fact verify Plaintiff's United States residency status. Plaintiff submitted and provided information sufficient for Wells Fargo to verify his residency, including his U.S. address, the fact that he had DACA and federal work authorization, his Social Security card and SSN, and a signed form authorizing Wells Fargo to verify his Social Security number.  Accordingly, Wells Fargo verified his United States residency.

123.    The true and accurate reason Wells Fargo declined Plaintiff an auto loan was that Plaintiff was a DACA recipient, i.e., because he was a non-resident alien without a U.S. visa, the category of non-resident aliens ineligible for direct auto loans.

124.    To be compliant with ECOA, Wells Fargo would have had to provide an adverse action notice stating that Class Members were denied credit because they "had DACA" or "did not have a visa," or something substantively equivalent.  Wells Fargo did not provide Plaintiff or any Class Members such a disclosure.

125.    Wells Fargo violated ECOA by falsely stating the reasons for its denial of auto loans to Plaintiff and members of the ECOA Class.

126.    Articulated in the alternative, Wells Fargo violated ECOA by omitting the accurate reasons for its denial of auto loans to Plaintiff and members of the ECOA Class.

127.    Plaintiff and members of the ECOA Class are entitled to damages resulting from Wells Fargo's violation of ECOA, including punitive and nominal damages, and equitable and declaratory relief, as well as the recovery of costs and attorneys' fees.

## THIRD CLAIM FOR RELIEF
### Obtaining Consumer Reports Without a Permissible Purpose
### (FCRA, 15 U.S.C. § 1681b(f))

128.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

129.     Plaintiff brings this claim on his own behalf and on behalf of the FCRA Class.

130.     Wells Fargo obtained consumer reports from Plaintiff and the class with no intention of using them.  It had every reason to know that the criteria it established for direct auto loan applications would result in DACA recipients applying, but it failed to tell them that having DACA would make them ineligible for a loan until after they applied and had their credit pulled.

131.     Wells Fargo made it possible for individuals to apply for credit if they were non-resident aliens and had an SSN.  Only after they applied and had their credit check did Wells Fargo ask them to provide a U.S. visa.

132.     Wells Fargo considers non-resident aliens without a U.S. visa, including those with DACA, to be ineligible for direct auto loans.

133.     Wells Fargo collects applications from all non-resident aliens with SSNs, with and without visas.

134.     Non-resident aliens with valid SSNs but no visas number approximately one million individuals in that there are approximately 650,000 DACA recipients and 315,000 TPS holders currently in the U.S.  By contrast, about 1.4 million individuals are currently non-resident aliens with valid SSNs and U.S. visas.  Thus, it appears that over approximately 40% of the non-resident aliens with valid SSNs who applied were categorically ineligible for an auto loan.

135.     Wells Fargo obtained consumer reports from all non-resident alien applicants, with and without visas, immediately upon application.

136.     Wells Fargo did not assess creditworthiness, or have a legitimate need to assess creditworthiness, of Class Members because it considered them categorically ineligible for loans.

137.     Therefore, whether Wells Fargo used those consumer reports for some other purpose, or not at all, the pulling of those reports had no connection to Class Members' underlying credit transactions.

138.    Wells Fargo willfully violated FCRA by having neither a permissible purpose nor a legitimate business need for its use of Plaintiff's consumer report.  Wells Fargo should have known that if a bank sets up a process that collects a large number of consumer reports, but it only has a reason to review and use some of them in the underwriting process, the ones it does not use are not obtained "in connection with" a credit transaction and therefore the user of the report lacks a permissible purpose for obtaining them.

139.    By obtaining Plaintiff's consumer report without a permissible purpose, Wells Fargo has invaded Plaintiff's privacy and harmed Plaintiff's credit score.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and Class Members pray for relief as follows:

140.    Certification of the case as a class action on behalf of the Section 1981 Class, ECOA Class, and FCRA Class;

141.    Designation of Plaintiff Peña as a representative on behalf of the Section 1981 Class, ECOA Class, and FCRA Class;

142.    Designation of Plaintiff's counsel of record as Class Counsel;

143.    A declaratory judgment that the practices complained of herein are unlawful and violate Section 1981, ECOA, and FCRA;

144.    Statutory damages and nominal damages;

145.    A preliminary and permanent injunction against Wells Fargo and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs and usages set forth herein, and requiring them to comply with ECOA's written notice requirement;

146.    Exemplary and punitive damages in an amount commensurate with Wells Fargo's ability to pay and to deter future conduct;

147.    Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

148.    Pre-judgment and post-judgment interest, as provided by law; and

149. Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

Dated: New York, New York            Respectfully submitted,
       January 17, 2020

                              By:    /s/ *Ossai Miazad*
                                     **OUTTEN & GOLDEN LLP**

                                     Ossai Miazad*
                                     Michael N. Litrownik*
                                     685 Third Avenue, 25th Floor
                                     New York, NY 10017
                                     Telephone:  (212) 245-1000
                                     Facsimile:   (646) 509-2060
                                     om@outtengolden.com
                                     mlitrownik@outtengolden.com

                                     Jahan C. Sagafi (Cal. Bar No. 224887)
                                     Rachel Dempsey (Cal. Bar No. 310424)
                                     One California Street, 12th Floor
                                     San Francisco, California 94111
                                     Telephone: (415) 638-8800
                                     Facsimile: (415) 638-8810
                                     jsagafi@outtengolden.com
                                     rdempsey@outtengolden.com

                                     Brian James Shearer*
                                     Craig L. Briskin*
                                     **JUSTICE CATALYST LAW**
                                     718 7th Street NW
                                     Washington, D.C. 20001
                                     518-732-6703
                                     brianshearer@justicecatalyst.org
                                     cbriskin@justicecatalyst.org

                                     Benjamin D. Elga*
                                     81 Prospect Street
                                     Brooklyn, NY 11201
                                     518-732-6703
                                     belga@justicecatalyst.org

                                     *admitted *pro hac vice*

                                     ***Attorneys for Plaintiff and the proposed Classes***