Jahan C. Sagafi  (Cal. Bar No. 224887)
Rachel Dempsey (Cal. Bar No. 310424)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile:  (415) 638-8810
jsagafi@outtengolden.com
rdempsey@outtengolden.com

Brian James Shearer*
Craig L. Briskin*
JUSTICE CATALYST LAW
718 7th Street NW
Washington, D.C. 20001
Telephone: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Ossai Miazad*
Michael N. Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

Benjamin D. Elga*
JUSTICE CATALYST LAW
81 Prospect Street, 7th Floor
Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org

*Attorneys for Plaintiff and the Proposed Class*
*admitted *pro hac vice*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| EDUARDO PEÑA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 19-cv-04065-MMC-TSH<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY SETTLEMENT APPROVAL ORDER**<br><br>Judge:      Maxine M. Chesney<br>Hearing Date:  July 10, 2020<br>Hearing Time:  9:00 a.m.<br>Courtroom:  7, 19th Floor |

# <u>NOTICE OF MOTION AND MOTION</u>

PLEASE TAKE NOTICE that on July 10, 2020, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 7 on the 19th floor of this Court's San Francisco Courthouse, located at 450 Golden Gate Avenue in San Francisco, California, Plaintiff Eduardo Peña, individually and as a class representative, will, and hereby does, move this Court for the following relief with respect to the Settlement Agreement and Release (attached as Exhibit A to the Declaration of Ossai Miazad in Support of Motion for Preliminary Settlement Approval Order) with Defendant Wells Fargo Bank, N.A.:

1.      that the Court certify, for settlement purposes only, settlement classes pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3);

2.      that the Court appoint Plaintiff as representative of the Class;

3.      that the Court appoint Plaintiff's attorneys as Class Counsel;

4.      that the Court grant preliminary approval of the Settlement;

5.      that the Court approve mailing to the Class Members the proposed Class Notice;

6.      that the Court appoint JND Legal Administration Co. as the Settlement Administrator; and

7.      that the Court schedule a hearing for final approval of the Settlement.

This Motion is made on the grounds that the Settlement is the product of arms-length, good-faith negotiations; is fair, reasonable, and adequate to the Class; and should be preliminarily approved, as discussed in the attached memorandum.

The Motion is based on: this notice, the following memorandum in support of the motion, the Miazad declaration (which annexes a copy of the Settlement), the Briskin declaration, the Court's record of this action, all matters of which the Court may take notice, and oral and documentary evidence presented at the hearing on the motion. This motion is unopposed by Wells Fargo.

Dated: June 16, 2020

Respectfully submitted,

By: /s/ *Ossai Miazad*
       Ossai Miazad

Ossai Miazad*
Michael N. Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

Jahan C. Sagafi (Cal. Bar No. 224887)
Rachel Dempsey (Cal. Bar No. 310424)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
jsagafi@outtengolden.com
rsun@outtengolden.com
rdempsey@outtengolden.com

Benjamin D. Elga*
JUSTICE CATALYST LAW
81 Prospect Street, 7th Floor
Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org

Brian James Shearer*
Craig L. Briskin*
JUSTICE CATALYST LAW
718 7th Street NW
Washington, D.C. 20001
Telephone: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

*admitted *pro hac vice*

*Attorneys for Plaintiff and the Proposed Class*

# **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL AND PROCEDURAL BACKGROUND .......................................... 2

    A.  Wells Fargo's Lending Policies Made DACA Recipients Ineligible for Direct Auto Financing ...................................................................................... 2

    B.  Procedural History ........................................................................................ 3

III.  THE PROPOSED SETTLEMENT .................................................................... 4

    A.  The Settlement Classes ................................................................................. 4

    B.  Settlement Overview .................................................................................... 5

        1.  Programmatic Relief ......................................................................... 5

        2.  Monetary Relief ................................................................................ 5

    C.  Class Representative Service Award .............................................................. 9

    D.  Attorneys' Fees and Costs ............................................................................. 9

    E.  Settlement Administration Costs ................................................................ 10

    F.  Cy Pres Awardees ....................................................................................... 11

IV.  ARGUMENT ................................................................................................... 12

    A.  Certification of the Rule 23 Classes Is Proper ........................................... 12

        1.  Rule 23(a) Is Satisfied .................................................................... 12

        2.  Certification Is Proper Under Rule 23(b)(3) .................................. 15

        3.  Plaintiff's Counsel Should Be Appointed as Class Counsel ......... 16

    B.  The Settlement Is Fair, Reasonable, And Adequate ................................... 16

        1.  Plaintiff's Case Faced Significant Hurdles on Liability and Class Certification .................................................................................... 187

        2.  The Settlement Amount Is Appropriate ......................................... 18

        3.  The Extent of Discovery Supports Settlement ............................... 20

        4.  Counsel's Experience and Views Support Approval ...................... 20

        5.  The Parties Participated in Arms-Length Negotiations Before an Experienced Neutral Mediator ....................................................... 21

C.    The Proposed Notice Is Clear and Adequate ........................................... 21

V.    A FINAL APPROVAL HEARING SHOULD BE SCHEDULED ................................. 22

VI.    CONCLUSION ........................................................................................................ 23

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                          **Page(s)**

*Abdullah v. U.S. Sec'y Assocs.*,
   731 F.3d 952 (9th Cir. 2013).................................................................. 13

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)............................................................... 14, 15, 16

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)........................................................................ 15

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001).............................................................. 13

*Betancourt v. Advantage Human Resourcing, Inc.*,
   No. 14 Civ. 01788, 2016 WL 344532 (N.D. Cal. Jan. 28, 2016) ...................... 17, 18

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011).............................................................. 10

*Buccellato v. AT&T Operations, Inc.*,
   No. 10 Civ. 00463, 2011 WL 3348055 (N.D. Cal. June 30, 2011) ...................... 9

*Cancilla v. Ecolab, Inc.*,
   No. 12 Civ. 3001, 2015 WL 4760318 (N.D. Cal. Aug. 12, 2015)...................... 17

*Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*,
   No. 15 Civ. 224, 2016 WL 314400 (N.D. Cal. Jan. 25, 2016)........................ 13

*Cotter v. Lyft, Inc.*,
   176 F. Supp. 3d 930 (N.D. Cal. 2016) ...................................................... 18

*Covillo v. Specialtys Cafe*,
   No. 11 Civ. 00594, 2013 WL 5781574 (N.D. Cal. Oct. 25, 2013) ...................... 11

*Cunningham v. Cty. of Los Angeles*,
   879 F.2d 481 (9th Cir. 1988)............................................................... 10

*del Toro Lopez v. Uber Techs., Inc.*,
   No. 17 Civ, 6255, 2018 WL 5982506 (N.D. Cal. Nov. 14, 2018) ...................... 11

*Donnenfeld v. Petro, Inc.*,
   No. 17 Civ. 2310 (E.D.N.Y. Mar. 5, 2020)................................................. 8

*In re Easysaver Rewards Litig.*,
   906 F.3d 747 (9th Cir. 2018)........................................................... 11, 12

*Edwards v. Hearst Commc'ns*,
 No. 15 Civ. 9279 (S.D.N.Y. Apr. 4, 2019) ................................................... 8

*Ellis v. Costco Wholesale Corp.*,
 285 F.R.D. 492 (N.D. Cal. 2012) ................................................................. 15

*Fernandez v. Victoria Secret Stores, LLC*,
 No. 06 Civ. 04149, 2008 WL 8150856 (C.D. Cal. July 21, 2008) .......................... 21

*Fulford v. Logitech, Inc.*,
 No. 08 Civ. 204, 2010 WL 807448 (N.D. Cal. Mar. 5, 2010) ............................... 10

*Galeener v. Source Refrigeration & HVAC, Inc.*,
 No. 13 Civ. 04960, 2015 WL 12976106 (N.D. Cal. Aug. 20, 2015) ......................... 9

*Glass v. UBS Fin. Servs., Inc.*,
 No. 06 Civ. 4068, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007) ............................. 9

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) ............................................................... *passim*

*In re Heritage Bond Litig.*,
 No. 02 ML 1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ....................... 18-19

*In re Hyundai & Kia Fuel Econ. Litig.*,
 926 F.3d 539 (9th Cir. 2019) ...................................................................... 16

*Johnson v. Triple Leaf Tea Inc.*,
 No. 14 Civ. 1570, 2015 WL 8943150 (N.D. Cal. Nov. 16, 2015) ..................... 10, 13

*Jones v. Wells Fargo Bank, N.A.*,
 No. B237282, 2015 WL 661757 (Cal. Ct. App. Feb. 17, 2015) ............................. 15

*Lewis v. Wells Fargo & Co.*,
 No. 08 Civ. 2670, slip op. at 4 (N.D. Cal. Apr. 29, 2011) .................................. 9

*Linney v. Cellular Alaska P'ship*,
 151 F.3d 1234 (9th Cir. 1998) ..................................................................... 20

*Ma v. Covidien Holding, Inc.*,
 No. 12 Civ. 2161, 2014 WL 360196 (C.D. Cal. Jan. 31, 2014) ...................... 18-19

*In re Mego Fin. Corp. Sec. Litig.*,
 213 F.3d 454 (9th Cir. 2000) ...................................................................... 20

*In re MyFord Touch Consumer Litig.*,
 No. 13 Civ. 3072 (N.D. Cal. Nov. 7, 2019) ...................................................... 8

*Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*,
 221 F.R.D. 523 (C.D. Cal. 2004) ........................................................... 12, 20

*In re Painewebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ................................................................ 20

*Pappas v. Naked Juice Co of Glendora, Inc.*,
    No. 11 Civ. 8276, 2014 WL 12382279 (C.D. Cal. Jan. 2, 2014) .................... 11

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) ........................................................................ 12

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) .................................................................. 17, 21

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ........................................................................ 1

*Ross v. Trex Co.*,
    No. 09 Civ. 670, 2013 WL 12174133 (N.D. Cal. Dec. 16, 2013) .................. 10

*Ross v. U.S. Bank Nat'l Ass'n*,
    No. 07 Civ. 2951, 2010 WL 3833922 (N.D. Cal. Sept. 29, 2010) ................... 9

*Seguin v. Cty. of Tulare*,
    No. 16 Civ. 01262, 2018 WL 1919823 (E.D. Cal. Apr. 24, 2018) .................. 8

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ...................................................................... 11

*Stevens v. Harper*,
    213 F.R.D. 358 (E.D. Cal. 2002) .................................................................. 13

*Stovall-Gusman v. W.W. Granger, Inc.*,
    No. 13 Civ. 2540, 2015 WL 3776765 (N.D. Cal. June 17, 2015) .................. 18

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ........................................................ 17

*Tierno v. Rite Aid Corp.*,
    No. 05 Civ. 02520, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) ................ 16

*Tijero v. Aaron Bros., Inc.*,
    301 F.R.D. 314 (N.D. Cal. 2013) .................................................................. 21

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) .................................................................................. 15

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................................... 13

*Walker v. Life Ins. Co. of the Sw.*,
    953 F.3d 624 (9th Cir. 2020) ........................................................................ 10

*Walsh v. CorePower Yoga LLC*,
  No. 16 Civ. 05610, 2017 WL 589199 (N.D. Cal. Feb. 14, 2017)...................................14-15, 17

*Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*,
  No. 05 Civ. 2320, 2006 WL 2642528 (N.D. Cal. Sept. 14, 2006).......................................... 16

*Wren v. RGIS Inventory Specialists*,
  No. 06 Civ. 05778, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011)............................................ 21

**Statutes**

15 U.S.C. § 1681n(a)(1)(A) .......................................................................................................... 19

15 U.S.C. § 1691e ........................................................................................................................ 19

Cal. Civil Code § 52(a) ................................................................................................................ 18

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................ *passim*

**Other Authorities**

Alba Conte & Herbert B. Newberg, 4 Newberg on Class Actions (4th ed. 2002) ....................... 12

Alba Conte & Herbert B. Newberg, 4 Newberg on Class Actions (5th ed.) .......................... 15, 17

Manual for Complex Litigation (4th ed. 2004).......................................................................... 12

**MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION**

## I. INTRODUCTION

Plaintiff Eduardo Peña ("Plaintiff" or "Class Representative") has lived in Illinois since he was a child and was granted temporary protection from deportation, federal work authorization, and a Social Security number under the June 2012 program known as Deferred Action for Childhood Arrivals ("DACA"). After obtaining DACA, Plaintiff sought an auto loan from Wells Fargo's direct auto financing line of business but was denied. Plaintiff then brought a class action lawsuit against Wells Fargo in July 2019 alleging lending discrimination. The parties have now settled this litigation for significant monetary and programmatic relief. In connection with the settlement, Wells Fargo will change its direct auto lending policy to make direct auto loans available to DACA recipients on the same terms and conditions as it offers credit to U.S. citizens, fully eliminating the harm challenged by the lawsuit. The settlement also provides for significant monetary relief totaling $1.185 million, comprised of cash payments of at least $280,000 that could increase to as much as $630,000 to class members who submit valid claim forms, as well as $50,000 in administration costs, a $5,000 service award for Class Representative, and $500,000 in fees and costs. *See* Ex. A (Settlement Agreement or SA) §§ 3.2; 3.3; 15.2.[1]

For the reasons set forth below, the proposed Settlement and this Motion readily satisfy the requirements of Rule 23, Ninth Circuit precedent, *see, e.g.*, *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1060 (9th Cir. 2019), and established Northern District practice, including the Class Action Settlement Guidance. *Procedural Guidance for Class Action Settlements*, U.S. Dist. Ct. for Northern District Cal., https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (last updated Dec. 5, 2018). Although the parties reached a resolution relatively early in this case, they litigated a number of issues at the pleading stage and exchanged sufficient discovery to adequately assess the strengths and weaknesses of Plaintiff's claims. Further, the parties reached settlement through an arms-length mediation overseen by Hunter R. Hughes, one of the leading national mediators of complex discrimination class actions. Plaintiff

---

[1]     All exhibits are attached to the accompanying Declaration of Ossai Miazad in Support of Motion for Preliminary Settlement Approval Order ("Miazad Decl.")

accordingly and respectfully submits that the Court should preliminary approve this exceptional settlement, and notice should issue to Class Members to let them make claims, object, or opt out, as appropriate.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Wells Fargo's Lending Policies Made DACA Recipients Ineligible for Direct Auto Financing.

DACA, announced by President Obama on June 15, 2012, and promulgated through the Department of Homeland Security, allows non-citizens who entered the United States as children and who meet certain requirements to apply for work authorization and relief from deportation proceedings.[2]  DACA was promulgated to provide opportunities to young people who came to the United States as children and "who want to staff our labs, or start new businesses, or defend our country."[3]  Its motivating principle was to strengthen its recipients' ability to actively participate in the American economy and contribute to civic life.[4]  In addition to work authorization, DACA recipients are eligible to apply for and receive SSNs, enabling them to identify themselves for employment and other contractual purposes.[5]

There is no federal or state law or regulation that prohibits banks from lending to non-citizens generally, or DACA recipients specifically, based on their status as non-citizens.  Wells Fargo, however, maintained lending policies that made DACA recipients facially ineligible for credit products offered by its direct auto financing line of business ("direct auto").  Plaintiff is a DACA recipient living in the United States with a valid SSNs who was denied the opportunity to be considered for credit from Wells Fargo.

---

[2]     Remarks on Immigration Reform and Exchange With Reporters, 2012 Daily Comp. Pres. Doc. 201200483 (June 15, 2012), https://www.govinfo.gov/content/pkg/DCPD-201200483/html/DCPD-201200483.htm.  *See generally* Memorandum from Janet Napolitano, Sec'y of Homeland Sec., on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[3]     Obama, *supra* note 2.

[4]     *Id*.

[5]     Fact Sheet, Social Security Number and Card – Deferred Action for Childhood Arrivals, https://www.ssa.gov/pubs/deferred_action.pdf.

## B.   Procedural History

On July 16, 2019, Plaintiff Peña filed a putative class action complaint against Wells Fargo Bank, seeking to represent two nationwide classes consisting of all non-United States citizens who resided in the United States and held DACA status at the time they applied for direct auto financing from Wells Fargo.  ECF No. 1.  Plaintiff Peña amended the complaint in September 2019, seeking to represent a third class of DACA recipients.  ECF No. 27.  In all, Plaintiff Peña sought to represent classes of DACA residents who were (1) declined direct auto financing by Wells Fargo, (2) declined direct auto financing and who received a written notice of adverse action with an inaccurate statement of the reasons for the denial, and (3) declined direct auto financing and whose consumer reports were obtained by Wells Fargo.  *Id.* ¶¶ 65-68. Plaintiff Peña asserted claims of alienage discrimination under 42 U.S.C. § 1981, a violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f, and its implementing regulations, and a violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681b(f)-1681x. *Id.* ¶¶ 78-98.

Wells Fargo moved to dismiss the First Amended Complaint on several grounds, including that Peña failed to plead facts sufficient to state claims under ECOA and FCRA.  ECF No. 39.  On December 23, 2019, the Court granted Wells Fargo's motion in part, dismissing Plaintiff Peña's ECOA and FCRA claims but granting leave to amend.  ECF No. 54.  Plaintiff Peña filed a Motion for Leave to File a Partial Motion for Reconsideration, which the Court denied.  ECF Nos. 63, 75.

On January 17, 2020, Plaintiff Peña filed a Second Amended Class Action Complaint, repleading his claims under ECOA and FCRA.  ECF No. 66.  The parties agreed to stay the case on February 7, 2020 and engage experienced private mediator, Hunter Hughes, to assist them in settlement discussions.  ECF Nos. 81, 82; Miazad Decl. ¶¶ 20.  The parties executed a binding term sheet on March 4, 2020, and then spent several months negotiating a long-form settlement agreement, which they signed on June 16, 2020.  Miazad Decl. ¶¶ 21-23.

Prior to staying the case, the parties engaged in discovery, including the exchange of written discovery requests and responses and the production of documents.  Miazad Decl. ¶ 13.  The parties

have also exchanged information as to Wells Fargo's systems and denial codes, briefed issues as to the confidentiality of discovery materials, and were in the process of negotiating several discovery disputes at the time the case settled. *Id.* ¶ 16. During settlement negotiations, Wells Fargo produced the direct auto lending eligibility policy. *Id.* ¶ 22.

## III.   THE PROPOSED SETTLEMENT

### A.   The Settlement Classes

For settlement purposes only and consistent with the parties' settlement agreement, Plaintiff seeks certification of the following classes, defined as:

**California Class** means all individuals who applied for credit from the Wells Fargo direct auto financing line of business between July 16, 2017 and the date of preliminary approval and were denied as set forth in the Class Data produced by Wells Fargo, and, at the time they applied, were California residents as set forth in the Class Data produced by Wells Fargo and held valid and unexpired DACA status. SA § 1.9.2

**National Class** means all individuals who applied for credit from the Wells Fargo direct auto financing line of business between July 16, 2017 and the date of preliminary approval and were denied as set forth in the Class Data produced by Wells Fargo, and, at the time they applied, were not California residents as set forth in the Class Data produced by Wells Fargo and held valid and unexpired DACA status.[6] SA § 1.9.1.

Because Wells Fargo did not record whether applicants had DACA, its data set listing potential Class Members consists of approximately 1,625 applicants in the United States with valid SSNs who did not meet Wells Fargo's citizenship or immigration status requirements— DACA and non-DACA applicants alike, including work-authorized non-citizens with employment or student visas and recipients of temporary protected status ("TPS"), all of whom are eligible for SSNs. Miazad Decl. ¶ 31. However, limiting this data set based on characteristics common to DACA recipients, such as U.S. addresses and valid SSNs, suggest that the California and National Classes (*i.e.*, those with DACA), comprise approximately 400 individuals. *Id.* ¶ 32.

---

[6]     Excluded from both Classes are Wells Fargo, all officers, directors, and employees of Wells Fargo, and their legal representatives, heirs, or assigns, and any Judges to whom the Action is assigned, their staffs, and their immediate families.

## B. Settlement Overview

The settlement provides two important forms of relief for the Class Members: (1) programmatic relief under which Wells Fargo will change its lending practices for its direct auto line of business to extend loans to current and valid DACA recipients on the same terms and conditions as U.S. citizens; and (2) a Settlement Fund of $280,000 to $630,000, depending on the number of claimants, to compensate for the harm they suffered. The parties have agreed that the settlement shall be administered as if governed by 28 U.S.C. § 1715, and Wells Fargo has agreed to provide CAFA Notice as required by that statute.

### 1. Programmatic Relief

This settlement provides exceptional programmatic relief: Wells Fargo will change its lending practice for its direct auto financing line of business to extend unsecured credit to current DACA recipients on the same terms and conditions as U.S. citizens, so long as there is an appropriate product. SA § 3.2.1. Wells Fargo has also agreed to annually provide to Class Counsel a written description explaining the status of the Programmatic Relief for a period of two years. *Id.* § 3.2.2.

While it is difficult to quantify the benefit that this programmatic relief will convey to DACA recipients in the years to come, these changes will be extremely valuable. If even 1,000 DACA recipients nationwide apply for direct auto financing each year for the next four years, and the availability of such credit is worth $2,000 (half the statutory penalty for depriving someone access to loans and credit under the Unruh Act), these changes are worth $2,000,000. Moreover, this figure may be conservative, as many more individuals will get even greater economic opportunity from these changes in the coming years.

### 2. Monetary Relief

The $1,185,000 settlement amount will cover: (a) up to $630,000 in cash payments to Class Members; (b) an incentive award of $5,000 for Plaintiff; (c) settlement administration costs, not to exceed $50,000; and (d) up to $500,000 in attorneys' fees and costs. SA §§ 3.3; 15.1-15.2.

Wells Fargo will create separate settlement funds for the California Class and the National Class ("California Fund" and "National Fund," respectively), both of which will be funded based

on claims made by Class Members. *Id.* §§ 3.3.2-3.3.8. Wells Fargo's Class Data will determine how many claims each Class Member may make, *i.e.*, how many times each Class Member was denied a direct auto loan in the relevant period. *Id.* § 1.27; 1.46. In other words, as long as a Class Member makes one valid claim, they will receive a cash payment for each credit denial that appears in the Class Data. *Id.* For the California Fund, (1) the first 110 Verified Claims[7] from California Class members shall add $2,500 per claim to the fund, up to $275,000; (2) any remaining Verified Claims from California Class members shall add $800 per claim to the fund. *Id.* § 3.3.2. The California Fund will have a floor of $225,000 and a cap of $525,000, depending on the number of claimants. *Id.* § 3.3.4.

The National Fund will be created by adding $300 to the fund for every Verified Claim from National Class Members, up to and not to exceed $105,000. *Id.* §§ 3.3.5-3.3.6. The amount in each fund will be determined based on Verified Claims and will only be funded up to the number of Verified Claims. *Id.* §§ 1.43.1-1.43.2. As explained in detail below, California Class Members who submit a Verified Claim shall be paid *pro rata* from the California Fund and National Class Members shall be paid *pro rata* from the National Fund. *Id.* §§ 3.3.3; 3.3.7. In other words, National Class Members will receive up to $300 per Verified Claim and California Class Members will receive an amount up to $2,500 per claim, depending on the number of Verified Claims.

Following preliminary approval of the Settlement Agreement, Wells Fargo will provide the Settlement Administrator and Class Counsel with the updated Class Data.[8] *Id.* § 7.2. The Settlement Administrator will issue notice via U.S. mail and email (where an email address is

---

[7]     "Verified Claim" means a written request, submitted via a Claim Form, submitted by a Settlement Class Member to the Settlement Administrator, pursuant to the instructions set forth in the Claim Form, including Official Documentation. SA § 1.46. "Verified Claim Form" means a Claim Form that is (a) fully completed and properly executed showing the Verified Claimant is entitled to Claim Settlement Relief, including a fully completed and properly executed Form W-9, (b) timely returned to the Settlement Administrator, (c) validated by the Settlement Administrator pursuant to the procedures set forth in this Agreement, and (d) which includes Official Documentation. *Id.* § 1.47.

[8]     The Class Data will identify (i) individuals who were denied a direct auto product; (ii) during the class period; (iii) based on agreed-to denial codes related to their residency status; (iv) where the individual provided an SSN, a U.S. address, and were not listed as a U.S. citizen or LPR.

available) to all individuals on the Notice List within 35 days of the preliminary approval order. SA § 7.3. Those individuals will have 60 days to make a claim in the settlement or 45 days to exclude themselves or file an objection with the Court. *Id.* §§ 1.6; 1.28; 1.30.

To make a claim in, opt out of, or object to the settlement, Class Members will be required to sign and return a one-page form ("Claim Form") to the Settlement Administrator. *Id.* §§ 5.2; 5.3; 11.1; 12.3. The Claim Form will require the recipient to affirm that they: (1) had valid and unexpired DACA status at the time they applied for one of the relevant credit products; (2) were denied at least one of those products; and (3) that they have and are prepared to provide official documentation to verify that status. *Id.* Class Members seeking to opt-out of or object to the settlement will, in addition, be asked to demonstrate their current or former valid and unexpired DACA status by providing (1) an I-797 Approval Notice from an I-821-D and/or (2) a work authorization card containing the code "C-33" ("Official Documentation"). *Id.* §§ 11.1; 12.3. Claim Forms may be submitted online or by email or mail. *Id.* Ex. 2 (Claim Form). Consistent with current best practices, the Settlement Administrator will maintain a dual-language (English-Spanish) website providing the Notice, Claim Form, Settlement Agreement and Exhibits, key motions, and orders. *Id.* § 6.2. The Claims Administrator will also create a dual-language (English-Spanish) toll-free phone number. *Id.* A reminder notice will be issued by email only, if available, 30 days into the claims period. *Id.* § 7.6.

After final approval of the Settlement Agreement, the Settlement Administrator will contact the individuals who submitted Claim Forms and request documentation to demonstrate that they have valid and unexpired DACA status or had valid DACA status at the time of their denial. *Id.* §§ 5.2.2; 5.3.2. Upon timely receiving this information, the Settlement Administrator will validate the Claim Form and documentation and, if consistent with the terms of the Settlement Agreement, will deem the claim to be one or more Verified Claims. *Id.* If at any point during the claims period an individual submits a Claim Form or Official Documentation that the Settlement Administrator deems deficient, the Settlement Administrator will promptly notify that individual and Class Counsel, and the individual will have 14 days to cure any deficiency. *Id.* § 5.4. A Class Member may make only one Verified Claim per denied

application. *Id.* §§ 5.2.3; 5.3.3. Joint or multiple borrowers who are denied on a single application will be treated as a single application and their *pro rata* share will be divided equally per applicant. *Id.*

After this phase, the Settlement Administrator will advise Wells Fargo of the amount of each Settlement Fund based on the number of Verified Claims. *Id.* § 3.3.10. Within 21 days of receiving notice of the amount of the Settlement Funds, Wells Fargo will transfer those funds to the Settlement Administrator, which will issue and mail checks to Class Members. *Id.* §§ 3.3.2, 3.3.5, 3.3.10.

In exchange for the consideration described above, each Class Member shall release Wells Fargo of any and all claims (the "Released Claims") relating to Wells Fargo's denial of their loan applications based on alienage, lack of citizenship and/or immigration status, including, but not limited to, any claims under 42 U.S.C. § 1981, the California Unruh Act, Cal. Civil Code §§ 51 and 52 *et seq.*, other state civil rights statutes, ECOA, and FCRA.[9] SA §§ 1.35; 10.1. The Class Representative will also agree to a general release of all Released Claims against Wells Fargo for claims related to the denial of their loan applications. *Id.*

After consulting with the proposed Settlement Administrator about its experience and, based on their communications with Class Members to date and the realities of DACA recipients' lives, Plaintiff estimates that 5% to 15% of the Class Members will return Claim Forms. *See, e.g., Donnenfeld v. Petro, Inc.*, No. 17 Civ. 2310 (E.D.N.Y. Mar. 5, 2020), ECF No. 80-1 (8,074/91,807 or 8.6% of class members filed claims); *In re MyFord Touch Consumer Litig.*, No. 13 Civ. 3072 (N.D. Cal. Nov. 7, 2019), ECF No. 542 (claims submitted on behalf of 4.5% of class); *Edwards v. Hearst Commc'ns*, No. 15 Civ. 9279 (S.D.N.Y. Apr. 4, 2019), ECF No. 310 (294,748/3,930,421 or 7% of class members filed claims); *see also* Miazad Decl. ¶ 33. Plaintiff

---

[9] Although this release is broader than the claims pled in the complaint, the settlement provides significant value for Unruh Act claims, and Class Counsel are unaware of any additional viable claims it would extinguish. Beyond the Unruh Act, no other state law civil rights statutes provide comparable statutory penalties for claims related to the denial of Class Members' loan applications based on alienage, lack of citizenship and/or immigration status. These special circumstances justify a broadened release. *See, e.g., Seguin v. Cty. of Tulare*, No. 16 Civ. 01262, 2018 WL 1919823, at *5 (E.D. Cal. Apr. 24, 2018) (a broad release was permissible where the settlements reflected a reasonable compromise achieved through negotiation).

estimates that the return rate for California Class Members will be on the higher end of that range, considering the high amount of the settlement award per denial, and that the return rate for National Class Members will fall on the lower end of the range.  Miazad Decl. ¶ 34.

**C.**     **Class Representative Service Award[10]**

The settlement provides that, subject to Court approval, Wells Fargo will pay Plaintiff a service award of $5,000.  SA § 15.2.  This payment is intended to compensate him for (a) the time and effort that he has spent on behalf of the Class assisting Class Counsel with the prosecution of these claims, (b) the resulting significant value he has conferred to Class Members, and (c) the significant exposure and risk he incurred by exposing himself as a DACA recipient and taking a leadership role in a lawsuit that has garnered media coverage.[11]  *See, e.g.*, *Galeener v. Source Refrigeration & HVAC, Inc.*, No. 13 Civ. 04960, 2015 WL 12976106, at *3 (N.D. Cal. Aug. 20, 2015) (Chhabria, J.) ($27,000 and $25,000 to two class representatives); *Buccellato v. AT&T Operations, Inc.*, No. 10 Civ. 00463, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (Koh, J.) ($20,000 to lead plaintiff); *Lewis v. Wells Fargo & Co.*, No. 08 Civ. 2670, slip op. at 4 (N.D. Cal. Apr. 29, 2011), ECF No. 315 (Wilken, J.) ($22,000 and $20,000 for named plaintiffs); *Ross v. U.S. Bank Nat'l Ass'n*, No. 07 Civ. 2951, 2010 WL 3833922, at *4 (N.D. Cal. Sept. 29, 2010) (Illston, J.) ($20,000 service award for each of four class representatives); *Glass v. UBS Fin. Servs., Inc.*, No. 06 Civ. 4068, 2007 WL 221862, at *16-17 (N.D. Cal. Jan. 26, 2007) (Chesney, J.) ($25,000 to each of four class representatives).  For these reasons, the service awards are appropriate and do not undermine the adequacy of Plaintiff as a Class Representative.

**D.**     **Attorneys' Fees and Costs**

The Settlement Agreement allows Class Counsel to request an award of attorneys' fees and expenses of up to $500,000.  SA § 15.  In a non-common fund case brought under fee-shifting statutes such as Section 1981 and the Unruh Act, the lodestar method for awarding

---

[10]     This Section and the next Section preview, at a general level, the more detailed factual and legal presentation Plaintiff will provide in his fee petition and request for approval of Incentive Awards to be filed prior to the Final Approval Hearing.

[11]     *See, e.g.*, Matt Egan, *Wells Fargo Discriminated Against Dreamer by Denying Auto Loan, Lawsuit Claims*, CNN Business (July 19, 2019, 5:05 PM), https://www.cnn.com/2019/07/19/business/wells-fargo-dreamers-daca-lawsuit-auto-lending/index.html.

attorneys' fees is appropriate. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011); *Ross v. Trex Co.*, No. 09 Civ. 670, 2013 WL 12174133, at *1 (N.D. Cal. Dec. 16, 2013). The lodestar figure is "presumptively reasonable." *Cunningham v. Cty. of Los Angeles*, 879 F.2d 481, 488 (9th Cir. 1988). Additionally, the fact that the award of attorneys' fees and costs was negotiated separately and will not be paid out of the relief available to the class supports a finding that the requested fee award is reasonable. *Fulford v. Logitech, Inc.*, No. 08 Civ. 204, 2010 WL 807448, at *1 (N.D. Cal. Mar. 5, 2010) (Chesney, J.).

Class Counsel's lodestar in this litigation is approximately $387,393, based on approximately 723 attorney hours over the course of this litigation, and Plaintiff's costs are approximately $8,466. Miazad Decl. ¶ 53. Plaintiff intends to request an award of attorneys' fees and expenses of $500,000. Class Counsel have performed substantial work to earn this fee, including amending the complaint twice, briefing a motion to dismiss, and exchanging discovery. Further, the fees and costs were negotiated separately from the Settlement Fund.

Class Counsel's lodestar will increase during the coming months while Class Counsel continues to work to secure preliminary approval, oversee the dissemination of notice, respond to Class Member inquiries, and brief and seek final approval. *Johnson v. Triple Leaf Tea Inc.*, No. 14 Civ. 1570, 2015 WL 8943150, at *8 (N.D. Cal. Nov. 16, 2015) (Chesney, J.) (accounting for "future attorney time" in decision whether attorneys' fees were reasonable). Class Counsel expects that its total lodestar and costs will approach $500,000. If not, Class Counsel will request that the Court approve a modest multiplier. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998), *overruled in part on other grounds*, *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624 (9th Cir. 2020).

### E.    Settlement Administration Costs

The Settlement Agreement provides that Wells Fargo will pay the cost of a Settlement Administrator, up to $50,000. The parties have selected JND Legal Administration Co. ("JND") as Settlement Administrator. The parties selected JND by gathering bids from three settlement administrators from a list of four approved settlement administrators proposed by Wells Fargo. Miazad Decl. ¶ 44. Because the method of notice and claims payment processes are delineated in

the Settlement Agreement, no new methods were proposed by the proposed settlement administrators, and instead the parties evaluated whether the proposed settlement administrators were equipped to handle the notice and claims process as negotiated by the parties. *Id*. ¶ 45. Class Counsel has retained JND to administer the claims process in 14 cases in the past two years, including cases with complex claims processes like this one. *See, e.g.*, *del Toro Lopez v. Uber Techs., Inc.*, No. 17 Civ, 6255, 2018 WL 5982506, at *14 (N.D. Cal. Nov. 14, 2018); Miazad Decl. ¶ 48 (listing cases JND has worked on with Class Counsel in the past two years).

JND has agreed to perform all administration work set forth in the Settlement Agreement for a will-not-exceed cost of $50,000, which JND anticipates being sufficient to cover the total costs of settlement administration. SA § 3.3.1. The Settlement Administrator's maximum fee amounts to approximately 2.7% of the $1,185,000 maximum Settlement Fund, which is reasonable in light of the amount and complexity of the work to be performed (especially processing and verifying the Claim Forms, which will require careful manual review), and is in line with settlement administration fees in comparable cases. *See, e.g.*, *Pappas v. Naked Juice Co of Glendora, Inc.*, No. 11 Civ. 8276, 2014 WL 12382279, at *19 (C.D. Cal. Jan. 2, 2014) ($816,000 administration fee, equal to 9% of $9 million settlement); *Covillo v. Specialtys Cafe*, No. 11 Civ. 00594, 2013 WL 5781574, at *7 (N.D. Cal. Oct. 25, 2013) (up to $48,741 administration fee, equal to 2.4% of $2 million settlement).

### F. Cy Pres Awardees

Plaintiff has negotiated a settlement that requires Wells Fargo to pay at least $280,000. In the event that the combined payments to Class Members from the California and National Settlement Funds is less than this floor, the amount between the total distributions to Class Members and $280,000 shall be distributed equally between United We Dream and Consumer Action. *Id.* § 3.3.9; *see Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) (holding that *cy pres* distribution is appropriate "for the limited purpose of distributing the unclaimed funds"); *In re Easysaver Rewards Litig.*, 906 F.3d 747, 761 (9th Cir. 2018) (same). United We Dream is an immigrant youth-led non-profit that empowers young people to develop leadership and organizing skills and undertake campaigns promoting justice

and the dignity of immigrants. Miazad Decl. ¶ 55. Consumer Action is a non-profit that promotes consumer rights and advocates for consumer policies that promote financial prosperity for underrepresented consumers. *Id.* ¶ 56; *see also Easysaver*, 906 F.3d at 761-62 (*cy pres* recipients should be selected in light of the objectives of the underlying statute and the interests of the class). Class Counsel do not have any relationships, presently or in the past, with these organizations. Miazad Decl. ¶ 57.

## IV. <u>ARGUMENT</u>

Settlement approval "involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004); *see also* Manual for Complex Litigation §§ 21.632-634 (4th ed. 2004). Preliminary approval requires two elements: First, the court must determine that the settlement class meets the requirements for class certification if it has not yet been certified, Fed. R. Civ. P. 23(a), (b), and second, the court must determine that the settlement is fair, reasonable, and adequate, Fed. R. Civ. P. 23(e)(2). *Hanlon*, 150 F.3d at 1025-26.

### A. Certification of the Rule 23 Classes Is Proper.

For settlement purposes, the parties agree to certification of the California Class and the National Class.[12] "The validity of use of a temporary settlement class is not usually questioned." Alba Conte & Herbert B. Newberg, 4 Newberg on Class Actions § 11:22 (4th ed. 2002). The relevant factors also weigh in favor of certification.

### 1. Rule 23(a) Is Satisfied.

<u>First</u>, numerosity is met because joinder of Class Members would be impractical. Fed. R. Civ. P. 23(a)(1). Numerosity is satisfied here because Wells Fargo's data on applicants who did

---

[12] Plaintiff pled three nationwide classes in his Second Amended Complaint ("SAC"). ECF No. 66. The National Class as defined in the Settlement Agreement is substantively the same as the nationwide classes pled in the SAC; they cover the same products offered by the same line of business within the same time period, and both encompass denials made under the same internal Wells Fargo denial codes. Although Plaintiff did not plead a California Class in his SAC, the Unruh Act claims of the California Class are based on the identical factual predicate as the Section 1981 claims brought by the National Class. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006).

not meet Wells Fargo's citizenship or immigration status requirements – refined based on characteristics common to DACA recipients – reveals that the California and National Classes likely consist of hundreds of individuals. The Notice List contains approximately 1,625 individuals and Class Counsel believe 20-25%, or up to approximately 400 individuals, are DACA recipients who could be National or California Class Members. Miazad Decl. ¶ 32. Further, potential Class Members are "geographically dispersed" nationwide, including within California, which supports a finding of numerosity. *See Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*, No. 15 Civ. 224, 2016 WL 314400, at *6 (N.D. Cal. Jan. 25, 2016) (noting that "joinder may be impracticable where a class is geographically dispersed").

Second, commonality is met because "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In examining commonality, the Supreme Court has stated that the focus is on whether there are common issues of fact among class members and whether class treatment will "generate common *answers* apt to drive the resolution of the litigation." *Abdullah v. U.S. Sec'y Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Here, there are numerous common questions, such as whether Wells Fargo's lending policies deny Plaintiff and Class Members the opportunity to be considered for credit because of their alienage or DACA status and whether Wells Fargo's lending policies violate Section 1981 or the Unruh Act. Further, Plaintiff asserts liability based on uniform lending policies that apply to all Class Members. *See, e.g.*, *Stevens v. Harper*, 213 F.R.D. 358, 377 (E.D. Cal. 2002) (in civil rights context, "commonality is satisfied 'where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members'" (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001))).

Third, typicality is satisfied. Rule 23 typicality requires a finding that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under the rule's "permissive" standard, "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Johnson*, 2015 WL 8943150, at *3 (quoting *Hanlon*, 150 F.3d at 1020). Here, the Class Representative is typical of the California Class and the National Class he

proposes to represent because (1) he held DACA and a valid SSN when he applied for a loan from the line of business at issue in this Settlement; and (2) he alleges that he was denied credit because he is not a U.S. citizen or LPR pursuant to Wells Fargo's policies.

Fourth, Plaintiff has fairly and adequately protected the interests of the class and will continue to do so. Fed. R. Civ. P. 23(a)(4). The adequacy requirement is met where the class representative: (1) has common, and not antagonistic, interests with unnamed class members, and (2) will vigorously prosecute the interests of the class through qualified counsel. *Hanlon*, 150 F.3d at 1020; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Adequacy is met because Class Representative has the same interests as other Class Members and has shown that he can fairly and adequately protect Class Members' interests. Like all Class Members, Class Representative was denied credit by Wells Fargo under specific denial codes pursuant to Wells Fargo's lending policies. Miazad Decl. ¶ 49. The Class Representative has no conflicts of interest with the Class Members and, indeed, Class Members stand to benefit substantially from his pursuit of statutory damages on their behalf. Although members of the two classes will receive different ranges of awards under the proposed allocation plan for monetary relief, this feature of the Settlement does not present adequacy issues. *Hanlon*, 150 F.3d at 1021. This is in part because the Class Representative, as a member of the National Class only, will receive a lower award than members of the California Class because he is not releasing an Unruh Act claim, which is more valuable. However, the differences between the damages and potential remedies are ultimately small, all Class Members are subject to the same settlement terms and, of course, if any Class Member disagrees with the proposed relief, he or she may opt out. *Id.* Further, the Class Representative has vigorously represented the interests of his fellow Class Members and devoted time to the prosecution of this action, including by responding to discovery and having numerous phone calls with counsel. Miazad Decl. ¶¶ 51-52.

In addition, Plaintiff is represented by adequate counsel. Outten & Golden LLP and the lawyers at Justice Catalyst Law ("JCL") have extensive experience litigating complex class actions and have vigorously prosecuted this action on behalf of Plaintiff through motion practice and discovery. Miazad Decl. ¶¶ 4-9 (collecting cases); Briskin Decl. ¶¶ 4-7; *see also, e.g., Walsh*

*v. CorePower Yoga LLC*, No. 16 Civ. 05610, 2017 WL 589199, at *8 (N.D. Cal. Feb. 14, 2017) ("[Outten & Golden] ha[s] a proven track record in the prosecution of class actions as they have successfully litigated and tried many major class action cases.").

For these reasons, Class Counsel satisfy the adequacy requirement of Rule 23(a).

## 2. Certification Is Proper Under Rule 23(b)(3).

Rule 23(b)(3) requires that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both of these requirements are met here.

The proposed classes, the California Class and the National Class, are sufficiently cohesive to satisfy predominance. *Amchem*, 521 U.S. at 623. Predominance does not require "that each element of [a plaintiff's] claim [is] susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks and citation omitted). Rather, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting William B. Rubenstein, Newberg on Class Actions § 4:50 (5th ed.)). Here, Plaintiff challenges discriminatory policies that apply to all Class Members. Common questions as to the nature and legality of these blanket policies can be adjudicated collectively and will drive the resolution of Plaintiff's claims. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 509, 538 (N.D. Cal. 2012) (predominance requirement satisfied as to discrimination claims where plaintiffs challenged "specific employment practices" that applied "companywide"); *cf. Jones v. Wells Fargo Bank, N.A.*, No. B237282, 2015 WL 661757, at *8, 15 (Cal. Ct. App. Feb. 17, 2015) (affirming class certification under California law for Unruh Act claims challenging Wells Fargo's practices resulting in race-based lending discrimination); *id.* at *14 ("Claims that a uniform policy was consistently applied to a group are proper for class treatment."). Further, Plaintiff's status as Class Representative of the California Class, comprised of members who are releasing Unruh Act claims and will receive higher settlement awards than the National Class,

does not present any obstacle to satisfying predominance. Differences between state laws do not preclude predominance where claims revolve around a "common nucleus of facts," as they do here. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 563 (9th Cir. 2019); *see also Hanlon*, 150 F.3d at 1022.

Superiority rests on factors like individual class members' desire to bring individual actions and the utility of concentrating the litigation in one forum. Fed. R. Civ. P. 23(b)(3). Here, "there is no indication, that class members seek to individually control their cases, that individual litigation is already pending in other forums, or that this particular forum is undesirable for any reason." *Tierno v. Rite Aid Corp.*, No. 05 Civ. 02520, 2006 WL 2535056, at *11 (N.D. Cal. Aug. 31, 2006); *see also Amchem*, 521 U.S. at 615. Few Class Members would invest the time and money, plus the stress inherent in litigation, for a chance to possibly recover modest damages. In addition, individual lawsuits from hundreds of plaintiffs would be wasteful and inefficient for the court system. *See, e.g.*, *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, No. 05 Civ. 2320, 2006 WL 2642528, at *11 (N.D. Cal. Sept. 14, 2006). Because the class mechanism will achieve economies of scale for Class Members, conserve judicial resources, and preserve public confidence in the system by avoiding repetitive proceedings and preventing inconsistent adjudications, superiority is met.

### 3. Plaintiff's Counsel Should Be Appointed as Class Counsel.

Adequacy of class counsel depends on (1) work performed on the matter, (2) experience, (3) knowledge of the law, and (4) resources counsel can commit. Fed. R. Civ. P. 23(g)(1)(A). Class Counsel readily satisfy these criteria, as set forth above. *See supra* Part IV.A.1; *see also* Miazad Decl. ¶¶ 4-9; Briskin Decl. ¶¶ 4-7.

### B. The Settlement Is Fair, Reasonable, And Adequate.

Once the Court has found class certification proper, the next step of the preliminary approval process is to assess whether the settlement is "fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026. Typically, the first-stage analysis inquires into "obvious deficiencies," with preliminary approval granted if the settlement is non-collusive and within the

range of possible final approval. *Walsh*, 2017 WL 589199, at *6 (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).[13]

When considering whether to grant approval, courts often "put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Courts may also assess the following factors, which are assessed in greater detail at final approval. These factors are: (1) "the strength of the plaintiffs' case," "the risk, expense, complexity, and likely duration of further litigation," and "the risk of maintaining class action status throughout the trial," (2) "the amount offered in settlement," (3) "the extent of discovery completed and the stage of the proceedings," and (4) "the experience and views of counsel." *Hanlon*, 150 F.3d at 1026. In addition, courts review "the presence of a governmental participant" and "the reaction of the class members to the proposed settlement." *Id.* The former is not relevant, and the latter cannot be gauged at this stage.

### 1. Plaintiff's Case Faced Significant Hurdles on Liability and Class Certification.

"Approval of a class settlement is appropriate when 'there are significant barriers plaintiffs must overcome in making their case.'" *Betancourt v. Advantage Human Resourcing, Inc.*, No. 14 Civ. 01788, 2016 WL 344532, at *4 (N.D. Cal. Jan. 28, 2016). Plaintiff faces substantial obstacles to full recovery. First, liability is far from guaranteed. This litigation—a lending discrimination class action on behalf of DACA recipients—presents a theory with numerous unsettled issues. Other defendants in cases involving Section 1981 challenges on behalf of DACA recipients have argued that DACA recipients are not "lawfully present" in the United States to show that they are not members of a protected class under Section 1981 and Wells Fargo may raise a similar argument. Wells Fargo may also point to instances in which it extended credit to DACA recipients through what it characterizes as an "exceptions process" as proof that Wells Fargo does not discriminate against DACA recipients. Wells Fargo could also highlight events in Plaintiff's credit history to show that he was not qualified for the credit

---

[13]     *See also Cancilla v. Ecolab, Inc.*, No. 12 Civ. 3001, 2015 WL 4760318, at *3 (N.D. Cal. Aug. 12, 2015) (focusing preliminary approval analysis on "noncollusive negotiations," the lack of "obvious deficiencies" or "preferential treatment," and being "with[in] the range of possible approval"); Alba Conte & Herbert B. Newberg, 4 *Newberg on Class Actions*, § 13.15 (5th ed.).

products he sought, regardless of his DACA status. Finally, Wells Fargo has vigorously contended that its lending policies are justified because DACA—which the current administration has attempted to rescind—is a tenuous immigration status and a bank is justified in limiting credit to applicants who might be subject to deportation orders at any time from eligibility for credit for credit risk, business, compliance, and regulatory reasons.

Plaintiff also faces obstacles to obtaining class certification. As explained above, Plaintiff cannot identify Class Members from Wells Fargo's data with certainty, which presents manageability issues. Wells Fargo could also argue that Plaintiff cannot show commonality because Wells Fargo did not have an explicit policy that made DACA recipients ineligible based on their DACA status for the challenged credit products, or because some applicants would have been denied credit regardless of immigration status.

### 2. The Settlement Amount Is Appropriate.

"[P]erhaps the most important factor" courts consider in determining whether to grant preliminary approval is "plaintiffs' expected recovery balanced against the value of the settlement offer." *Cotter v. Lyft, Inc*., 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) (Chhabria, J.) (internal quotation marks omitted). Here, the monetary and programmatic relief provide excellent value for Class Members. Though the precise amount of the monetary awards per Class Member is not yet known, under any scenario the monetary relief under the Settlement is likely to be a high percentage of their maximum damages. Similarly, the settlement provides the greatest degree of programmatic relief possible.

California Class Members are eligible for individual awards of up to $2,500 per denial of a credit application, which is more than 60% of the statutory damages available under the Unruh Act for each discriminatory act. Cal. Civil Code § 52(a) (providing statutory damages of $4,000 per violation); Miazad Decl. ¶ 27. This is an excellent result for California Class Members.[14] If a

---

[14] *See, e.g.*, *Betancourt*, No. 14 Civ. 1788, 2016 WL 344532, at *5 (N.D. Cal. Jan 28, 2016) (granting final approval of settlement providing approximately 9.7% of total maximum potential recovery if class members had prevailed on all claims); *Stovall-Gusman v. W.W. Granger, Inc.*, No. 13 Civ. 2540, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (finding that a settlement constituting 7.3% of plaintiff's estimated trial award to be "within the range of reasonableness" (quoting *Ma v. Covidien Holding, Inc.*, No. 12 Civ. 2161, 2014 WL 360196, at *5 (C.D. Cal. Jan.

higher number of California Class Members submit Verified Claim forms – and because monetary awards are paid *pro rata* – individual awards may decrease to $1,735 per claim or lower.  Miazad Decl. ¶ 28.  However, even if 500 California Class Members submit Verified Claims – a substantially higher response rate than the parties anticipate – that would amount to awards of approximately $1,050 each, more than 25% of the $4,000 minimum damages under Unruh.  *Id*.  In light of the risks of an adverse judgment on the merits or on class certification, even awards on the lower end of this range still provide an excellent value to California Class Members.

The parties estimate that National Class Members will receive approximately $300 per denial.  Miazad Decl. ¶ 29.  This is an excellent benefit for National Class Members in light of the obstacles to proving damages on a class-wide basis.  First, Plaintiff would likely not have been able to show actual damages under Section 1981 at all.  Class Counsel consulted with economic experts who determined that significant obstacles existed to valuing and modeling actual or economic damages for a denial of credit where Class Members could potentially obtain the same credit elsewhere, or turn to savings accounts or loans from family members.  Miazad Decl. ¶ 29.  Second, the average award per National Class Member accounts for Wells Fargo's statutory damages exposure of $100 to $1000 per violation under FCRA, *see* 15 U.S.C. § 1681n(a)(1)(A), a claim that the Court had dismissed with leave to replead.  ECF No. 54.  Leading up to mediation, Class Counsel was developing a viable theory under FCRA for the recovery of statutory penalties, which Wells Fargo was willing to take into account during settlement talks.[15]  Miazad Decl. ¶ 29. For these reasons, the monetary relief obtained by Class Counsel for National Class Members in this action is excellent.

Plaintiff also obtained the *maximum* degree of programmatic relief that Class Members could possibly obtain.  Wells Fargo has agreed to extend unsecured credit to current and valid DACA recipients on the same terms and conditions as U.S. citizens.  In other words, Wells Fargo will *not* consider DACA as a factor in evaluating credit risk or in underwriting, which might

---

31, 2014))); *In re Heritage Bond Litig.*, No. 02 ML 1475, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005) (calling a recovery of 36% of the total net loss an "exceptional result").

[15]    By contrast. statutory penalties are not available under ECOA.  *See* 15 U.S.C. § 1691e.

invariably lead to inferior credit terms. All DACA recipients nationwide—not just Class Members—will benefit from this programmatic relief. DACA recipients have a great need for access to credit and have encountered significant difficulty in obtaining it.[16] As one of the largest lenders in the country, the programmatic relief offered by Wells Fargo is a significant benefit to Class Members (and DACA recipients nationwide) and is likely better than what could be obtained by protracted litigation and trial.

### 3. The Extent of Discovery Supports Settlement.

A settlement requires adequate discovery. The touchstone of the analysis is whether "the parties have sufficient information to make an informed decision about settlement," including formal and informal discovery. *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 459 (9th Cir. 2000) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)). Here, the parties have exchanged written discovery and produced documents, including documents and data relating to Wells Fargo's systems and denial codes. Miazad Decl. ¶¶ 13; 16. Additionally, the parties were in the process of addressing various discovery disputes at the time they reached a settlement in principle. *Id*. Wells Fargo also produced critical discovery for settlement purposes, including the direct auto financing lending policy. *Id*. ¶ 22. Finally, the parties benefitted from the rigorous and exhaustive discovery that the parties exchanged in *Perez v. Wells Fargo*, the related case in this District. *Id*. ¶ 17. Thus, the Settlement results from Class Counsel's informed judgment about the strengths and weaknesses of the claims.

### 4. Counsel's Experience and Views Support Approval.

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *DIRECTV, Inc.*, 221 F.R.D. at 528 (quoting *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997)). "[P]arties

---

[16]     More than 800,000 individuals have been approved under DACA in the United States. U.S. Citizenship & Immigration Servs., *Approximate Active DACA Recipients: Country of Birth as of February 28, 2019* at 5,
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/
Immigration%20Forms%20Data/All%20Form%20Types/DACA/2_Approximate_Active_DACA
_Recipients_Demographics_-_Feb_28_2019.pdf.

represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation[.]" *Rodriguez*, 563 F.3d at 967.

Class Counsel are some of the most experienced class action litigators in the country. Miazad Decl. ¶¶ 4-9; Briskin Decl. ¶¶ 4-7. Class Counsel specialize in prosecuting complex employment and civil rights class actions and, over many years, have successfully—and unsuccessfully—litigated many such cases, putting them in a strong position to weigh the strengths and weaknesses of Plaintiff's claims and Wells Fargo's defenses. Miazad Decl. ¶¶ 4-9 & Ex. B (describing "Past Distributions" in accordance with Northern District of California Procedural Guidance for Class Action Settlements). Based on their extensive experience, Class Counsel believe that the Settlement is fair, reasonable, and adequate.

### 5. The Parties Participated in Arms-Length Negotiations Before an Experienced Neutral Mediator.

A settlement reached "in good faith after a well-informed arms-length negotiation" is presumed to be fair. *Fernandez v. Victoria Secret Stores, LLC*, No. 06 Civ. 04149, 2008 WL 8150856, at *4 (C.D. Cal. July 21, 2008).[17] Here, the settlement easily meets the rigorous scrutiny required in this District and by *Roes, 1–2*, for both substantive and procedural reasons. First, the Settlement is substantively strong, providing excellent monetary relief and robust programmatic relief. Second, the Settlement is procedurally sound, (a) having been reached after hard-fought, adversarial litigation, including discovery and motion practice, (b) with no parallel litigation that could give rise to reverse auction concerns, and (c) reached after a mediation overseen by a highly experienced mediator with particular expertise in complex class actions. Miazad Decl. ¶¶ 10-23, 38.

### C. The Proposed Notice Is Clear and Adequate.

The proposed Notice is the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B), and is "reasonable," Fed. R. Civ. P. 23(e)(1). The Notice and Claim Form are consistent with Northern District of California's Procedural Guidance for Class Action

---

[17] *See also Wren v. RGIS Inventory Specialists*, No. 06 Civ. 05778, 2011 WL 1230826, at *6 (N.D. Cal. Apr. 1, 2011); *Tijero v. Aaron Bros., Inc.*, 301 F.R.D. 314, 325 (N.D. Cal. 2013) (private mediation "support[s] the conclusion that the settlement process was not collusive").

Settlements and modern best practices set forth by the Federal Judicial Center.[18]  The Notice and Claim Form are easily understandable and include: (1) contact information for Class Counsel to answer questions; (2) the address for a website maintained by the Settlement Administrator that will link to important documents in the case; and (3) instructions on how to access the case docket via PACER or in person at any of the Court's locations.  The Notice will state the date of the final approval hearing and states that the date may change without further notice to the Class, and further advises Class Members that they should check the settlement website or the Court's PACER site to confirm that the date has not been changed.  The Notice explains the deadlines for objecting, opting out, and submitting a Claim Form.  SA Ex. 1.

The Claim Form is clear, user-friendly, and focused on a few key relevant facts to which Class Members have ready access.  The Claim Form is helpfully pre-printed with individualized information in customized paper copies.  It will also be available online, so that Class Members can submit Claim Forms via a secure online submission form.  In addition, Class Counsel will assist the Settlement Administrator in responding to Class Member questions, helping them file Claim Forms and navigate the process generally.

## V.    A FINAL APPROVAL HEARING SHOULD BE SCHEDULED.

Plaintiff, in consultation with Wells Fargo, propose the following schedule for finalizing and implementing the Settlement:

| Event | Proposed Date |
| --- | --- |
| **Preliminary Approval Hearing** | **July 10, 2020** |
| Court enters Preliminary Approval Order* | July 24, 2020 |
| WF provides class list data to Settlement Administrator | August 7, 2020 |
| Settlement Administrator disseminates Notice | August 28, 2020 |
| Settlement Administrator sends Reminder notices | September 25, 2020 |
| Deadline for Class Members to opt out, and/or object | October 12, 2020 |
| Plaintiff file Fee and Incentive Award Motions | October 23, 2020 |
| Deadline for Class Members to file Claim Forms | October 27, 2020 |
| WF deadline to terminate settlement | November 12, 2020 |

---

[18]    *See Illustrative Forms of Class Action Notices: Overview*, Fed. Judicial Center, https://www.fjc.gov/content/301253/illustrative-forms-class-action-notices-introduction (last visited June 15, 2020).

| Event | Proposed Date |
|---|---|
| Plaintiffs file Final Approval motion | November 13, 2020 |
| **Final Approval Hearing** | **December 4, 2020** |
| Final Approval Order* | December 18, 2020 |
| Effective Date (assuming no appeals)* | January 22, 2021 |
| WF funds Settlement | April 12, 2021 |
| Settlement Administrator mails checks to Class | April 17, 2021 |

\* Assumed date for purposes of calculating subsequent dates.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (1) certify, for settlement purposes only, settlement classes pursuant to Federal Rule 23(a) and 23(b)(3); (2) grant preliminary approval of the Settlement; (3) appoint Plaintiff Peña as Class Representative, his counsel as Class Counsel, and JND as Settlement Administrator; (4) approve mailing to the Class Members the proposed Notice; and (5) schedule a hearing for final approval of the Settlement.

Dated: June 16, 2020                    Respectfully submitted,

By: _/s/ Ossai Miazad_____
    Ossai Miazad

Ossai Miazad*
Michael N. Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile:  (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

Jahan C. Sagafi (Cal. Bar No. 224887)
Rachel Dempsey (Cal. Bar No. 310424)
OUTTEN & GOLDEN LLP
One California St., 12th Floor
San Francisco, California 94111
Telephone: (415) 638-8800
Facsimile:  (415) 638-8810
jsagafi@outtengolden.com

rsun@outtengolden.com
rdempsey@outtengolden.com

Benjamin D. Elga*
JUSTICE CATALYST LAW
81 Prospect Street, 7th Floor
Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org

Brian James Shearer*
Craig L. Briskin*
JUSTICE CATALYST LAW
718 7th Street NW
Washington, D.C. 20001
Telephone: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

*admitted pro hac vice

*Attorneys for Plaintiff and the Proposed
Class*