Jahan C. Sagafi  (Cal. Bar No. 224887)
Rachel Dempsey (Cal. Bar No. 310424)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile:  (415) 638-8810
jsagafi@outtengolden.com
rdempsey@outtengolden.com

Ossai Miazad*
Michael N. Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

Brian James Shearer*
Craig L. Briskin*
JUSTICE CATALYST LAW
718 7th Street NW
Washington, D.C. 20001
Telephone: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Benjamin D. Elga*
JUSTICE CATALYST LAW
81 Prospect Street, 7th Floor
Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org

*Attorneys for Plaintiff and the Proposed Class*
*admitted *pro hac vice*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| EDUARDO PEÑA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 19-cv-04065-MMC-TSH<br><br>**DECLARATION OF OSSAI MIAZAD IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASS AND PRELIMINARY APPROVAL OF THE CLASS ACTION SETTLEMENT** |

I, Ossai Miazad, declare under penalty of perjury as follows:

1.      I am a partner at the firm of Outten & Golden LLP ("O&G") in New York, New York, Plaintiff's counsel herein, co-chair of O&G's Discrimination and Retaliation Practice Group, and a member of O&G's Class Action Practice Group.  O&G is a firm of about 70 attorneys based in New York City, with offices also in San Francisco and Washington D.C., which focuses on representing plaintiffs in a wide variety of employment and civil rights matters, including class action litigation challenging systemic employment discrimination on the basis of protected characteristics such as race, gender, and nationality; credit discrimination on the basis of citizenship status; and disparate impact litigation regarding the use of criminal background checks in employment eligibility.

2.      I am one of the lawyers primarily responsible for prosecuting Plaintiff's claims.

3.      I make these statements based on personal knowledge and would so testify if called as a witness at trial.

**Background and Experience**

4.      I received a Juris Doctor degree from American University Washington College of Law in 2004.  Since joining O&G in 2007, I have exclusively represented plaintiffs in employment litigation and other employee rights matters, with a focus on representing employees in class action and impact litigation involving discrimination.  I currently serve as plaintiffs' counsel in numerous major class action lawsuits involving these claims.

5.      I am the Co-Chair of O&G's Discrimination and Retaliation Practice Group.  I have served as a Co-Chair of the Subcommittee on USERRA for the American Bar Association's ("ABA") Labor and Employment Law Section, Fair Labor Standards Legislation Committee.  I have also served on the New York City Bar Association's Committee on Civil Rights and as a board member of the New York affiliate of the National Employment Lawyers Association ("NELA").

6.      I have been appointed as Class Counsel in many cases, including *Gonzalez v. Pritzker*, No. 10 Civ. 3105 (S.D.N.Y.), a nationwide class action litigation challenging, under

Title VII of the Civil Rights Act of 1964 ("Title VII"), the racially disparate impact of the U.S. Census Bureau's criminal history screening process.  I have litigated numerous other discrimination class actions, such as *Long v. Southeastern Pennsylvania Transportation Authority*, No. 16. Civ. 1991 (E.D. Pa.) (FCRA and Pennsylvania Criminal History Record Information Act claims); *see also* 903 F.3d 312 (3d Cir. 2018) (substantially prevailing on appeal of dismissal of FCRA claims on standing grounds), *Keels v. Geo Group, Inc.*, No. 15 Civ. 6261 (E.D.N.Y.) (FCRA claims under Section 1681b(b)(3)), *The Fortune Society, Inc. v. Macy's Inc.*, No. 19 Civ. 5961 (S.D.N.Y.) (Title VII and New York City Human Rights Law criminal history discrimination claims); *Pickett v. SIMOS Insourcing Solutions, Corp.*, No. 17 Civ. 1013 (N.D. Ill.) (FCRA claims under Section 1681b(b)(2) and (b)(3)), *Mandala v. NTT Data, Inc.*, No. 18 Civ. 6591 (W.D.N.Y.) (Title VII criminal history discrimination claims), *Millien, et al. v. The Madison Square Garden Co., et al.*, No. 17 Civ. 4000 (S.D.N.Y.) (FCRA and New York City Human Rights Law criminal history discrimination claims), and *NAACP New York State Conference Metropolitan Council of Branches v. Philips Electronics North America Corporation*, Index No. 156382/2015 (Sup. Ct. N.Y. Cnty.) (New York City Human Rights Law criminal history discrimination claims).

7.     I have also litigated other discrimination class actions on behalf of DACA recipients, including *Juarez v. Northwestern Mutual Ins. Co.*, No. 14 Civ. 05107 (S.D.N.Y.) (employment discrimination); *Rodriguez v. The Procter & Gamble Co.*, No. 17 Civ. 22652 (S.D. Fla.) (employment discrimination; defendant's motion for summary judgment denied on June 10, 2020); *Perez v. Wells Fargo Bank, N.A.*, No. 17 Civ. 00454 (N.D. Cal.) (lending discrimination); and *Juarez v. Social Finance, Inc.*, No. 20 Civ. 03386 (N.D. Cal.) (lending discrimination).

8.     The attorneys at O&G are experienced, highly regarded members of the plaintiffs' bar with extensive expertise in complex class action litigation.  Courts have repeatedly recognized O&G as qualified counsel in class actions.  *See, e.g.*, *Gonzalez v. Pritzker*, No. 10 Civ. 3105, 2016 WL 5395905, at *4 (S.D.N.Y. Sept. 20, 2016) (Title VII class action) ("Class Counsel are nationally recognized employment class action litigators . . . . Outten & Golden's

resources played a significant role in Class Counsel's ability to pursue this litigation without compensation over the past six years."); *Hall v. L-3 Communications Corp.*, No. 15 Civ. 231, slip. op. at 7 (E.D. Wash. Jan. 25, 2019) (USERRA class action) ("The attorneys involved in this case have litigated it expertly, and in their long experience in class action and labor work conclude this settlement is fair and reasonable."); *Pickett v. SIMOS Insourcing Solutions, Corp.*, No. 17 Civ. 1013 (N.D. Ill.) (FCRA class action) (appointing O&G as class counsel in settlement); *Easterling v. Connecticut, Dep't of Correction*, 08 Civ. 826 (D. Conn.) (appointing O&G as class counsel in a Title VII case); *Jaffe v. Morgan Stanley & Co., Inc.*, No. 06 Civ. 3903 (N.D. Cal.) (race discrimination class action brought on behalf of African American and Latino financial advisors, resulting in settlement of $16 million and comprehensive injunctive relief); *Duling v. Gristede's Operating Corp.*, No. 06 Civ. 10197 (S.D.N.Y.) (appointing O&G as class counsel in a Title VII case); *Amochaev v. Citigroup Global Markets, Inc., d/b/a Smith Barney*, No. 05 Civ. 1298 (N.D. Cal.) (gender discrimination class action brought on behalf of a national class of female financial advisors, resulting in settlement of $33 million and comprehensive injunctive relief); *Wright v. Stern*, No. 01 Civ. 4437 (S.D.N.Y.) (appointing O&G as class counsel in a Title VII case).

9. I supervised numerous other O&G attorneys and staff who worked on this matter. Brief backgrounds for these primary O&G attorneys and staff are set forth below:

a. Michael N. Litrownik is Counsel with O&G and a member of the Class Action Practice Group. Before he joined O&G in 2013, he worked at a small plaintiff-side firm litigating consumer rights class actions and police misconduct cases. Mr. Litrownik received his J.D. from Washington University School of Law in 2010. Since 2010, Mr. Litrownik has exclusively represented workers and consumers in individual and class action litigation, including other lending and employment class actions on behalf of DACA recipients such as *Juarez v. Northwestern Mutual Ins. Co.*, No. 14 Civ. 05107 (S.D.N.Y.) (employment discrimination); *Rodriguez v. The Procter & Gamble Co.*, No. 17 Civ. 22652 (S.D. Fla.) (employment discrimination; defendant's motion for summary judgment denied on June 10,

2020); *Perez v. Wells Fargo Bank, N.A.*, No. 17 Civ. 00454 (N.D. Cal.) (lending discrimination); and *Juarez v. Social Finance, Inc.*, No. 20 Civ. 03386 (N.D. Cal.) (lending discrimination).  Mr. Litrownik is a member of the National Employment Lawyers Association – New York, where he serves on the Judiciary Committee, the New York City Bar Association, where he serves on the Public Service Committee, and the Federal Bar Council, where he serves on the Employment Litigation Committee.  Mr. Litrownik was admitted to the bar of the Commonwealth of Massachusetts in 2010, and the bar of the State of New York in 2011.  Mr. Litrownik is also admitted to the bars of the United States District Courts for the Southern, Eastern, and Western Districts of New York, the District of Massachusetts, the District of Connecticut, and the U.S. Courts of Appeal for the Second and Eleventh Circuits.

d.      Rachel Williams Dempsey is an associate at O&G in San Francisco. Before joining the firm in 2017, Ms. Dempsey clerked for the Honorable John A. Kronstadt, United States District Court for the Central District of California, and for the Honorable Richard R. Clifton, Ninth Circuit Court of Appeals.  Ms. Dempsey received her J. D. in 2015 from Yale Law School and her B.A., *cum laude*, from Yale University in 2009.  Ms. Dempsey is admitted to practice in California and the Ninth Circuit.

e.      Hannah Cole-Chu is an associate at O&G in Washington D.C.  Before joining the firm in September 2018, Ms. Cole-Chu clerked for the Honorable Alvin W. Thompson, United States District Court for the District of Connecticut.  Ms. Cole-Chu received her J.D., *magna cum laude*, from the University of Maryland Francis King Carey School of Law in 2017.  During law school, Ms. Cole-Chu was Editor in Chief of the *Maryland Law Review* and Co-President of the Maryland Public Interest Law Project, Inc.  She received her B.A. from Bard College in 2009.  Ms. Cole-Chu is licensed to practice in Maryland and Washington, D.C.

h.      Miguel Tapia Colin is a paralegal at O&G.  Before joining O&G in 2019, he graduated from Columbia University with a B.A. in Political Science and Government and worked as a legal intern at the Law Offices of Jeffrey E. Goldman.

**Litigation**

10.     Plaintiff Peña filed this case as a putative class action on July 16, 2019, seeking to represent two nationwide classes of all non-United States citizens who resided in the United States and held DACA status at the time they applied for direct auto financing from Wells Fargo. ECF No. 1.  Plaintiff asserted claims of alienage discrimination under 42 U.S.C. § 1981 on behalf of the first class, and a violation of the Equal Credit Opportunity Act ("ECOA") on behalf of the second class.  *Id.*

11.     In September 2019, Plaintiff amended the complaint seeking to represent a third class of DACA recipients who were declined direct auto financing and whose consumer reports were obtained by Wells Fargo in violation of the Fair Credit Reporting Act ("FCRA").  ECF No. 27.

12.     On October 28, 2019, Wells Fargo moved to dismiss the First Amended Complaint on several grounds.  ECF No. 39.

13.     Beginning in November 2019, the parties engaged in discovery, including the exchange of written discovery requests and responses and the production of documents.

14.     On December 23, 2019, the Court granted Wells Fargo's Motion to Dismiss as to the FCRA and ECOA claims, allowing Plaintiff leave to amend, and denied Wells Fargo's Motion as to the Section 1981 claims.  ECF No. 54.

15.     Plaintiff filed a Second Amended Complaint on January 17, 2020 that repleaded the claims under ECOA and FCRA.  ECF No. 66.

16.     During this period, the parties exchanged written discovery requests and responses, produced documents and data, including information as to Wells Fargo's systems and denial codes, briefed issues as to the confidentiality of discovery materials, and were in the process of negotiating several discovery disputes at the time the case settled.

17.     In addition to the data produced in this action, the parties benefited from the rigorous and exhaustive discovery exchanged in the related case *Perez v. Wells Fargo*, No. 17 Civ. 454 (N.D. Cal.).

**Settlement Negotiations**

18.     In late January 2020, the parties began discussing potential resolution of the case.

19.     By this point, Plaintiff had a well-informed understanding of the scope of the legal issues and underlying facts.

20.     On February 7, 2020, the parties agreed to stay the case and engage experienced private mediator Hunter Hughes to assist the parties in settlement negotiations.

21.     Over the next several weeks, with the continued assistance of Mr. Hughes, the parties intensively negotiated a binding term sheet, which was signed on March 4, 2020.

22.     After further negotiation and additional discovery including production of the relevant auto policy documents, the parties executed a long-form settlement agreement ("Settlement Agreement") on June 16, 2020.

23.     The Settlement Agreement, along with a notice, claim form, reminder notice, and proposed communication regarding Official Documentation is attached hereto as **Exhibit 1** to this Declaration.

**The Settlement**

24.     The settlement provides excellent programmatic relief, substantial payments for California Class Members, and payments for National Class Members.  Both California and National Class Members may receive one or more payments based on how many of their auto loan applications Wells Fargo denied during the relevant period because they were not a U.S. Citizen or LPR.

25.     So long as the Class Member affirms they were denied at least one auto loan (in addition to the other required affirmations about DACA and a Social Security number), the number of cash payments they will receive under the Settlement will be based on data from Wells Fargo's application database, as contained in the Class Data.  In other words, Class Members need not recall the specifics of each auto loan denial going back to July 16, 2017 to receive payments for more than one auto loan denial.

26.     As to programmatic relief, Wells Fargo has agreed to change its lending policies to offer direct auto loans to DACA recipients on the same terms and conditions as it offers them to U.S. citizens and LPRs, provided there is an appropriate product (*e.g.*, no investor products if not permitted by the investor, like FHA loans).  This is the best possible programmatic relief that Plaintiff could have obtained at trial because Wells Fargo has agreed to not use DACA as a factor in determining credit risk or creditworthiness for auto loans.  In other words, Wells Fargo will not consider DACA at all in considering DACA recipients' applications for auto loans.

27.     The settlement provides awards of up to $2,500 per application denial (or claim) for California Class Members.  This figure represents more than 60% of the $4,000 per violation statutory penalty under the Unruh Act that Plaintiff would seek on behalf of California Class Members at trial.

28.     For the first 110 Verified Claims submitted by California Class Members, Wells Fargo will add $2,500 to the settlement fund, meaning that if the settlement administrator receives 110 or fewer Verified Claims from California Class Members, then Class Members will receive $2,500 per claim.  For each additional Verified Claimant after that, Wells Fargo will add $800 per claim to the fund, up to a cap of $525,000.  Therefore, the amount per claim decreases the more Verified Claims are submitted, such that if there are 200 Verified Claims, each claim is worth $1,735.  However, even if 500 California Class Members submit Verified Claims – a substantially higher response rate than the parties anticipate –the awards would still be approximately $1,050 each, more than 25% of the $4,000 minimum damages under Unruh.

29.     Plaintiff estimates that National Class Members will receive approximately $300 each.  This number reflects nominal damages under Section 1981 and ECOA, because Plaintiff did not seek compensatory damages under these statutes in the operative complaint.  While prosecuting *Perez v. Wells Fargo*, No. 17 Civ. 454 (N.D. Cal.), a case involving related issues, Plaintiff's counsel consulted with a well-known economist, who determined that there were significant obstacles to valuing and modeling actual damages for a denial of credit where credit was potentially available elsewhere, or where Class Members could turn to savings or loans from

friends and family.  It also reflects the statutory damages available under FCRA, which range

under the relevant statute from $100 to $1,000 per violation if the plaintiff can prove willfulness.

*See* 15 U.S.C. 1681.  Although Plaintiff's FCRA claims were dismissed, Class Counsel was

developing a viable theory for the recovery of statutory penalties under FCRA, which Wells

Fargo was willing to take into account during settlement talks.

30.     If there are 350 or fewer total claims from National Class Members, each Class

Member will receive $300 per claim, up to a maximum of $105,000 total.  If higher, that amount

will be lowered on a pro rata basis with the addition of each Class Member over 300.

31.     Wells Fargo did not record which immigration statuses applicants for direct auto

loans had if they were not U.S. citizens or lawful permanent residents ("LPRs").  Because Wells

Fargo did not maintain such applicant data, it could not identify who among the population of

non-U.S. citizens non-LPRs had DACA.  Therefore, Wells Fargo's data set listing potential

Class Members comprises approximately 1,625 applicants in the United States with valid SSNs

who did not meet Wells Fargo's citizenship or immigration status requirements and were denied

credit on that basis.  This list includes DACA and non-DACA applicants alike, such as work-

authorized non-citizens with employment or student visas and recipients of temporary protected

status ("TPS"), all of whom are eligible for SSNs.

32.     We estimate that approximately 20-25% of this group will have (or had) DACA

and be eligible for cash payments.  We arrive at this estimate by comparing the approximate

number of DACA recipients to the approximate number of individuals with TPS and visas.

According to USCIS and immigrants' rights groups, there are approximately 800,000 individuals

with DACA[1] and approximately 315,000 individuals with TPS in the United States.[2]  In addition,

---

[1]     American Council on Education, 2018 DACA Fact Sheet, available at: https://www.acenet.edu/Documents/DACA-Fact-Sheet.pdf.
[2]     Center for American Progress, What Do We Know About Immigrants With Temporary Protected Status?, Feb. 11, 2019, available at: https://www.americanprogress.org/issues/immigration/news/2019/02/11/466081/know-immigrants-temporary-protected-status/.

approximately one million individuals who receive employment visas each year;[3] we therefore

assume that there are approximately two million employment visa-holders in the United States

each year.  Combining DACA recipients, TPS recipients, and employment visa-holders yields a

total of approximately 3,115,000 individuals, approximately 20-25% of whom are DACA

recipients.  Applying that same representative figure to Wells Fargo's data set on auto loan

denials yields up to approximately 400 DACA recipients who will be eligible to become Class

Members.

33.     After consulting with JND about its experience and, based on our

communications with Class Members to date, we estimate that approximately 5-15% of the

people who receive notice will return valid Claim Forms.  JND provided us with several

examples of cases it has administered with a comparable claims process, including some with a

post-submission verification requirement, in which the claims rate ranged from approximately

4% to approximately 14.5%, as follows:

a.     *Edwards v. Hearst Communications*, Case No. 1:15-cv-09279-AT-JLC

(S.D.N.Y.): Over 3.9 million class members were provided notice via email or a postcard,

depending on email address availability, informing them of a settlement in a class action alleging

violations of a Michigan privacy law by disclosing customers' subscription information to third-

parties.  Approximately 7% of class members filed a claim for a benefit estimated to be

approximately $155, via an online portal on the case website or by returning the postcard claim

form.

b.     *Donnenfeld v. Petro Home Services*, Case No. 2:17-cv-2310-SIL

(E.D.N.Y.): Approximately 92,000 plaintiffs were notified via email and a mailed postcard

notice depending on email address availability, and approximately 8.6% of class members filed a

claim.  Approximately 14% of the claims were via hard-copy claim form and 86% were filed

online through the case website.  This matter alleged that plaintiffs who entered into a Ceiling

---

[3]     Migration Policy Institute, Temporary Visa Holders in the United States, Dec. 5, 2019, available at: https://www.migrationpolicy.org/article/temporary-visa-holders-united-states.

10

Price Agreement with defendants for the purchase of heating oil, did not receive the benefit of that agreement and overpaid for their heating oil.

      c.   *Pemberton v. Nationstar Mortgage LLC*, Case No. 3:14-cv-01024-BAS-MSB (S.D. Cal.): This matter involved allegations concerning defendant's alleged failure to report some borrowers' negative amortization payments to the IRS on tax Form 1098 for tax years between 2010 and 2018 and in reliance on the Form 1098 sent to them by defendant, they overpaid their taxes because they were not able to claim the full amount of their mortgage interest deduction.  Approximately 8% of almost 64,150 class members filed a claim to receive approximately $50 by completing and returning a claim form or by filing a claim online.  Valid claims required the submission of supporting documentation.  In addition, claimants who filed deficient claims forms received a deficiency notice and were able to re-file a corrected claim form.

      d.   *In re MyFord Touch Consumer Litigation*, Case No. 3:13-cv-03072-EMC (N.D. Cal): Approximately 4% of the class of nearly 385,000 Ford vehicle owners filed a claim to receive a benefit amount of up to $400 for damages related to the Ford MyTouch infotainment system.  Depending in the Claim option, class members were required to submit documents supporting their claim and had the option to file a claim online or via a mailed hard copy.  Class notice was conducted via email where available and a double-panel postcard short-form notice was mailed to the entire class.

      e.   *Dougherty vs. Barrett Business Services, Inc.*, Case No. 17-2-05619-1 (Washington Superior Court, Clark County): In a matter alleging violations of the Fair Credit Reporting Act ("FCRA") by defendant while obtaining background reports on job applicants, approximately 14.5% of the class submitted valid claims, from a class of approximately 41,500. Class members received a postcard notice with a detachable and returnable claim form and were also able to file claims online through the case website in order to receive a benefit estimated to be approximately $125.

34.     Plaintiff's counsel expects that the claims rate will be on the higher end of that range (i.e., closer to 15%) for California Class Members, considering the high amount of the settlement award per denial, and on the lower end of that range (i.e., closer to 5%) for National Class Members.

35.     Plaintiff's counsel recognizes the costs and risks of prosecuting this pathbreaking litigation through class certification, summary judgment, trial, and appeal.  This is especially true here.  The Section 1981 claim is a discrimination claim involving the legality of lending policies that exclude DACA recipients from credit—which has few analogues in federal court litigation. Both the ECOA and FCRA claims are also novel and relatively untested, and both were dismissed by this Court in the First Amended Complaint.  While Plaintiff believes he has developed a viable theory for his FCRA and ECOA claims, he understands that Wells Fargo would likely move to dismiss them again if litigation were to continue.  I firmly believe that it is in the interest of Plaintiff and all Class Members to resolve finally and completely their potential claims against Wells Fargo, and that the terms of this settlement are in the best interests of the class and are fair, reasonable, and adequate.

36.     Counsel for Wells Fargo has informed Plaintiff's Counsel that it does not oppose Preliminary Approval of the Settlement Agreement, conditional certification of the settlement class, approval of the proposed notice of class action settlement, or approval of the proposed schedule for settlement approval.

37.     At all times, our negotiations were conducted at arms' length and on a bifurcated basis: the Parties negotiated programmatic and class member relief first, and only when substantial agreement was reached on these issues did the Parties discuss service awards for the Named Plaintiff and attorneys' fees and costs.

38.     Plaintiff is aware of no parallel litigation that could give rise to reverse auction concerns.

39.     This Settlement addresses a principal concern of the lawsuit—ensuring that individuals with DACA have access to credit.  It does so by providing for a change in Wells

Fargo's policy that allows individuals with DACA to apply for and be considered by credit on the same terms as United States citizens, as long as there is an appropriate product available.

40.     If contested litigation were to continue, Plaintiff expects another Motion to Dismiss, a contested discovery period, expert witness discovery, an opposition to his class certification motion, as well as a motion for summary judgment from Wells Fargo and potential *Daubert* challenges to Plaintiff's expert witnesses.  Depending on the outcome of these motions, Plaintiff's recovery would depend on maintaining class status through and prevailing at trial.

41.     Plaintiff anticipates that Wells Fargo will raise several arguments in defense of Plaintiff's claims under the Unruh Act, Section 1981, FCRA, and ECOA.  These include the argument that DACA recipients are not "lawfully present" in the United States and therefore not protected under Section 1981(which is an argument that other defendants in similar cases have raised); that Wells Fargo extended credit to DACA recipients on an "exceptions" basis and therefore does not have a discriminatory policy; that Plaintiff was not qualified for the credit products her sought, regardless of his DACA status, and that proving eligibility for each member of the proposed class would be unmanageable; that Wells Fargo has a legitimate, non-discriminatory business justification for its lending policies because DACA recipients present too great a lending risk, as DACA could be rescinded any time and is an inherently tenuous status; that it provided an accurate statement of reasons for auto loan denials; that it had a permissible purpose for pulling applicants' credit reports; and that any potential FCRA violation was not willful.

42.     Plaintiff is prepared to and confident that he can rebut all of these arguments, but there is limited or no binding case law on many of issues, which increases the risk of litigation. For example, because no other litigation has reached the merits on the issue of lenders' refusal to lend to DACA recipients, the merits issues in this case are novel.

43.     In addition, the tenuous status of DACA increases Plaintiff's litigation risk.  The administration of President Donald Trump announced on September 5, 2017, that it was ending DACA.  After that announcement, three district courts around the country issued nationwide

injunctions that blocked implementation of the new policy on deferred action, allowing DACA recipients to continue to renew their status.  On November 12, 2019, the Supreme Court heard oral argument on the legality of the administration's attempts to terminate DACA.  A decision on that case remains pending, and the outcome could affect the protections currently enjoyed by Class Members and make it more difficult to extend them loans on the same terms as U.S. citizens.

**Settlement Administrator**

44.     Plaintiff has selected JND, a well-regarded national settlement administrator, to administer this settlement, after gathering bids from three potential administrators.  These administrators were selected from a list of four settlement administrators proposed by Wells Fargo.

45.     Because the method of notice and claims payment processes are delineated in the Settlement Agreement, no new methods were proposed by the proposed settlement administrators, and instead the parties evaluated whether the proposed settlement administrators were equipped to handle the notice and claims process as negotiated by the parties.

46.     JND has agreed to perform all administration work set forth in the Settlement Agreement for a maximum cost of $50,000, which JND anticipates to be sufficient to cover the total costs of settlement administration.

47.     Over the last two years, JND has administered either the settlement process or the class or collective notice process in 14 cases involving Outten & Golden, including in cases with complex claims processes such as this one.  It has not had any engagements with Justice Catalyst.

48.     The Outten & Golden cases that JND has administered in the last two years are as follows:

| CASE NAME | CASE NO. | JURISDICTION |
|---|---|---|
| *Reid v. Balfour Beatty Infrastructure Inc.* | 17-cv-70541 | Ohio C.P. Tuscarawas |
| *Kirchoff v. Big River Restaurants* | N/A private arbitration | N/A private arbitration |
| *Jacob v. Duane Reade, Inc., et al.* | 11-cv-160 | S.D.N.Y. |
| *Ilano v. Wells Fargo Bank, N.A.* | 30-2019-0199146 | Cal. Super. Orange |
| *Krokos et al. v. The Fresh Market, Inc.* | 16-cv-12082 | D. Mass. |
| *Lee and Campbell v. The Hertz Corporation, Dollar Thrifty Automotive Group, Inc.* | CGC-15-547520 | Cal. Super. San Francisco |
| *Lyft Inc. Arbitration Administration* | N/A private arbitration | N/A private arbitration |
| *Millien, et al. v. The Madison Square Garden Company and MSGN Holdings, LP* | 17-cv-4000 | S.D.N.Y. |
| *Casebeer, et al. v. Darktrace Inc.* | 0505263/2020 | N.Y. Sup. Kings |
| *Presson, et al.  v. Recovery Connections Community, et al.* | 18-cv-466 | E.D.N.C. |
| *Rabin, et al. v. PricewaterhouseCoopers LLP* | 16-cv-2276 | N.D. Cal. |
| *Ivery, et al. v. RMH Franchise Corp., et al.* | 17-cv-1619 | N.D. Ill. |
| *DeGuzman v. Sierra Pacific Mortgage Company, Inc.* | 2020-00278744-CV | Cal. Super. Sacramento |
| *Del Toro Lopez v. Uber Technologies, Inc.* | 17-cv-6255 | N.D. Cal. |

**Class Representative**

49.     Class Representative Eduardo Peña has claims that are typical of the class because, like all Class Members, he lives in the U.S., has DACA and a valid SSN, and was denied credit by Wells Fargo under specific denial codes pursuant to Wells Fargo's lending policies that reflect denials because the applicant is neither a U.S. citizen nor LPR.

50.     Mr. Peña has no conflicts of interest with the Class Members and, indeed, Class Members stand to benefit substantially from Mr. Peña's pursuit of damages on their behalf.

51.     Mr. Peña has vigorously represented the interests of the Class, including by assisting Counsel in drafting the Complaint, responding to discovery requests, and having numerous phone calls with counsel.

52.     Mr. Peña also undertook significant personal risk by "outing" himself as a DACA recipient and taking a leadership role in a lawsuit that has garnered significant media coverage. *See, e.g.*, Matt Egan, *Wells Fargo Discriminated Against Dreamer by Denying Auto Loan,*

*Lawsuit Claims*, CNN Business (July 19, 2019),

https://www.cnn.com/2019/07/19/business/wells-fargo-dreamers-daca-lawsuit-auto-lending/index.html.

**Class Counsel Fees and Costs**

53.    As detailed in the below graph, Class Counsel's requested fee of $500,000 represents $112,607 more than Counsel's actual lodestar and costs to date.  Class Counsel expects its lodestar to grow substantially through preliminary and final approval, including responding to Class Member inquiries, appearing for hearings, and overseeing the claims process, verification process, and distribution of payments to Class Members.

| Firm | Fees | Hours | Costs |
|------|------|-------|-------|
| Outten & Golden LLP | $ 257,716 | 552 | $7,224.06 |
| Justice Catalyst | $ 121,211 | 171 | $1,241.99 |
| **TOTAL** | **$ 378,927** | **723** | **$8,466.05** |
| **GRAND TOTAL: $387,393.05** | | | |

54.    All of these fees and costs were reasonably expended for the benefit of the class.

**Proposed Cy Pres Recipients**

55.    Cy pres recipient United We Dream is an immigrant youth-led nonprofit that organizes and advocates for the dignity and fair treatment of immigrant youth and families.  In particular, United We Dream provides resources and support to DACA recipients like those in the class, including information on what DACA is, updates on legal developments in DACA-related litigation, help in completing and filing DACA renewals, and financial assistance with the DACA application fee.

56.    Cy pres recipient Consumer Action is a nonprofit focused on consumer education and advocacy for underrepresented consumers nationwide.  Consumer Action uses multilingual consumer education materials to provide low- and moderate-income and limited-English speaking consumers, including class members and their families, with information about their rights, empowering them to achieve financial security.

57.     Class Counsel do not have any relationships, presently or in the past, with these organizations.

**Exhibits**

58.     Attached hereto as **Exhibit A** is a true and correct copy of the Settlement Agreement executed on June 16, 2020.

59.     Attached as **Exhibit B** is a chart of past distributions in comparable class action settlements, in compliance with the Northern District of California's Procedural Guidance for Class Action Settlements.

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Dated:     June 16, 2020
           New York, New York

                                        Respectfully submitted,

                                        By: _____

                                        **OUTTEN & GOLDEN LLP**
                                        Ossai Miazad
                                        685 Third Avenue, 25th Floor
                                        New York, New York 10017
                                        Tel.: (212) 245-1000