UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

MITZIE PEREZ and SERGIO BARAJAS,    )
Individually, and ANDRES ACOSTA,    )
TERESA DIAZ VEDOY, VICTORIA RODAS,  )
And SAMUEL TABARES VILLAFUERTE,     )
Individually and on behalf of all   )
Others similarly situated,          )    NO. C 17-00454-MMC
                                    )
           Plaintiffs,              )
     VS.                            )
                                    )
WELLS FARGO BANK, N.A.,             )
                                    )
           Defendant.               )
_____ )
                                    )
EDUARDO PENA,                       )
                                    )
           Plaintiff,               )
     VS.                            )    NO. C 19-04065 MMC
                                    )
WELLS FARGO BANK, N.A.,             )
                                    )
           Defendant.               )    San Francisco, California
_____ )    Friday, July 24, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:  (By Zoom Webinar)

For Plaintiffs:
                    OUTTEN AND GOLDEN, LLP
                    685 Third Avenue
                    25th Floor
                    New York, New York  10017
               **BY:  MICHAEL N. LITROWNIK, ESQ.**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

     (Appearances continued, next page)

For Defendant:

            MCGUIRE WOODS LLP
            Tower Two-Sixty
            260 Forbes Avenue
            Suite 1800
            Pittsburgh, Pennsylvania  15222
      **BY:  K. ISSAC deVYVER, ESQ.**
           **KARLA L. JOHNSON, ESQ.**

<u>**Friday - July 24, 2020**</u>                                    <u>**9:03 a.m.**</u>

**P R O C E E D I N G S**

        **THE CLERK:**  Calling Civil Case No. 17-454, Mitzie

Perez, et al. versus Wells Fargo, and Civil Case No. 19-4065,

Eduardo Pena versus Wells Fargo.

    Will counsel please state your appearances for the record.

        **MR. LITROWNIK:**  Good morning, Your Honor.  This is

Michael Litrownik from Outten & Golden, for plaintiffs in both

matters.

        **THE COURT:**  Thank you.  Someone else there you were

going to add?

        **MR. LITROWNIK:**  Sure.  I have several colleagues --

and I believe several of our clients as well -- both at Outten

& Golden and our nonprofit co-counsel, MALDEF and Justice

Catalyst, on as attendees.

    But I'll be doing all the speaking.

        **THE COURT:**  Very good.  Thank you.

        **MR. deVYVER:**  Good morning, Your Honor.

    You have Issac deVyver from McGuireWoods, along with Karla

Johnson, on behalf of the defense Wells Fargo in both cases.

        **THE COURT:**  All right.

    Mr. deVyver, you're coming through, but not very strongly.

What are you using to connect to us this morning?

        **MR. deVYVER:**  It's a combination of video and audio,

Your Honor.

1    I can see Your Honor, and I can also see Mr. Litrownik

2  speaking.  But for some reason, I can't get our video to

3  connect here.

4    And I apologize about that.

5    **THE COURT:**  Okay.  I'm going to switch, just so that

6   I don't possibly blur as I move around.

7    Okay.  All right.  So there are a number of things that we

8  have to take up this morning.  This is a motion for a

9  preliminary approval of a proposed class-action settlement.

10  There are two separate settlements, one in the *Perez* case and

11  one in the *Pena* case.

12    There are some problems here that I need to address with

13  you counsel at some length.  Aside from the very many things

14  that I would have to take up with you regarding the notice, the

15  claim forms, things that often come up in connection with these

16  kinds of matters, there's some underlying substantive matters

17  that are of some significance.  So I do want to go through

18  those.

19    We all know what these cases are.  These are people with

20  DACA status who applied for various types of loans from Wells

21  Fargo.  They say that they were turned down by reason of a

22  policy categorically excluding persons with DACA status from

23  obtaining credit of that nature.

24    There are different claims filed in the two cases.  And I

25  want to talk to you about what that might present by way of at

least some inquiry, though not necessarily an obstacle to settlement.

We have, in the *Perez* case, plaintiffs who apply for a credit card, for a student loan, and a small business loan. And then *Pena*, an auto loan.

The claims in *Perez*, as you know, are --

(Internet disruption)

(Reporter interruption)

**THE COURT:** Did anyone other than the court reporter notice that?

**MR. LITROWNIK:** You were fine here, your Honor.

**THE COURT:** All right. It's at your end, Ms. Ball. I'm not sure why.

I'll go back, and just repeat what I said.

(Reporter interruption)

**THE COURT:** All right. Thank you. Yes.

Just in case anyone hadn't figured it out from the record we have, this hearing, because of the COVID-19 pandemic, is being conducted as a Zoom hearing. And we have had several problems as a result.

Ms. Geiger, you're muted at the moment. Let me just ask you, although we can't see you -- or could you let me know whether you had any problem following, either on the audio or the video, what I was saying about the claims in the cases?

**THE CLERK:** No problem at all, Your Honor.

THE COURT:  Okay.

And, Ms. Ball, at the moment, if you could just unmute for a moment and let me know, am I coming across at your end fully or not?

(Reporter interruption)

THE COURT:  Okay.  Well, we'll see what happens.  I don't remember where you lost me, but --

(Reporter interruption)

THE COURT:  She's not in the courtroom.  I don't know if she can do it.  In fact, that's why I was commenting about her background where she is located.

Ms. Geiger, are you able to even record where you are?

THE CLERK:  Yes, I am, Your Honor.

THE COURT:  Oh, okay.  Good.  Thank you.

All right.  Well, where did you lose me?

(Reporter interruption)

THE COURT:  Oh.  Well, okay.  Well, let me repeat this again.  I'm sorry that it didn't come through at your end.

So the claims in the *Perez* case are under 42 U.S.C. Section 1981, and under the California Unruh Act.

In *Pena*, there is no state-law claim.  They're all federal claims.  And there's again the Section 1981 claim, then a claim under the Equal Credit Opportunity Act, and one under the Fair Credit Reporting Act.

1    The settlements are provided in the motion for approval.

2  They are somewhat involved, so I won't go over every detail.  A

3  great deal of care has been put into how they would be funded.

4  And, how claims would be made.  And I'll take that up as we go

5  along.

6    There's an estimated 50,000 class members in a national

7  class in the *Perez* case.  And, let's see.  In *Pena*, there's

8  approximately 400 class members.

9    Let me double-check that.  See what this note says.  It's

10  a little hard to follow.  Just a minute.

11    Okay.  In the two classes, I guess, nationally, there's

12  around 50,000 class members.  It's not known fully.  And then

13  400 in the California class.  So there are two different

14  classes.

15    The payments in the California class will be higher, for

16  the reasons stated that the relief allowed under the state law

17  is far more extensive than what could be obtained under the

18  federal law, as it's difficult here to show actual loss, and

19  there wasn't a provision in the federal law for statutory

20  damages, just nominal damages.

21    The sum -- the maximum sum that would be used to fund the

22  settlement is -- oh, let me go back to that, too.  Hmm.  Sorry.

23  Not sure where that is in my notes.  I'll just skip over it for

24  the moment.  It's close to $5 million.  I think the cap is at

25  4 million, 750.

So let me just pass all that up for a minute. It's too involved. And we'll get back to it, individually.

The Court has looked over the various factors in connection with what I would have to consider in a final approval. And I can go over those afterwards.

The notices I want to indicate -- which I do have to consider -- seem to be adequate the way that the parties propose that notice be given to the class members.

As you know, there's recent case law out of the Ninth Circuit that has looked very carefully at efforts to notify class members. Here, hopefully, these class members can be identified from the records at Wells Fargo.

And then once that happens, various types of notice are going to be sent, including reminder notices. So we have both mail, email. It sounded like an adequate effort was going to be made to reach those class members.

Then, the -- I've covered already what the differential is. There's a maximum that would be received for the *Perez* class members, which would be $2,500 for the California class, and 100, maximum, for the national class members.

And then in *Pena*, 2,500 for the California, and up to 300 for the national.

That all seems to be a reasonable recovery, given various caps on what the plaintiffs could recover if the case went fully to trial on a very good day.

1    The -- go past that, other notes that I've got, for a

2  moment.

3    Okay.  There are some matters with the release that I want

4  to take up with you.  I think that that's a potential problem

5  that we have here.

6    The concern I have is with the scope, which covers two

7  type of loans that are not supported factually in the operative

8  complaints.  And those loans are mortgages, and the personal

9  loans.

10    Personal loans were included at one time, have been

11  removed because the plaintiff who applied for a personal loan

12  from Wells Fargo and was turned down, apparently, with respect

13  to that plaintiff, Wells Fargo had another reason in advance of

14  ever considering her alienage or non-citizenship status for

15  turning her down.  And so that claim was removed from the fifth

16  amended complaint in the *Perez* case for that reason.

17    Mortgages, we don't have anyone.  And even if, for

18  purposes of including someone in a class, for class

19  certification, you could say that certain -- certain loans had

20  the same policy -- which isn't even being said here, by the

21  way.  I think it's -- the phrase was "enough similar" or

22  "sufficiently similar" or words to that effect in somebody's

23  opinion.

24    But even if that were good enough -- and it probably isn't

25  for purposes of class inclusion -- for purposes of a release,

1    the cases say that you can't release a claim that isn't

2    factually supported in the complaint, the class action

3    complaint.  And you don't have to plead the cause of action.

4        In other words, you can give up claims, much as happens in

5    *res judicata*, claims you could have brought but didn't, as long

6    as the facts would support those claims.

7        So at the moment, we have a big gap in the complaint in

8    *Perez* with respect to a couple of kinds of loans.  And I don't

9    know, then, whether plaintiffs' counsel wants to address that.

10       **MR. LITROWNIK:**  Of course.  Thank you, Your Honor.

11   I'm -- in terms of the personal loan, I'm actually slightly

12   confused because our plaintiff who was denied -- I believe

13   it's Teresa Diaz Godoy --

14       **THE COURT:**  That's correct.

15       **MR. LITROWNIK:**  -- who was denied a personal loan, I

16   believe she's maintained the claim throughout.  And that's

17   included in the operative complaint, the fifth amended

18   complaint.

19       **THE COURT:**  It is not.  It's very clearly not in

20   there.  The paragraph that originally had the claim in it was

21   in all the other complaints.  All of the first four had both

22   of the types of loans she applied for.  And then, it kind of

23   expanded on the other loan, and pointedly removed the personal

24   loan and had a footnote explaining why in your motion for

25   class cert -- and I can find that, if you want, I've got it

1    here somewhere in the pile of papers.  And I'll read that to

2    you if you want to be reassured that it's not in there.

3         **MR. LITROWNIK:**  So I'm -- I'm opening up the

4    document.  I --

5         **THE COURT:**  So this is coming as a big surprise to

6    you.  But let me say that -- I'll read you the class cert

7    note, just so you know what it is.

8         And then, if you could clear it up, if you could, you

9    either need someone who got turned down on a personal loan and

10   an amendment to add them, or some statement in the complaint as

11   a factual matter, if you can make it, that the policy for

12   personal loans is essentially identical to that of some other

13   loan that's already pleaded.

14        Otherwise, I'm not releasing it.  I'll just tell you that.

15   I can't do it.  You can't go around releasing claims that

16   nobody has brought or could bring in the action.

17        So give me a second.

18        I'm looking for the operative complaint as well.  And I

19   don't know -- yeah, okay.  Hang on.  Okay.  In the fifth

20   amended complaint, we're talking about Ms. Diaz Vedoy and --

21   okay.  Paragraph 56 of that complaint simply references her

22   credit card.  And then the rest of it is about credit cards.

23        And if you give me a minute, I'm going to see if I have

24   the fourth.  I had it, but I don't think -- hold on a minute.

25   I'll just go off and see if I can find it.

1    (A pause in the proceedings)

2    **THE COURT:**  Okay, the paragraph that would be the

3    equivalent in the fourth amended complaint -- let's see.

4    Yes.  Paragraph 61 in the fourth amended complaint says

5    that on or about January 28 of 2017 she went to Wells Fargo to

6    -- looking for a personal loan of about $6,000 and a credit

7    card to help pay for certain kinds of debt.  And then there was

8    a long thing about why she, you know, wanted this money, to

9    help her parents, et cetera.

10    When we got to the fifth amended complaint and the

11    equivalent paragraph, which is the second one under her name,

12    all of the details of why she wanted money have been removed.

13    And it simply -- and so has the personal loan.  And it says on

14    or about that date, she went to Wells Fargo, looking for a

15    credit card to consolidate balances.  So, that's what that

16    says.

17    Then if we go to the notice of motion and motion for class

18    certification, that's Document No. 293-3, there is a

19    Footnote 15 on Page 8, stating as follows (As read):

20         "Ms. Diaz Godoy's application for a personal loan was

21         denied on the spot due to her credit profile.

22         However..."

23    And then it goes on to say:

24         "...if it had proceeded further, the application

25         would have been denied because she wasn't a permanent

1    resident."

2        Now, nonetheless that was removed.  So that's the history

3    of the personal loan pleading.  It's not in the complaint.  The

4    reason for it is apparently what's in that footnote.

5        And you're going to have to decide how you're going fix

6    that if you want to get rid of personal loans, and settle that

7    in this class action.

8        **MR. LITROWNIK:**  Understood.  Thank you for the

9    clarification, Your Honor.

10       **THE COURT:**  Okay.  Hang on, I'm going to take those

11   papers which relate to that issue and put them aside.

12       Okay.  Did you want to say anything about that,

13   Mr. deVyver?

14       (No response)

15       **THE COURT:**  Is he there?

16       Hello.  You're muted.

17       **MR. deVYVER:**  Your Honor, I'm here.

18       **THE COURT:**  And did you want to say anything,

19   Mr. deVyver, about the personal loan issue?

20       **MR. deVYVER:**  No, Your Honor, not at this time.

21       **THE COURT:**  Okay.  And can I just make sure, am I

22   pronouncing -- is it Lit-rov-nik?

23       **MR. LITROWNIK:**  Lit-row-nik.

24       **THE COURT:**  Okay.  Thank you.  All right, thank you.

25       **MR. LITROWNIK:**  Your Honor, sorry.  Can I add one

 1    thing?  And I'm sorry for missing what you were getting at.

 2        I think what we had hoped to -- what we had tried to do in

 3    the settlement and in the papers is -- what we did was

 4    encompass -- both credit cards and personal loans are contained

 5    within the same business line for Wells Fargo, which is called

 6    Personal Lines and Loans, or CFS.

 7        And CFS has the exact same eligibility policy -- not

 8    substantially similar, the exact same, for -- I'm sorry, I

 9    misphrased it.

10        THE COURT:  No, I didn't say anything.  I was just

11    kind of following you.

12        MR. LITROWNIK:  Okay.

13        THE COURT:  But you would have to put that in the

14    complaint to be a fact.

15        MR. LITROWNIK:  Understood.

16        THE COURT:  Okay.

17        MR. LITROWNIK:  And we can do that, yes.

18        THE COURT:  Okay.  That's great.  Now, on the

19    mortgage, that's a whole other story, and I don't know that

20    you are going to be able to do it.  You know, and mortgages

21    are secured.  They may have a different policy about secured

22    loans.  Once they got your house, you can leave the country,

23    they'll sell it and make out like a bandit.

24        So -- you know.

25        MR. LITROWNIK:  Right.  So Your Honor, let me address

that.  I think there are two ways I can address that.

One is that we're happy to submit the -- so I think the policies are functionally the same in terms of making DACA recipients ineligible.  And we're happy to provide a supplemental submission laying out the language of each policy to demonstrate that for Your Honor.

We'll provide them under seal, because I believe they're still confidential in the case.

**THE COURT:**  You have to plead the facts at least as a conclusion, if not --

**MR. LITROWNIK:**  Uh-huh.

**THE COURT:**  -- otherwise.  And then if you want to support that with documentation under seal, either as an exhibit or otherwise, you could do that.

**MR. LITROWNIK:**  Okay.

**THE COURT:**  But, again, we're not talking about certifying a class to include.

For example, if you had some product case, and somebody said:  I brought my -- you know, I bought your green label product, and it made -- it had too much of something, and it didn't say it.

And then someone says:  Well, we want to include in the class everybody who bought this product, green label, blue label, it doesn't matter.  And there's something -- you know.

And then somebody says:  Okay, the green and blue label

products have the exact same content, the same misleading label, whatever.  But, if you want to release a claim, you're not trying the thing.  If you want to release it, you have to have the claim supportable in the complaint.  So I'll leave that to you to try and figure out how you want to do that.

I have real questions about the mortgage.  From what you've said about personal lines and credit, maybe that, you know -- credit cards -- maybe that all falls into place.

Now, there's a kind of oddball thing on the *Pena* case. Here, you're just maybe giving people more money, so it's not necessarily a total stumbling block.  But the *Pena* California people would be getting the same kind of money that -- at least, the 2,500 potentially that the *Perez* California class is getting.  But in *Pena*, there's no California claim.

So is the idea:  Well, we could have gotten one, and then we would have filed a California claim, and then we would have settled that too, and we would have had to find a plaintiff who lived in California, and it was just too much trouble, so we're just settling that claim because it could be -- an Unruh Act claim could have been filed if we found somebody who had standing to bring it, based on the facts we have in our fifth amended complaint?

**MR. LITROWNIK:**  That's exactly right, Your Honor.

**THE COURT:**  Okay.

**MR. LITROWNIK:**  The additional idea is that it's

essentially an allocation plan where California members are
receiving a huge boost in terms of their monetary relief.

And I just also want to just emphasize one clarification.
The $2,500 or the $100 in terms of the monetary relief is per
denial.  So it's not just if you applied three times, you get
2,500.  If you applied three times, you were denied, you would
get 7,500, which would provide fantastic value for the class.

THE COURT:  Let me ask you a question.  If somebody
gets turned down, how many times do they keep going back,
assuming they figured out that it's because of their status
and nothing they could fix up in their financial profile?

Do you have many people that made multiple applications?
It will -- if that's the case, given how this money that's
being put in is kind of staged, it's going to reduce the amount
that would be otherwise available to all the class members if
everybody only had one -- you know, one claim.

So do you have any idea how many people actually applied
multiple times, or for multiple kinds of loans?

MR. LITROWNIK:  So we think -- we think there's some.
We know like, for example, one of our plaintiffs did, applied
to both a credit card and a personal loan.

THE COURT:  Uh-huh.

MR. LITROWNIK:  We don't yet have access to that
data.  Wells Fargo has access to it now.

THE COURT:  Okay.

1    **MR. LITROWNIK:**  If the Court grants preliminary

2    approval, we'll have access to that.  We're happy to provide a

3    supplemental submission if the Court would like that.

4         **THE COURT:**  Not necessarily.

5         **MR. LITROWNIK:**  Yeah.

6         **THE COURT:**  I was just curious about, you know, if

7    you get turned down and then you think it's pretty obvious why

8    you did, why would you apply again?  Just curious.

9         Okay.  All right.  Let's see here.

10        Okay.  Yeah, I think I've covered that particular -- to me

11   this was a considerable problem, because it's something that

12   may require amending your complaint.  It's going to push your

13   timeline back.

14        Okay.  Let me just keep going with the papers I have here.

15   We already covered the mortgage, all right.

16        On the attorneys' fees, just a couple of things to take

17   up.  And the incentive awards.  $25,000 per class

18   representative is quite a significant sum.  You are going to

19   have to support that very strongly.

20        I know that there's been a citation to a case from quite a

21   few years back that I handled where I did approve that.  And

22   looking back over that file, there isn't much that shows what

23   actually went on in that case on the, at least, filed record.

24   But times have changed quite a bit since then.

25        I just want you to know, this isn't a slam-dunk that

everybody's getting 25,000. I'm not asking you to support it now; I'm just alerting you. When you file your motion.

As to the people who aren't even class representatives, do you have some authority that they would be entitled to a payment directly from the Court, as opposed to divvying something up behind the scenes later?

MR. LITROWNIK: We can -- we'll research that authority and provide it.

THE COURT: Okay. All right. Thank you.

As far as what -- the fees that counsel are looking for, although they would be considerably over the 25 percent benchmark, they, on a lodestar basis, are already approaching the higher amount, that would be more like 25 percent, anyway. And so I think that -- I don't think there'll be much of a problem in *Perez*.

In *Pena* it's a little harder because the lodestar is significantly below right now. But there may be ways that you can show that a -- 25 percent, if you actually put some value on the non-economic relief they're getting, the policy change -- which is significant.

I'm not sure how one values it. I haven't really looked to see how you might put some figure on it. But, you can consider that, if there's a way to do it, or at least to point out --

MR. LITROWNIK: Uh-huh.

1  **THE COURT:**  -- how important it is to get the change

2  in the policy, and not just the financial award that the

3  plaintiffs would get.

4  **MR. LITROWNIK:**  Your Honor, if I could just add, I

5  think two recent developments have only increased the value of

6  the programmatic relief.

7  One, of course, is the Supreme Court's decision sustaining

8  DACA, last month.

9  And the second is just last week, I think a Federal Court

10  in the District of Maryland essentially forced -- issued an

11  injunction forcing the government to begin accepting new DACA

12  applications again.

13  **THE COURT:**  How does that affect the value of the

14  relief that you are obtaining in this settlement?

15  **MR. LITROWNIK:**  Sure.  So the -- because there will

16  be new DACA recipients who are added to the existing pool of

17  DACA recipients, who will be able to benefit from the change

18  in lending policy.

19  **THE COURT:**  Oh, all right.  Okay.  All right.

20  **MR. LITROWNIK:**  In the future.  Yeah.

21  **THE COURT:**  All right.  So more people will benefit,

22  not just the current group, but even an expanded group, --

23  **MR. LITROWNIK:**  Exactly --

24  **THE COURT:**  -- because of the changes.  Okay, that's

25  fine.  That's a pretty good point.

1      If I did not award, let's say, the totality of the fees

2 and incentive awards that are being sought here, what would

3 happen to that -- that extra money?

4      Does that revert?  Or where does it go?  Does it go to

5 *cy pres*?

6      And then we'll take up the *cy pres* problem.

7           **MR. LITROWNIK:**  I'm not sure -- not sure that is

8 addressed.  Let me check the settlement agreement quickly,

9 Your Honor.

10           **THE COURT:**  Sure.

11      You still with us, Mr. deVyver?

12           **MR. deVYVER:**  Yes, Your Honor, I'm still here.

13           **THE COURT:**  Very faintly.

14           **MR. deVYVER:**  I apologize.  I'll try to speak up.

15           **THE COURT:**  That's okay.

16      Did you find anything, Mr. Litrownik?

17           **MR. LITROWNIK:**  I believe it reverts.

18           **THE COURT:**  Okay.  Well, I'll keep that in mind.

19      Anyway, you might note that somewhere, if you figure it

20 out.

21           **MR. LITROWNIK:**  Okay.

22           **THE COURT:**  Let's go to *cy pres*.

23      The plan here is that if -- there's a -- there's a floor

24 to how much -- or how far down the defendant can go, regardless

25 of how many people make claims.  And if that floor is not

1 exhausted, then the balance would go to nonprofits, rather than

2 back to the defendant.  That's admirable.  But I have some

3 concerns about the charities chosen.

4      So let's take a look at the *Perez* case first.  All right?

5           **MR. LITROWNIK:**  Sure.

6           **THE COURT:**  There are two charities that are

7 nonprofits that are being selected.  Each one has some issues.

8 And I appreciate that those were pointed out to the Court

9 primarily by plaintiffs' counsel.

10      Now, the first we'll take is TheDream -- is what,

11 TheDream.US, is that --

12           **MR. LITROWNIK:**  Exactly, Your Honor.

13           **THE COURT:**  Okay.  TheDream.US is a nonprofit that is

14 most closely related to the members of the class and the

15 claims that are being brought here.

16      As you know, for a *cy pres* selection to survive, you are

17 really looking at what the courts call the next best

18 distribution, when you can't make a direct monetary payment.

19 So there should be, they say, a substantial nexus, you know,

20 between the interests of the class members and the particular

21 nonprofit.

22      Here, TheDream.US really focuses on DACA recipients, so

23 this is -- and helping them.  And that's very important.  The

24 slight glitch here is that Mr. Saenz was on the advisory board

25 of that particular nonprofit, and he's one of the class

counsel.

What does the advisory board do?  Is this like a board of directors, or what?

**MR. LITROWNIK:**  I believe the -- I believe the advisory board is actually different than the board of directors for the nonprofit.

**THE COURT:**  Okay.

**MR. LITROWNIK:**  And I'm -- I know Mr. Saenz was involved.  He resigned in advance.  And we -- we disclosed that, which Your Honor knows.

**THE COURT:**  Yes.  I don't know that just getting off, in and of itself, would be good enough.  Particularly given whenever this particular nonprofit was chosen.

The problem is it looks a bit like favoritism, like class counsel chose their -- you know, their pet charity to give the money to.

And, you know, the case that I think you cited where someone had gone to the university or whatever, it was way in the distant past.  And so, you know, the Court was essentially saying and using the words:  There's no continuing relationship.  Not that somebody dropped out the day before, but that they hadn't really had any connection for years.

This is a different situation.  And I don't want to get all the way -- for example, let's say we get all the way to the end here, and all these notices go out, and everybody is told

that the excess funds that aren't used are going to go, in
part, to TheDream.US, and I decide that you can't do it.  I
don't even know what happens to the settlement at that point.

So I think we have to know in advance whether this is
going to work.

**MR. LITROWNIK:**  Yeah.  Thank you, Your Honor.

I think one thing to highlight with this *cy pres* designee
is that there are a limited number of nonprofits focused on
DACA recipients, especially in terms of access to education and
students' loans and financing, and this is really the primary
one.

You know, it's not like, you know, there are other sorts
of issues where there are myriad nonprofits across the country,
you know, large ones, small ones.  Here, there really are a
limited number.  We think it's a really excellent organization
that has the closest nexus we could find.

And I understand Your Honor's concern.  If there's
anything, any representations we can make about, you know, the
lack of involvement of Mr. Saenz in terms of the nonprofit in
the future, we'd be happy to do those, you know, make sure we
could --

**THE COURT:**  Not really in the future.  It's the now.
 All right?

In other words, if you want to give your money to your
brother-in-law, and your sister divorced him, okay.  I just --

you know, I'm just saying that the relationship exists.  And it
doesn't go away in a month.  All right.

     And so the question is how -- maybe he didn't have a role
in selecting this charity.  In all likelihood, given that you
say there are very few DACA charities, and he's involved with
DACA recipients, he probably knows all about this, he probably
called it to your attention; that's fine.  I don't know if
there was some vote that was taken.  I really don't.

     But I'm just telling you that if you can't get him out of
the picture enough, it's going to look like you picked
counsel's pet charity to give the money to.  And I can't
necessarily allow that to happen, without the record being made
very clear as to why that isn't what happened.

     I don't know if there are -- there just aren't any other
DACA charities or nonprofits, or the ones that there are can't
do the work that this one does.  And why this one would win on
its own, despite what somebody might call nepotism.

     But I am concerned about it.  And I don't want to get to
the end of the day, and then what do we do if it doesn't fly?
And if somebody wanted to challenge this later?

               **MR. LITROWNIK:**  Uh-huh.

               **THE COURT:**  So what do you think?  Knowing what you
know about whatever -- and, you know, not disclosing any, you
know, attorney/client-privileged information or what have you,
do you think you can make a record that will sufficiently

1  explain why this particular nonprofit should be chosen over,

2  let's say, another one that's focused on DACA?  Or somebody

3  else?

4  　　　　MR. LITROWNIK:  I think we can make that record in

5  our final approval motion, Your Honor.

6  　　　　THE COURT:  All right.  Because you don't want to go

7  to spending all the money, and then have to start all over

8  again.

9  　　　Do you have to, by the way, split all this up?  What if

10  you gave it all to just one non-problematic nonprofit?

11  　　　　MR. LITROWNIK:  Well, Your Honor, as part of our

12  settlement negotiations, one of the provisions was that the

13  parties essentially would jointly select *cy pres* designees.

14  And so what ended up happening was we selected one, Wells

15  Fargo selected one, and -- and agreed to split any funds that

16  are distributed.

17  　　　　THE COURT:  Who chose United We Dream?

18  　　　　MR. LITROWNIK:  That was us, Your Honor.

19  　　　　THE COURT:  Okay.  There doesn't seem to be much of a

20  problem with that one.  All the others, there's something that

21  has to be discussed.  United We Dream, that doesn't have

22  anybody -- at least that I know of, that you've called to my

23  attention -- connected with it in some way, in advisory or

24  other fashion.  And, appears to be sufficiently close to

25  whatever we're doing here in terms of the claims that are

being brought.

Let's go to UnidosUS.  That's the other charity or nonprofit that was selected in the *Perez* case.  And number one, it primarily serves or it only serves the, quote-unquote, Hispanic community.

I'm sure that a lot of DACA recipients are members of the Hispanic community and are Latino, but they aren't the sole members.  And so I would like to ask you if you know when you -- from whatever you do about DACA recipients at large, whether they're members of this class or they end up not being, what the percentage breakdowns are in terms of:  Do Latino young people make up the vast majority of DACA applicants, for example.

MR. LITROWNIK:  Yes, Your Honor.  I believe it's around 80 percent of DACA recipients are -- were born in Central -- Latin America or in Mex- -- primarily Mexico.  Other Latin American countries, as well.

THE COURT:  All right.  That may be enough to get past the fact that this particular organization is not serving a community that essentially includes whatever Asian recipients there are, South Asian recipients, other recipients.  European recipients.  Okay.

Then you have another problem of sorts.  Janet Murguia, who -- I wonder if you could maybe put the bottle down while we're talking.  Okay?

1       **MR. LITROWNIK:**  Okay.  Of course, Your Honor.

2       **THE COURT:**  We are essentially in a formal

3   proceeding.  Otherwise, I'll start drinking coffee.

4       Okay.  That the -- Janet Murguía, she's a very

5   accomplished person, she has a sister who is a Ninth Circuit --

6   is on the Ninth Circuit Court of Appeals, Mary Murguia.  And

7   it's a very accomplished family.  Anyway, I can see why

8   somebody might pick her to be on an advisory counsel for Wells

9   Fargo.

10      Now, this is something that Mr. deVyver, if he can get his

11  volume up enough, is going to have to address.  And my question

12  there is:  What is this stakeholder advisory council that she

13  is a member of?

14      **MR. deVYVER:**  Your Honor, the stakeholder advisory

15   council was a council that Wells Fargo's new leadership put

16   together when Mr. Scharf took over as the CEO of Wells Fargo

17   to help guide the bank.

18      I mean, I don't -- Wells Fargo has had some problems over

19  the last couple of years.  It's been in the news, and there's

20  no, sort of, point for me to recount some of that.  But the

21  purpose of this advisory committee is that it's just to help

22  give guidance to Wells Fargo in making decisions that are in

23  the best interest of its customers, and frankly, in the best

24  interest of the community.

25      **THE COURT:**  Okay.  In other words, Wells Fargo's kind

of reaching out to the community that it serves, and perhaps some of the aspects of the community that may have not been served as well in the past, and is getting their input as to how they can do better?

    **MR. deVYVER:**  That is correct, Your Honor.

    **THE COURT:**  Okay.  All right.  That may not be a problem, then.  So, let's leave that one in place.

This formerly -- this was formally the National Council of La Raza.  It's now called UnidosUS, for whatever reason.

Okay.  Then I've already mentioned United We Dream in the *Pena* case.  And that seemed to be an appropriate nonprofit.  It says that they provide resources and support to DACA recipients like those in the class.  And, including legal and other financial assistance and so forth.  Or advice regarding financial -- not necessarily giving money.

And then the last one we have in the *Pena* case is a nonprofit called Consumer Action.  And they are essentially a consumer organization.  I am not sure that they have a close enough nexus under the case law to qualify.  Yes, they have materials that are multi-lingual.  So does the registrar of voters; we're not giving them any money.

So I'm not sure just because they have people who, if they're -- you know, if they're using multi-lingual consumer education materials, that they are focused enough on what might be considered DACA recipients.

How would you connect up Consumer Action -- I assume --
well, this one was picked by Wells Fargo, I guess, from what I
was told earlier about the United We Dream choice.

So I guess you're still on, Mr. deVyver.

**MR. deVYVER:** Yes, Your Honor.

We -- we chose this particular charity -- or nonprofit, I
should say. What we were looking to do there was, as
Your Honor sort of talked about, is support consumer rights.

And so it's an organization, it's a nonprofit that
supports the rights of consumers. They are a lot of low-income
non-English speaking consumers, and they're basically just
trying to help them navigate their way through consumer issues.

And I think in part we were thinking *Pena*, in particular,
had some -- as Your Honor pointed out, some different claims in
terms of, you know, credit issues that were at issue in that
case that weren't at issue in *Perez*. And we thought that this
particular organization may help sort of address some of those
issues.

**THE COURT:** Anything you wanted to say about that,
Mr. Litrownik?

**MR. LITROWNIK:** I agree with Mr. deVyver. I think
the distinction in *Pena* is that we did have some
credit-related claims that touched a little bit more on
consumer-rights issues, classic consumer-rights issues than in
*Perez*.

THE COURT: Okay. To that extent, again, even if there's no objection by a class member to the inclusion of any of these particular nonprofits, for any review that may be available -- and I'm not sure, you know, if there's standing to bring an appeal -- if you don't object now, can you still bring, you know, an appeal later, I don't know where all that goes. But, you wouldn't want something coming up later and creating litigation later, or somebody gets annoyed with one of these groups.

So I strongly suggest that at the time that you move for final approval, assuming we get to that point, that you support these various charity or nonprofit recipients with as much as you can that would negate whatever the -- or at least serve to ameliorate any concerns that are raised by the factors that we've discussed here today.

And as I say, there's always an eye that's looking at these types of choices.

Let's go over briefly the final approval factors. Because if you couldn't get past those, there's no point picking it up here.

So we've already gone over some of the concerns I have that need to be cleared up. But we can talk about the general factors. The strength of the plaintiffs' case, for example.

In that regard, there are concerns here that could be raised about the basis of the Wells Fargo decisions, at least

for purposes of the Section 1981, which is narrower, let's say, than the Unruh Act in terms of what you can and can't consider, and whether they were really considering someone's alienage, or rather, their reduced legal status, something other than just you're not a natural-born citizen.

So there are legal issues. And as you know, there was a lot of motion practice that didn't all get fully heard because of the settlement. But there were a lot of issues that were going to be raised, and had been raised. We were on a fifth amended complaint in the *Perez* case.

The risk, the expense, the complexity and likelihood of further duration, I think, definitely there were significant risks. It would be costly; it's already been costly.

Maintaining the class action status, the parties -- in this instance, there was a dispute about Wells Fargo's policies, and whether there was a common policy. So there could be definitely a risk there, in continuing on as a class.

The amount that's offered I think is quite good in this instance. In the *Pena* case, the class members could receive over maybe 62 percent of their possible damages. That's very high. And the non-California residents, $300 for possible damages that might be statutorily 100 to 1,000, I think that's pretty -- pretty good, actually. A lot of very valuable injunctive relief. And the value of that, according to plaintiffs' counsel, is going up as we speak.

The discovery, there's -- this case has already gone quite a ways down the road. This isn't a case where somebody came in and just immediately said: Let's do the quickest thing we can do and settle it. There was quite a bit of litigation. There was a lot of discovery; a lot of depositions had been conducted.

There were a lot of discovery disputes that were resolved by the Magistrate Judge assigned, Judge Laporte, who's now gone off to JAMS -- probably because of this case, anyway.

**MR. LITROWNIK:** We apologize, Your Honor.

**THE COURT:** And then, *Pena*'s the more recent case, so there's been less direct pretrial work done in that case, but they had the benefit of what was done in *Perez*. And so there was no point in reinventing the wheel and spending money unnecessarily in that case.

So I think that those factors all weigh in favor of the settlement being approved.

Let me go back and see if I left any out.

Well, for example, experience and views of counsel. Everyone here is very experienced. And plaintiffs' counsel has focused quite a bit on this particular area.

The government -- did a CAFA notice go out, or did the appropriate notice go out yet?

Do you know?

**MR. LITROWNIK:** It did, Your Honor. I think -- I

believe, within ten days after filing of the preliminary
approval motion.

    **THE COURT:**  Okay.  There's been no concern expressed
by any government agency, or department, rather.

    And of course, we don't have the class members yet.  But
we could -- we'll wait, and we'll see if we hear anything from
any attorney general.  But I doubt that we will.

    Now, let's talk about the proposed schedule.  I had
changes that I thought should be made to yours, but that was
only if by, let's say, the -- the end of next week, everything
could be cleared up.  And I don't think that that is, as it
turns out, going to be the case, if you have to amend.

    You know, originally we were going to have a hearing at an
earlier date, and then you were running everything from about
two weeks from that point.  When the hearing got pushed back,
then we would only be looking at essentially a week or less.
And there's -- I think there's too much to be done.  I haven't
even gotten to the notice and the claim forms.  Those are all
of a more traditional nature.

    The harder part would be what you're going to do about
these two claims that you want to have released that, at the
moment, I can't approve.

    A quick overview.  I don't want to give different dates
for making a claim, opting out, objecting.  I'm going to give
one date for that.

1    Let me just tell you what I was proposing, give you that

2    kind of relative schedule so you would have that in mind.  And

3    then, if we are going to have to move this for further

4    review -- which wouldn't necessarily require a further hearing,

5    but it could, but let's say that it didn't -- you would know

6    when you were going file whatever you had to file to fix up

7    whatever you have to fix up.  Then you would know the kind of

8    dates that I'm looking at.  And you could use those to put in

9    to your notice and, you know, things like that.  Okay, and you

10   would have that in mind.

11       I was looking at it as follows.  Let us say -- and this

12   isn't going to happen -- that in the typical case, I could tell

13   people:  Here's what you need to clean up in the notice.  And

14   generally we might not even have a claim form, but we do here

15   for a variety of reasons.

16       And I would usually say: Can you get all that done in a

17   week?  If so, if you can get it to me by Wednesday or Thursday

18   of next week, by Friday, hopefully, then I could get everything

19   out, and then everything would flow from it.

20       Let's pretend that was going to happen here, and that we

21   were looking at July 31, I sign off on an order preliminarily

22   approving.

23       You might want to make some notes about this, then.  Okay?

24       I would then use the following dates, as opposed to

25   necessarily the ones you were using.  Some of these are

relative, very much like what you chose.  Others, I'm changing.

So then, for Wells Fargo to provide the class data to the settlement administrator, that would be August 14.

Then, the date for the notice to go out, September 4.

Because people have to be able to -- the class members -- to see what the motion is for fees and for the incentives, that motion should be filed the same date, September 4.

It's all going to go back, as you know, it'll be a later date, but the two could go out together.  Then they could get the notice and that motion, and then be told where they could, you know, find all that.

Then the reminder, sort of using your idea, would be October 2.  That's the reminder notice.

And then the deadline to do one of three -- well, not quite one of three, but to do whatever is going to be applicable here, to either opt out, or object, or submit a claim objecting and/or submit a claim, that would be November 3.  One date.

The people look at it, they say: I'm going to either opt out, I'm going to stay in, I'm going to object or I'm not going to object.  They do that all on one date; they don't get 50 different dates.

Then we would say the deadline for Wells Fargo to terminate the settlement on your proposal -- it was only a day before the plaintiff filed the motion for final approval.  In

this instance, I would say, then, the motion for final approval

would be November 20, and the deadline for Wells Fargo to sort

of fish or cut bait is November 19.

And then the final approval hearing, if this had been when

I was proposing, two weeks would be December 4.  But one of

those two weeks would be the Thanksgiving week, so I would have

made it December 11, in all likelihood.  But since we're

probably going to end up in a period where there isn't going to

be an intervening long holiday, it may not matter.  But, keep

that in mind, if you're looking at what would be a hearing

date.

So, if you're going to -- if you're going to have to amend

the complaint, how long do you think it would take you to kind

of work that out both as to the personal loan -- which sounds

like you could do fairly easily from what you said, but the

mortgage I'm still pretty concerned about.

But, let's say you could do something.  When would all

that get kind of fixed up?

**MR. LITROWNIK:**  Well, I think Your Honor said

exactly, the mortgage issue, I'm -- I think a week would be

fantastic if we could do that, but we -- I think right after

this hearing is done, we'll get on -- plaintiffs' counsel will

get on the phone, and then we'll probably need to speak to

Mr. deVyver and his colleagues --

**THE COURT:**  Uh-huh.

1          MR. LITROWNIK:  -- and figure something out.  I would

2     like to say a week, but --

3          THE COURT:  I'm not trying to rush you.  You're the

4     one who wants to get things rolling.  So let me just -- I'm

5     not trying to put pressure on you to do it faster.  I'm just

6     trying to get an idea, because then we could see where these

7     dates pushed back however many weeks it might be, you know,

8     where it all falls.

9     And you could -- obviously you can file a sixth amended

10    complaint or whatever you're going to do.  Or -- I guess, let's

11    see, if you're giving it up in both cases, you're going to have

12    to amend -- it's only in *Perez*.  So you only have to fix the

13    *Perez* complaint.

14         MR. LITROWNIK:  Uh-huh, uh-huh.

15         THE COURT:  And that, I think, you could obviously

16    just have a stipulation to file a sixth amended complaint, get

17    that on file.

18         MR. LITROWNIK:  Right.

19         THE COURT:  And once that's on file and I have a

20    chance to review it along with whatever else you're going to

21    have to fix up, we would say that maybe a week after I get all

22    that, I would then have an order out.  And so you could kind

23    of figure out how that would look.

24    And we'll come back to it afterwards, because I want to

25    talk to you about the notices.  Okay.

         **MR. LITROWNIK:**  Okay, Your Honor.

         **THE COURT:**  Now, do you have the notices available in
front of you?

         **MR. LITROWNIK:**  Um --

         **THE COURT:**  Can you get them?  Because one of you or
both of you are going to need to take down the changes that I
am indicating need to be made to make this notice clear and
workable.

         **MR. LITROWNIK:**  Um, I -- I have it in front of me,
Your Honor.  And my very capable colleagues who are listening
in will be able to take down all the changes.

         **THE COURT:**  Okay.  All right.  So because this part
is going to be whatever changes of a clerical or other nature
need to be made, those are going to be made at your end.
Whatever concerns I have about the form of order, if there's
anything that even touches on substance, I'll tell you about
it.  I can do that and I will.  All right.

      But the notice, the claim forms, that's all kind of in
your court.  Okay?

         **MR. LITROWNIK:**  Okay.

         **THE COURT:**  All right.  So, let's take a look.  And
when I am talking about a problem that's in both cases, I'll
let you know.  So whoever is going to work on this, one of
those people might want to be *Pena* and one might want to be
*Perez*, or somebody's going to just make the notes.  So that's

1    fine.

2         All right.  The first thing is that in both cases,

3    starting with Page 2, all the pages are called "Page 5."  You

4    have to renumber.

5              **MR. LITROWNIK:**  I'm sorry, Your Honor.

6              **THE COURT:**  Okay?  Okay.  This is not a hard one.

7     Okay?  Doesn't take long for me to tell you that.

8         There are blanks all over the place that will need to be

9    filled in on -- right now I'm just talking about Page 1 and,

10   you know, you've got X, X, X for various things.  So those

11   would have to be, you know, filled in to the extent that it's

12   something that you fill in.

13        Then, let's look, there's going to be -- let's see.  The

14   first paragraph that's not bolded, all right, in the

15   next-to-the-last section, it's kind of a confusing thing.  It

16   says (As read):

17              "In connection with this settlement, Wells Fargo will

18              change its lending practices for its credit card,

19              student lending, small business lending, personal

20              lines and loans and home mortgage lines of business

21              to make unsecured credit (and secured small business

22              credit) available to current and valid DACA

23              recipients."

24        Personal lines and loans, is that called "personal lines"?

25   Is there something called "personal lines"?  Or just "personal

loans"?

      **MR. LITROWNIK:**  I believe it's called "personal lines and loans," and it contains the credit card and personal loans.

      **THE COURT:**  Okay.  All right.  And then, is there something -- is there home mortgage lines of business?

      **MR. LITROWNIK:**  Well, so, Your Honor, thank you for, I think, highlighting some syntactical issues.

  I think one of the language struggles is we -- we referred to the particular credit products in some places, and the lines of business in others.

  And for example, we say that, you know, the plaintiffs applied for X, Y and Z type of credit product, right, like an unsecured credit card or a personal loan.  But then the actual programmatic relief will mean that Wells Fargo's changing the line of business policy.

  So it covers actually beyond just the single product that plaintiff applied for.  It's everything within the line of business.

      **THE COURT:**  Are mortgages part of the lines of business?

      **MR. LITROWNIK:**  There's a home mortgage line of business --

      **THE COURT:**  They do call it that.  Okay.  And then you have unsecured credit and secured small business credit.

1    Well, mortgages are secured.  So why does it say -- and

2  they're not unsecured, and they're not a small business credit,

3  are they?

4        MR. LITROWNIK:  That's right, Your Honor.  So that --

5  the reason --

6        THE COURT:  Maybe you can just say "unsecured and

7  secured credit available."

8        MR. LITROWNIK:  Sure, I think the reason for that --

9  of course.  The reason for that was because Wells Fargo had

10  made almost every other type of secured credit available to

11  DACA recipients.  For example, secured credit cards.  Maybe

12  that's it.

13    So we wanted to clarify that the small business credit,

14  both secured and unsecured, will now be available.

15        THE COURT:  Yeah, but that's not flowing from that.

16  The last word is "mortgage."

17        MR. LITROWNIK:  Right.

18        THE COURT:  So maybe you just want to say "secured

19  and unsecured," you know, "credit" or something "available,"

20  just to -- it's just a little bit garbled, I guess.

21        MR. LITROWNIK:  Yeah.

22        THE COURT:  It's not substantive, so much as it's

23  just -- I don't know.  Maybe nobody will notice it, but I did.

24        MR. LITROWNIK:  I understand, Your Honor.

25        THE COURT:  All right.  Now, in both cases, at the

very bottom you have an asterisk -- it's not a footnote, it's

an asterisk, but it's kind of like a footnote.  And it says:

"You may also submit this form online at..."

You know, a URL.

Okay.  Now, the problem is that there's no asterisk in --

corresponding in the text, itself.

In other words, you've got a footnote at the bottom, but

no footnote in the text.

So if you look at *Perez*, it looks like the asterisk needs

to go after the last sentence in the first paragraph on

Page 2 -- let me just see where I am here.

The sentence that ends -- wait a minute.  It's a sentence

that -- we're in this box called "YOUR LEGAL RIGHTS AND

OPTIONS..."

**MR. LITROWNIK:**  Uh-huh.

**THE COURT:**  And so then if you just see that first

 paragraph that says:

"...if you lived in California, up to 2,500 per

denial...by completing the enclosed Claim Form."

Then if you put the asterisk there and move your -- you

know, your corresponding asterisk or statement or footnote to

Page 2, then it makes some sense.  Otherwise, you don't have --

it's just there.  It's not -- it's just floating around.  A

free-floating footnote.

**MR. LITROWNIK:**  Understood, Your Honor.

1      **THE COURT:**  Okay.  And then in *Pena*, the asterisk, at

2  least in this instance, would be on the same page because

3  their "LEGAL RIGHTS AND OPTIONS," that box is actually on

4  Page 1, not on Page 2.

5      And if you wanted to be really grammatically correct as

6  well, there ought to be a comma in that box after the word

7  "credit" before the phrase "by completing the enclosed Claim

8  Form."

9      In other, words you've got it kind of -- you've got a

10  little phrase there, "up to 2,500 per each denial of credit,"

11  it started with a comma, but it didn't end with a comma.  You

12  ought to have a comma after "credit."

13      Okay.

14      **MR. LITROWNIK:**  Understood.  Thank you.

15      **THE COURT:**  By the way, I was not an English major in

16  college.  All right.  Okay.

17      Then let's go to *Perez.*  I have to go back to that on

18  Page 3.

19      This is only *Perez*.  So *Pena*, no problem here.

20      In the section, "Why did I get this notice..."  Okay.  The

21  first sentence summarizes the claims in the quote-unquote --

22  the quote-unquote claims in the quote-unquote lawsuit.

23      But right now, you've -- just so that you know, you have

24  got the personal loans and the mortgages in there.  And so it's

25  fine to keep that if, if we clean that up.  Okay?

1    In other words, if you can show good grounds for release,

2 then you'd be okay.

3    Okay.  Let's see if there was anything else.

4    Okay.  I think that was it on that one.

5    Then on Page 3, still, in that same "Why did I get

6 this..." the third sentence -- let me see where that is.

7    Yes, okay, so it's actually a kind of third paragraph.  It

8 says:

9         "The Parties have now settled this lawsuit..."

10    Hang on for a second.  And this is in both cases.

11         "...and a Settlement Administrator has issued this

12         notice."

13    They're not really issuing it, but I guess it's okay.  I

14 mean, they're really just mailing it.  I don't know.  Maybe

15 it's okay to say they issued it.

16    All right.  Let's go to Page 4.  "How do I know if I'm

17 part of the Settlement?"  That section.  The very last

18 sentence, which is its own little paragraph after that bolded

19 sentence paragraph, says:

20         "The Parties now settled this lawsuit..."

21    No, wait.  I'm off that.  Just a second.

22    It refers to the claims administrator, at an address and

23 phone number.  I think it's actually -- you're calling it the

24 "settlement administrator," right?

25         **MR. LITROWNIK:**  Um --

1    **THE COURT:**  You have been calling it the settlement

2   administrator.  I think you have to change that to "settlement

3   administrator."

4    **MR. LITROWNIK:**  Okay.

5    **THE COURT:**  Okay.  And then the address that's on the

6   first page of the notice I think is an email address.  So you

7   should say "email address."

8    **MR. LITROWNIK:**  Okay.

9    **THE COURT:**  Okay?  Instead of just "address and phone

10  number".  "Email, address and phone number."  That's in both

11   the cases.

12      All right.  Then with the bullets in the "California Class

13  Members," let's go to that.  That's on Page 5 in *Perez* and on

14  the bottom of 4 and continuing over to 5 in *Pena*.

15    **MR. LITROWNIK:**  Yeah.

16    **THE COURT:**  There are three.  Let me just go over.

17      Yeah, that's weird, because this list, it just says:  The

18  first 2,000 claimants shall add 2,500.  Sounds like they're

19  putting the money in.

20      What you should say is:  For the first 2,000 verified

21  claimants from the California class, comma, Wells Fargo shall

22  add...

23      That's what they're doing.  Or "will add," if you want to

24  say that.  "Wells Fargo will add..."

25    **MR. LITROWNIK:**  Right.

1    **THE COURT:**  Okay.  Otherwise, you're just -- the way

2    it reads now, the settlement will be funded based on how many

3    claims are submitted.  The first 2,000 verified claimants from

4    the California class shall add 2,500.

5         I understand what you're trying to say.  But it's -- you

6    know --

7         **MR. LITROWNIK:**  Yeah.

8         **THE COURT:**  So I would just start each of those with

9    the word "For," put a comma after the word "class."  And I

10   think I'd change "shall" to "will" and just say "Wells Fargo

11   will..."

12        **MR. LITROWNIK:**  Okay.

13        **THE COURT:**  Okay.  I think that's a lot clearer.  And

14   then again, you've got dates you've got to put in.  You know,

15   those are down at the bottom.

16        **MR. LITROWNIK:**  Right, Your Honor.

17        **THE COURT:**  I'm just kind of calling blanks to your

18   attention.

19        On Page 3 there was one at the top in a box, and then

20   there was one date, and you've got -- you know, Page 2, there

21   are a bunch of them also.

22        Okay.  Okay.  "How do I opt out?"  Let's see.  That's on

23   Page 7, so we've got at least -- no, there's something on

24   Page 6, still, in *Perez*.  I've got to go back.  Let me look.

25        Hm.  No, those are just inserts.  Right now you have stage

directions, okay, on Page 6. "Insert fairness hearing date,"
it says. In other places you're just putting like, you know,
something that was a blank. So be sure you take out, you know,
the stage directions, and just put in the information.

      **MR. LITROWNIK:** Right.

      **THE COURT:** Okay. On 6 -- 7, I'm sorry. Going to 7,
which is what I was going to do, you've got a couple of
blanks.

      You have here, after the first full paragraph, there's
this indented area with an address. And I think -- and that's
where the opt-out form should go. Right now it says "Perez v.
Wells Fargo," followed by a bunch of Xs.

      But the opt-out form that's part of your notice packet
states:

            "The form must be mailed to Settlement Administrator
            at..."

      The address. So to be totally consistent, instead of
saying "Perez v. Wells Fargo," maybe you should say "Settlement
Administrator." If you want "Perez" you can have it, I guess.
But you definitely want to have "Settlement Administrator" at
the top.

      **MR. LITROWNIK:** Okay. Thank you.

      **THE COURT:** Okay. You know, if you want to identify,
if the administrator has a bunch of different cases they're
working on, okay, fine. You know. That's sort of like an

attention thing.  Okay.  It's the same idea in *Pena*.

Then for both cases, there's a -- on Page -- let's see. It's Page 8 in *Perez* and 7 in *Pena*.  When you get to -- let's see -- where am I going to find this?

We're in the paragraph that -- I guess it would be the sort of penultimate, the second-to-last paragraph, down near the end of it.  In other words, the paragraph that is -- that is above the paragraph that begins "Additionally, if you choose to make a written objection..."

**MR. LITROWNIK:**  Uh-huh.

**THE COURT:**  In that paragraph above it, maybe four lines up from the bottom, it makes reference to a Class Action Clerk.  There really isn't anybody who is a class action clerk.  You should just say "Clerk of Court" there.

**MR. LITROWNIK:**  Okay.

**THE COURT:**  Okay.  And then it goes on to say that you can send that to that address, or you can go in person and file it at any location of the U.S. District Court in this district.  No, actually, you can't do that.

Let's see.  Our local rule, Civil Local Rule 5-2 says that if you manually file documents, you have to file them in the courthouse where the judge's chambers are located.  So, I'm in San Francisco.

So instead of saying what you did there, when you get to the "...or by filing them in person at..." then you could just

change "any" to "that" so it reads "at that location," get rid

of all the part about "...of the United States District

Court..." yak, yak, yak, through the word "California," and

then you're okay.

Then it will just read you can either mail it, or you can

file it in person at that address. Okay. That location.

That's how it's going to read. You can't go to Oakland; you

can't go to San Jose. Just at that location. Which is here.

**MR. LITROWNIK:** Okay.

**THE COURT:** Okay. Then you need the address, okay.

You've got another little stage direction, "insert time and

date."

Let's see. Well, let me see. I might have another

problem, too. Oh, yeah.

Excuse me.

I think it's okay, by the way, to say that. You know,

we're essentially closed to people just coming into the

courthouse and wandering around. But there's a dropbox on the

main floor. So if they came in and said "I need to file this,"

they would say "Put it in the clerk's dropbox." So that's

okay.

The problem about the location of where they can drop it

off, in *Pena*, it's on Page 7. And it's the last part of the

sentence that begins with "Any objection..."

Okay. All right. Then we're back, both cases, on --

1    let's see, if I look, Page 8, "When and where will the Court

2    decide whether to approve..."

3        Oh, yes.  It gives, like, the hearing, and it gives it a

4    courtroom.

5            **MR. LITROWNIK:**  Uh-huh.

6            **THE COURT:**  I do not want my name anywhere in this

7    notice.  Okay?  I don't want to get any kind of communication.

8    And you tell them, you know:  Don't try and get ahold of the

9    judge.

10       I don't want my name in here.

11           **MR. LITROWNIK:**  Okay.

12           **THE COURT:**  So the first place that I'm seeing that

13   that's coming up is in the when and where will I decide.

14       And you're looking at that, Mr. Litrownik?

15           **MR. LITROWNIK:**  Yes.

16           **THE COURT:**  Okay.  In that box, about three lines

17   down after the "19th Floor," it says:  Before me.  Okay?  Just

18   get rid of that reference to me.

19           **MR. LITROWNIK:**  Okay.

20           **THE COURT:**  Then, okay.  The next sentence says:

21           "Due to the ongoing COVID-19 pandemic, the fairness

22           hearing may be conducted telephonically or

23           virtually."

24       You might want to put a "However" so that it reads:  It's

25   going to be in Courtroom 7, but due to the pandemic, however,

1   it might be conducted in a different way.  Just so that they --

2   it's just kind of -- you know, it's not critical, but it might

3   just make it a little clearer.

4           **MR. LITROWNIK:**  Okay.

5           **THE COURT:**  And then you'll come down several lines

6   and you will see the words "Judge Chesney" starting a sentence

7   about one, two, three, four, five, six lines up from the

8   bottom of that paragraph, mid-paragraph or midline.  Just

9   change that to "The Court," with a capital C.  That'll be

10  fine.

11          **MR. LITROWNIK:**  Okay.  Thank you.

12          **THE COURT:**  Okay.  You can do the same thing under

13  "Do I have to come to the hearing?"  Where it says "Judge

14  Chesney" in the first sentence, you can change it to "the

15  Court."

16      And then when we get down to me, I speak at the hearing,

17  you will see a reference in the second line to "Class Action

18  Clerk."  That becomes "Clerk of Court" again.

19          **MR. LITROWNIK:**  Okay.

20          **THE COURT:**  Okay.  Let's see.  Just making sure.

21  Okay, that was in both cases.

22      We are coming down to the home stretch in the notice.  In

23  the section "Are there more details about the Settlement,"

24  that's the last section that we're dealing with.  I think that

25  there's just some clerical things here.

1       Just a minute.

2       There's several options to get more information.  And the

3   fourth listed option is by visiting -- let me just see here.

4   Visiting the office of the Clerk of Court, San Francisco,

5   between 9:00 and 4:00.

6       Okay.  I don't know whether that whole part should come

7   out, because they probably can't come in during this time.  As

8   far as civil cases go, we're closed to the public.  So I don't

9   know that we should have that.

10      Let me just see here.

11      I don't think they can get in.  So, while the -- the

12  general order is in place -- trying to think which order that

13  is.  It's in the seventies.  It could be 74, or it could be 73.

14  But we -- oh, 72-5, I think, now that I'm looking.

15      Unless we get a new one that opens it up, you need to take

16  that out, or people will show up and they'll be turned away.

17  They probably won't show up, frankly.

18          **MR. LITROWNIK:**  Okay.

19          **THE COURT:**  So in order to do that, if you do, then

20   strike that, which I think you're going to have to do, because

21   you want to move on this fairly quickly, if you can, and not

22   have it hanging around.

23      So, okay.

24          **MR. LITROWNIK:**  Okay.

25          **THE COURT:**  So then what you need, because then that

last one is not going to be the last one anymore, the PACER

idea is, so you need to put the word "or" now, you'll need to

move it up after the phone number that's in Line 2 of that

paragraph.  So it'll be -- you know, you can contact class

counsel at that, you know, phone number, or by accessing the

court docket through PACER.  Okay.

      **MR. LITROWNIK:**  All right.

      **THE COURT:**  And then I just want to take out the

line, and you should just strike the line "By order of the

U.S. District Court..." because I'm not ordering this.  Okay.

    Okay.  Then, okay.  Just cut that line, in both cases.

All right, so that takes care of the notice.

    With that in mind, okay, you're probably going to amend by

stipulation, if you can, because Wells Fargo wants to get as

much as it can cut out, and not to be coming back to them

again.  So, if you're going to work on that, that's going to

take you however much time you thought, maybe a week, maybe

two.  Not sure.  Now you're throwing this into the mix.

    What are we looking at?  And I haven't gotten to the claim

form yet.  But, how much more time do you think this adds?

      **MR. LITROWNIK:**  Well, Your Honor, I think we -- we

would be able to do everything that we need by August 5th.

      **THE COURT:**  Everything.  Okay, wait until I get to

the claim form.  Okay.

      **MR. LITROWNIK:**  Okay, well, we haven't heard the

issues with the claim form, but --

     **THE COURT:** Okay. I'm just looking at the time.

For now I think, Ms. Geiger, you don't have to get in touch with the other people. But if it starts to run a lot longer here, we might want to tell them that they should, you know, not expect us to get to them right away.

     **THE CLERK:** Okay, Your Honor.

     **THE COURT:** Thank you. Or whatever you think is best. I'll leave that to you as to what would be the most courteous time to let them know. But we won't be getting to them at 10:30, obviously.

All right. Now the claim form -- and again, we're talking about both cases.

Okay. First problem, okay, is what you're calling this thing. It's not a claim form, it's a group of documents includes a claim form. It also includes an opt-out and an objection form.

So if you want to keep these as some kind of packet, which I understand you're doing, you could just call it "Forms packet" or something like it, or "Forms" or "Three forms," or you can list them. But I don't think you can call it a claim form.

     **MR. LITROWNIK:** Okay.

     **THE COURT:** So it's got the request to opt out form, the objection form, and the claim form. And I'm not sure how

you want to put a heading on it.  But, I don't think you can

call it, up at the very top, under the title of the case and

the words "Class Action Settlement" the word "Claim Form and

Instructions."

You've got three separate forms, you happen to be putting

them together, and they don't all constitute claim forms.

**MR. LITROWNIK:**  Okay.  Understood.

**THE COURT:**  Give it a new name.  Whatever you think.

You could list all three if you wanted, or you have room on

that page if you wanted to go A, B, C, or you could do just

"Forms," whatever.

Okay.  All right.  Then at the top of the cover page, so

we'll see, claim form and instructions, that's going to be

changed.  You could just write:  Claim form, request to opt out

form, objection form and instructions, you know, just be wordy,

or figure out how you want to fix it in some reasonable way.

**MR. LITROWNIK:**  Okay.

**THE COURT:**  The last sentence in that grayed box --

I'm not sure if it shows gray on the computer screen, it's

gray when printed out -- and it says:  "Please read this claim

form carefully."  You're going to have to change that.  I

would put "Please read these forms and instructions

carefully."

**MR. LITROWNIK:**  Okay.

**THE COURT:**  Okay.  "Please read these forms and

1    instructions..."

2        Now we get to the first bolded language.  Of course,

3    you're calling it a claim form.  So you want to say the purpose

4    of -- you could say -- let's see how we're doing it.  "Each of

5    the three attached forms" or "The purpose of the attached

6    forms," if you wanted would probably be fine.  "the purpose of

7    the attached forms..."

8            **MR. LITROWNIK:**  Uh-huh.

9            **THE COURT:**  But again, we're just running into the

10    word "claim form."

11        Then, let's go, let's get into -- let's see, here.  The

12    text after that has a sentence with the term "Section B of this

13    claim form."  That's three lines up from the bottom of that

14    paragraph, starting midline.  And then another one that says

15    "Section C of this claim form."

16            **MR. LITROWNIK:**  Okay.

17            **THE COURT:**  So I guess you could say "Section B of

18    these forms" or just, I don't know, maybe you don't need to

19    say Section A, B and C at all.  There's also -- yeah, "Section

20    A" up at the second line of the claim form.

21        So I think it's -- let's go back for a minute so I don't

22    get too confused.  In Line 2 of the paragraph that begins "The

23    purpose" and it's now going to be "of the attached forms," why

24    not just say, when you get to that -- it starts right before,

25    "You must sign and submit," and then it says "Section A of this

1  claim form," you could just say "sign and submit the claim

2  form."  Okay.

3      Then when you get to the other, instead of saying "B of

4  this claim form," actually say what it is so "To opt out of the

5  settlement, you must complete and submit the request to opt out

6  form."

7          MR. LITROWNIK:  I think that works perfectly,

8  Your Honor.

9          THE COURT:  Right.  And then the last one, you know,

10  there, "the objection form."

11          MR. LITROWNIK:  Right.

12          THE COURT:  Okay.  Okay.  We got another "claim form"

13  in the "This is confidential" paragraph.  So you could say

14  "All information you provide on..." you could say "any of the

15  attached forms," if you want.

16          MR. LITROWNIK:  Uh-huh.

17          THE COURT:  But -- you know, "on any of the attached

18  forms."

19      Then, let's see.  There is the bolded word "completeness."

20  And I would replace "complete the applicable section of the

21  claim form" with "complete the claim form."  Because there,

22  that's the form for getting the money.

23          MR. LITROWNIK:  Right.

24          THE COURT:  So that applies to both of the cover

25  sheets on the notices.  And then -- wait a minute.  Let's see.

On the "Who can view," that will be -- so I wasn't through, I'm sorry. I was through with all the problems created by you calling the various -- all the forms "the claim form."

Going back, then, to another issue in the cover sheet or the cover page, in the "This is confidential" section, at the very end it says -- Item D is -- you know, these are who can look at it. And Item D is the Court. And then there's a parenthetical:

"If the Court requests it..."

And then it says:

"...and subject to appropriate confidentiality protections..."

All dealing with, I guess, the Court, what did you have in mind about that?

MR. LITROWNIK: I believe what we had in mind was that -- that the information would not be published on -- or -- or placed on the public docket.

THE COURT: Oh. I see. Okay.

MR. LITROWNIK: We can certainly clarify that.

THE COURT: Let's see. If the Court requests it -- maybe it's okay, if that's what you meant.

You know, for example, under federal law you can't put like, certain -- what's called -- I forget if it's called personal or confidential --

1    **MR. LITROWNIK:**  Yeah.

2    **THE COURT:**  Name -- oh, you can name, but address,

3  Social Security number, stuff like that.

4    **MR. LITROWNIK:**  That's right.

5    **THE COURT:**  So, okay.  Hm.

6     "To be kept confidential to the greatest..."

7     Maybe you just take that phrase out, and just have "and

8  the Court, if the Court requests it."

9    **MR. LITROWNIK:**  Uh-huh.

10    **THE COURT:**  Because you already start with, it will

11  be -- you know.

12    **MR. LITROWNIK:**  Right.

13    **THE COURT:**  And so you're not saying that the public

14  gets to view it.  It's just various -- it's almost individuals

15  will get to look at it.  But it's not like they're going to

16  hand it out on a street corner.

17    **MR. LITROWNIK:**  Right.

18    **THE COURT:**  Okay.  All right.  So maybe just take

19  that last little bit out of the parenthetical.

20    **MR. LITROWNIK:**  Okay.

21    **THE COURT:**  Okay.  Now, I think I can now go to the

22  second page.  Okay.

23     "Make a claim" is okay, although you might want to call it

24  "claim form," because at this point that is the claim form.

25     In other words, Section A is the claim form.

1    **MR. LITROWNIK:**  Okay.

2         **THE COURT:**  But I leave that up to you.

3    Let's see.  Okay.  And then the form -- okay, because of

4    the claim form, then we have an issue.

5    But before I get to the -- more of the -- the issue of how

6    we want to say this, you're not giving them a lot of room to

7    put their name, address and last four digits, unless they write

8    very small.

9    Would you want to give them another line?  Or are you

10   going to use up too much at the bottom with the info on the --

11   that should say "Settlement Administrator," not "Claims

12   Administrator," but -- at the bottom?  Or can you get it all on

13   that one page?  I understand how you want to.

14        **MR. LITROWNIK:**  Yeah.  I think we can -- we can give

15    them another line, and then --

16        **THE COURT:**  Maybe you can give them another line.

17   Okay.  Now, here's the issue.  As I understand the

18   settlement, if a claimant makes multiple claims that they can

19   get paid for each such claim as opposed to just each such

20   claimant, it's not -- they could get, you know, more than 2,500

21   if it came to that.

22   And you -- not you, personally, but Wells Fargo is going

23   to want to confirm that each of those denied applications was

24   at a time when the claimant had DACA status.

25   There may be people who applied before they got it, or

people who applied after they no longer had it; they didn't
keep it up.  I don't know enough about what you have to do with
DACA to -- but apparently, you don't necessarily assume that
once you've got it, you've always got it, and you didn't have
it before.

If that's the case, there are people that, at least
technically -- I think from what you've told me, there aren't
going to be a lot of multiple-applicant claimants.  But to the
extent there are, maybe one of those denied applications,
they're covered as a DACA recipient.  One of the others, they
aren't.

If you say to them, as you're currently saying in
Paragraph 2 under the "Make a claim or claim form" section:

              "If you had DACA status at the time of each timely
              denial, you may be eligible..."

And then that concern of mine is repeated when you get to
the paragraph that starts with their name and, you know, info.

And one, two, three, four, five, six lines down, the line,
a sentence that begins in the line under the blank for the
date, it says:  "I further declare that at the time of each
such timely denial, I had a valid unexpired DACA." or "...I had
valid unexpired DACA status..." If they had it on one, but not
at all -- you know, not for all of them, they had one but not
all of them, then they wouldn't get anything.

So I was wondering if you could say, because here we just

1  want to get them into the class of recipients, if you said "I

2  further declare that at the time of at least one such timely

3  denial," because Wells Fargo is going to make them prove up

4  everything if they make a claim.

5        **MR. LITROWNIK:** So actually, Your Honor, it's an

6  important clarification. One, what we negotiated in the

7  settlement is actually a little bit different.

8        **THE COURT:** Oh.

9        **MR. LITROWNIK:** It's more favorable to the claimants.

10       **THE COURT:** Well, that's what I was trying to cover.

11  This sounds like it's less favorable.

12       **MR. LITROWNIK:** Oh. Well, so let me try to explain.

13     So what we negotiated was that if a class member

14  essentially raised his or her hand and said: Hey, I applied for

15  a credit card from Wells Fargo and I had DACA when I had the

16  credit card, --

17       **THE COURT:** Uh-huh.

18       **MR. LITROWNIK:** -- that gives them entitlement -- as

19  long as they can prove that they either have DACA now or had

20  DACA at the time of their credit card, that gives them

21  entitlement to every time they were denied within the relevant

22  period, without having to prove DACA for all the other

23  denials.

24       **THE COURT:** Oh, okay. Okay. In for one, in for all.

25       **MR. LITROWNIK:** Exactly.

1    **THE COURT:** Then really what you want to say, "I

2  further declare that I had at least one such" as opposed to

3  "each such."

4    **MR. LITROWNIK:** Right, okay. Exactly Your Honor.

5    **THE COURT:** I was thinking you were limiting them to

6  you had to have all of them good, or you wouldn't get

7  anything.

8    **MR. LITROWNIK:** Right.

9    **THE COURT:** And I thought, gee, that's not right. I

10 wasn't necessarily saying if you had one good, you get all.

11 But if that's what you -- you know, that's what you settle

12 for, that's fine. This would cover it, in either instance.

13   So take a look at that. You're looking at it, right?

14   **MR. LITROWNIK:** Right.

15   **THE COURT:** Okay. And Wells Fargo, you should as

16 well.

17   And where you see that there's a blank with the capitals

18 of "date" and drop down one line where it says "I further

19 declare..."

20   **MR. LITROWNIK:** Uh-huh.

21   **THE COURT:** "...at the time of..." if you said "at

22 least one such timely denial I had valid unexpired DACA

23 status," or blah, blah, blah, blah, blah --

24   **MR. LITROWNIK:** So, actually, let me clarify one

25 other thing.

So even though what they have to do in terms of proof is show DACA status once, we -- what Wells Fargo -- what we negotiated was that they had to affirm by sworn statement in this claim form that they had DACA status at each time. Although they don't have to prove it by documents.

**THE COURT:** Well, that's -- that is really problematic. Because that's like saying that in order to get anything, they have to tell you, assumedly truthfully, that they were qualified for DACA every single time, even though they may not have.

**MR. LITROWNIK:** Well, so one -- I think one backstop to that is that they will need to have a Social Security number in Wells Fargo's system at each time of an application. And if it's not the same Social Security -- so just to give a little background, once you have DACA, you're able to get a valid Social Security number.

**THE COURT:** Oh.

**MR. LITROWNIK:** Some DACA recipients may have used other Social Security numbers in the past. Once they had DACA, they almost certainly obtained a valid Social Security number.

And so if they don't appear in Wells Fargo's data with the same Social Security number for each time, the parties will -- that will be an issue that the parties will confer about, in terms of payments. And if it seems like, you know, there are

1  potential fraud problems or anything like that, I think we will

2  be able to resolve them very easily.

3      THE COURT:  Yeah, I'm concerned about being able to

4  make someone prove something.  It looked like you were

5  requiring certain kind of proof, where now it turns out you're

6  not.

7      The point that I'm concerned about is if someone didn't

8  have DACA status for every application that they filed, but

9  they did for some, and you say you're only getting paid if you

10  had DACA status for all, they're out of luck.  Unless they lie.

11      MR. LITROWNIK:  Well, so, I think -- that's true.

12  However, what the actual applicant data will show is that they

13  -- they're not going to be found in the applicant data for the

14  applications where they did not have DACA, because they will

15  not have had the same Social Security number.

16      THE COURT:  Yeah, but why are you telling them that

17  they have to say they had DACA status for every single time,

18  in order to get paid?

19      MR. LITROWNIK:  Right.

20      THE COURT:  That's what you're telling them, right

21  now.

22      MR. LITROWNIK:  Right.  Well, I mean, that was --

23  that was language that the parties negotiated.  I think from

24  Wells Fargo -- I don't want to speak for Mr. deVyver.

25      From Wells Fargo's perspective, it was important, for

anti-fraud purposes, for a class member to affirm that by sworn statement.

     THE COURT:  It's one thing to say "I say that I have it for all," if you do.  If you don't, they can't say it, and they won't get paid.

     MR. LITROWNIK:  Okay.  I think, I think -- I think I -- okay.  I think I understand.

   And we can revise the language -- after conferring with Wells Fargo's counsel I think we can revise the language to reflect these concerns.

     THE COURT:  See, it looked to me like if somebody had multiples, that Wells Fargo had a way to confirm whether the person had DACA status for all, or only maybe one.  The reason that you need somebody to even say they had DACA is because Wells Fargo does not have a -- a discrete breakdown for DACA. They have a breakdown that includes people who are not citizens, or who are not lawful permanent residents and who are here.  And some of those people just may be here illegally, and some people may be DACA residents -- DACA members.  So they're going to have to sift through that first group.

     Once they get somebody who says they're DACA, they can look at them, and figure out whatever they're doing.  And to the extent they need more records, they can get them from the recipient -- the applicant.

1    **MR. LITROWNIK:**  Right.  Correct.

2         **THE COURT:**  But what I was concerned about is if you

3    tell someone, as you appear to be doing here, that you declare

4    that at the time you had -- of all of those applications, you

5    were -- you had DACA status, that -- maybe it's okay to say

6    that, if it's not saying you won't get any money -- unless --

7    let me just see if that works.  Let me see here.  Now that I

8    see what you're allowing.  But, let me look at the whole

9    thing.

10        Okay.  The person declares under penalty of perjury that

11   they applied to Wells Fargo and, you know, were denied, at

12   least one unsecured -- some kind of a loan or home mortgage

13   between January 29, '18, and whatever date we're going to do,

14   and therefore have one or more timely denials.  I further

15   declare at the time of all of those, in effect, I had DACA

16   status.

17        Well, what if they can't say that?  I don't know.

18        And then just to -- just to show you where it comes up

19   again, or actually, in the first instance, was in Paragraph 2

20   of that section where it says "If you had DACA status at the

21   time of each timely denial, you may be eligible for a payment."

22        **MR. LITROWNIK:**  Uh-huh.

23        **THE COURT:**  I was thinking maybe you could say "If

24   you had DACA status at the time of a timely denial, you may be

25   eligible for a payment of up to $100 per each such timely

1  denial."

2          **MR. LITROWNIK:**  Yeah.  Okay.  That makes --

3          **THE COURT:**  Yeah.  Wouldn't that part work, at least

4  at the top?

5          **MR. LITROWNIK:**  Yeah.  Yeah.  From our perspective,

6  yes.  I mean, I think that's -- that's what -- what we would

7  like.

8          **THE COURT:**  Mr. deVyver, do you want to weigh in on

9  this, if you're there?

10          **MR. deVYVER:**  I'm still here, Your Honor.  I mean, --

11          **THE COURT:**  Good.

12          **MR. deVYVER:**  -- I agree with Mr. Litrownik.  I do

13  think that these are issues that we can work out.

14          **THE COURT:**  Okay.  So least for that first one, in

15  that, you know, in Paragraph 2, you might change "each" to "a"

16  and then move the "each" essentially to after the word "per"

17  in the next line, and add "each such" there.

18      So that if -- you know, if you -- this way, you know, if

19  you -- you're saying you may be -- you may be in the class.  If

20  you had DACA status, you applied and you were turned down, for

21  every time that happened, you may get a hundred bucks.  You

22  know.

23      Okay.  The other part where I -- the next time that "each

24  such" came up, I had that concern as I've described to you.  I

25  was going to put "at least one such" but you can see how you

are going to deal with it.

And then, again, if you want to do sort of English major stuff, if you go up in the paragraph where they are going to put their name and declare, one, two, three, four -- I guess it's -- let me see, five lines up, the line starts "declare that" and then there's the phrase "upon request". You ought to put a comma after "that," so: I declare that, comma, upon request, comma, I can provide documentary -- et cetera.

MR. LITROWNIK: Okay.

THE COURT: Then, all right. This was, I just thought, a little confusing.

If you go three lines up from the bottom of that paragraph, that big one, and you say, da, da, da, da, and "I'm making this verified claim for inspection" -- okay, wait a minute. You're going to provide documentary proof. Let's see. All of the different types you can do.

And then it says: At the time of a denied application, for which I'm making this verified claim for inspection in the form of either, this "for inspection" is so far away from saying "I can provide documentary proof" that maybe you'd be better off just putting a comma after the words "verified claim" and then in lieu of "for inspection in the form of" say: specifically, comma, either a copy of X, Y or Z.

MR. LITROWNIK: Okay.

THE COURT: Is that all right?

1        **MR. LITROWNIK:**  Yeah.

2        **THE COURT:**  Okay.

3        **MR. LITROWNIK:**  Okay, Your Honor.

4        **THE COURT:**  Okay.  And then, you'll see in the second

5    to -- line up from the bottom, it starts "Approval notice

6    from" and then it's got this form.  And I guess they all know

7    what you're talking about.  There's a semicolon.  I guess it's

8    okay.

9        I mean, ordinarily, you wouldn't put a semicolon for

10   something that's an either-or and not an and.  And I guess you

11   just want to make it clear these are two separate things.  So

12   that's okay.

13       And then at the very bottom instead of "Claims

14   Administrator," "Settlement Administrator."

15       **MR. LITROWNIK:**  Yeah.

16       **THE COURT:**  Then on the -- I guess what's the last

17   page here -- one second. Where am I?  Hm.  I'm getting lost.

18   Just a minute.

19       Oh, I'm in the wrong -- just a second.

20       Okay.  Sorry.  I was looking at the form and not looking

21   at my notes for a while.  So I have to catch up here.

22       Hm.  Hang on.  Where am I?  I think I'm burning out here.

23   Just a minute.

24       Okay, I have a bunch of notes, and I didn't flip over in

25   my notes.  So, yeah, okay.  The last part of the claim form,

what, you know, is the true claim form, it says that you need
to provide a completed W-9 in order to receive payment.

     Now, in the settlement, the settlement says that if it's
approved, then the settlement administrator is going to send
each claimant a letter that tells them how to submit various
things.  And it also says in the settlement that they have to
submit a completed W-9.

     And they might think here in this sentence that it's not
later, but now, or at some time that they're not sure of.  So
if you look at the first part, it says (As read):

               "All documentation including any copy you submit of
               an I-797 approval notice from an I-821D or work
               authorization card containing the code 'C-33' will be
               requested at a later date."

     And then it goes on to say it will be kept confidential,
and not disclosed.

     You might then say:  At a later date, you will also be
asked to submit a completed W-9 form.  So they know that --
because that's a separate sentence.  It's not flowing from the
"at a later date."  So just so that they understand that they
don't have to do anything with the W-9 now.

               **MR. LITROWNIK:**  Okay.

               **THE COURT:**  So just before that sentence starts, you
 can just say "At a later date."

               **MR. LITROWNIK:**  Okay.  Thank you.

1        **THE COURT:**  And I don't know why you wouldn't use

2    "submit" just like you use "submit" in the earlier sentence so

3    they're consistent.

4        **MR. LITROWNIK:**  Okay.

5        **THE COURT:**  Okay.  That's just so they don't get

6    bogged down in different words, different phrases and

7    sentences.

8        Okay.  The request to opt out, let's see.  Oh, wait, I may

9    have -- just a minute.  Yeah, I know it's going to be *Pena*, but

10    I want to check something here first.

11        Yeah.  I guess just for *Pena* only -- I thought I might

12    have had something for both, but I just have this for *Pena*.

13    Yeah.  In the *Perez* case, the way you've set up the forms, each

14    one is on its own page.

15        **MR. LITROWNIK:**  All right.

16        **THE COURT:**  But in *Pena*, though, they're running

17    (Indicating).  You should have each one of those forms on its

18    own page so that the recipient understands these are discrete

19    items.  This isn't a run-on of what they were already filling

20    out.

21        **MR. LITROWNIK:**  All right.

22        **THE COURT:**  So the request to opt out should be on an

23    entirely new page.

24        Okay.  Now let's see.  I'm still on the request to opt

25    out.  Now I'm going to get back to both cases.  Okay.

1        Um, let's see.  I print your name.  It's the same problem

2 we discussed earlier, about what you can get or not get if you

3 have each denial at a time when you're DACA.

4        **MR. LITROWNIK:**  Okay.

5        **THE COURT:**  So, let's see.  This is opting out.

6 Okay.  And this may be a different concept.  Let's see.

7            "I declare I applied and was turned down.  I further

8            declare that at the time of each such, I had a

9            valid..."

10      Now that was where I was thinking of saying "at least

11 one."  You were going to work on that.  I think the same

12 problem is presented.

13        **MR. LITROWNIK:**  Right.  And just to -- I think it's

14 the same, it's the same issue here, and then also in the --

15        **THE COURT:**  Exactly.

16        **MR. LITROWNIK:**  -- objection form as well.  And we

17 can address that.

18        **THE COURT:**  Okay.  Yeah, it is.  Oh, here's

19 interesting -- yeah you actually said "Settlement

20 Administrator" here.  Okay.

21      Yeah, it's the same in the objection.  And in that

22 instance, it's in the very last paragraph, about five lines up.

23        **MR. LITROWNIK:**  Uh-huh.

24        **THE COURT:**  Let's see.  Oh, yes.  In the objection,

25 the bottom of the second page, you have a 1, but you don't

have a 2.  So I don't think you need a 1.

It says: If you intend to appear at the final approval
hearing, 1, you must do something.  There's no 2.

**MR. LITROWNIK:**  Okay.

**THE COURT:**  Get rid of the 1.  You can't have a 1 and
no 2.  Okay.

And then, let's just see.  No need for the 1.  Yeah.  At
the final approval hearing.  Let's see.  Whoops.

Then where it says "Class Action Clerk," and "if you
intend to appear," that should be "Clerk of Court."

And above that, in the bolded paragraph -- this is in both
cases -- where it says "District Court's Class Action Clerk," I
guess some District Courts have them; we don't.  And that again
should read "Clerk of Court."  Otherwise they're going to call
up and say:  Where's the Class Action Clerk?  And there isn't
one.

That, I think, exhausts the concerns I had.  Are we still
in whatever date you picked to get all this done?

**MR. LITROWNIK:**  Yeah.  I think so, Your Honor.

**THE COURT:**  All right.  Very optimistic.  Okay.

**MR. deVYVER:**  Your Honor?

**THE COURT:**  Yeah.

**MR. deVYVER:**  I beg your pardon.  This is
Mr. deVyver.

Two weeks feels a little ambitious to me.

1    **THE COURT:** That's okay. We can change -- we can

2    adjust that. Hang onto that thought, because I haven't picked

3    a date yet.

4        But, what were you thinking? Three?

5        **MR. deVYVER:** Yes, Your Honor. I was thinking three

6    weeks.

7        **THE COURT:** And then if we shoved everything back

8    three weeks, just, if we do that, and I'm going to -- if you

9    were -- if you did it faster because -- one second. Hang on.

10   I need to check something. I was going back to look at my

11   schedule.

12       Yeah. Well, just so that you understand, you're going to

13   file, whenever you do, whatever papers you're going to file to

14   fix up what I've been talking about and I guess we've been

15   talking about, to a certain extent, collectively. So that, we

16   need a date for.

17       Then you have to give me at least a week after that to

18   actually be able to review it, look at it, make sure it's all

19   -- you know. And knowing that this is not the only case, you

20   know, that we have in chambers, but assuming I can get it done

21   in a week, so that whatever schedule you're going to actually

22   be using and thinking you're using has that in it as well.

23       So if you thought that there were -- let's just say for a

24   minute, Mr. Litrownik, that we go with three instead of two.

25   All right. Just for discussion. Then you will have to figure,

when you are looking at where these dates are going to run from, they won't run from that date. They would run from a week after, assuming I can get it done, you know, within a week after you, you know, give me all this extra stuff.

And it won't all be just a sort of a clerical: Gee, did they fix this, did they fix this, did they fix this in the notice and form; it's also going to include the lower substantive: Did they get enough to get past, legally, the ability -- you know, the barrier to, you know, releasing a couple of types of loans here that at the moment aren't part of the case. Okay.

So, but if that were all running from, instead of July 24 -- let's see. Well, we'd be running from four weeks from today, I guess. Right?

Today is --

MR. LITROWNIK: The 21st, I believe. I think it's August 21st.

THE COURT: Oh, I'm -- wait. I'm in the wrong page. Yeah. Sorry. I've got your schedule, my schedule -- I was looking at the wrong schedule. I'm sort of wearing out, here.

Okay. So we would be running -- from July 31, we'd be running, I guess, four weeks from that? Is that it?

MR. LITROWNIK: Your Honor, I think it would be three -- four weeks from today. Or three weeks --

THE COURT: Yeah, three weeks from today, or four

from that.  But if yours is three weeks from today to submit,
and today is the 24th, that would take you to August 14th.

    **MR. LITROWNIK:**  Right.

    **THE COURT:**  I believe.  And then if everything was in
order, I should be able to get out an approval -- assuming you
can clear up, you know, the problems, I should be able to get
one out by August 21.

    So if I did that, then you look at the dates I gave you,
which are -- that's a month from -- you'd shove everything back
a month.

    **MR. LITROWNIK:**  Okay.

    **THE COURT:**  Which, just so that we can see, because
we are going to get into an odd situation.  From November 20,
which currently was the deadline to file the motion for final
approval that I was talking about if I was using next -- you
know, next Friday to approve --

    **MR. LITROWNIK:**  Uh-huh.

    **THE COURT:**  Okay, so that was the 20th.  One, two,
three, four, takes you to December 18, which is the Friday
before the Christmas week.  I don't know where Hanukkah falls
this year.  But anyway, the Friday before the Christmas week.

    And if that's what you -- we would be looking at, then we
have a problem, because I may be off the whole end of the year.
So we would have to pick a date for a hearing that is in
January.

1    And if you tried to do it a shorter time, you're going to

2    fall into -- it's not going to work.

3        **MR. LITROWNIK:**  All right.

4        **THE COURT:**  So if you looked at 2021, I wouldn't do

5    it -- well, the first Friday, anyway, is the 1st.  The next

6    Friday is the 8th.  That would be the earliest that we could

7    have a hearing.  And actually, that would be okay, I guess,

8    yeah.  So keep that all in mind when you're using dates and

9    seeing how that would work out.

10    Now, I, as I mentioned to you, can deal with the order.

11    To the extent I might want to make some changes that you might

12    not understand why, and are not just something that's of more

13    of a clerical nature, let me just double-check to see if

14    there's something I might want to call to your attention.

15    Otherwise, I'll just fix it up.

16    You know, there are places where you're referring to the

17    claim form.  And, you know, that tracks what we're not doing

18    now.  Some things about what the exhibits are.

19    Oh, I don't really know if the -- let's see, this is

20    Paragraph 9, let me go to Paragraph -- I'll probably take out,

21    for example, in Paragraph 3, "The settlement is presumptively

22    valid."  It either it is or it isn't.  I'm not going to say

23    that.

24    Let's see.  Paragraph 9.  I don't know if the notice

25    really is based on the model forms from the -- the FJC and our

1    procedural guidance.  I'm not going to just -- it either is or

2    it isn't.  So I'm just not going to say it, okay, and start

3    looking at trying to match this thing up to everything there.

4    It's not worth it.

5        There are things like people aren't going to be filing it

6    at any of the locations.  You know, things in the order that

7    track what I said needed to be changed elsewhere.

8        Oh, yeah.  Hang on.  In Paragraph 10, which has to do with

9    this CAFA notice, yeah, it's not pursuant to Rule 53(c), I

10   don't think.  That's not it.  Okay, but let me just see here.

11       No later than -- I'm going to put dates in as opposed --

12   I'll use dates -- instead of relative dates, I'll put real

13   dates in, actual dates.  But I'll do all that.  You don't have

14   to do anything on the order.

15       Right now, it says:  The Settlement Administrator has

16   prepared the CAFA notice in conformity with, you know, Section

17   1715, and I find that Wells Fargo's obligations are

18   satisfied...

19       You told me that had already happened.  And in the motion

20   for approval, you should make it clear.  Okay.  For final

21   approval.  And then, then I can say you did it, as opposed to

22   -- I don't know what it is.

23       Okay.  And so, fine.  I did want to ask you about that.

24   And that's cleared up.

25       Anything else is really just pretty much if there were

some changes that track whatever we were doing with the other

documents, or to put real dates in as opposed to relative, that

kind of thing.

Any concerns about the order?

**MR. LITROWNIK:**  Not -- not from --

**THE COURT:**  I can't hear you.

**MR. LITROWNIK:**  I'm sorry.  Not -- I don't,

Your Honor.  Thank you.

**THE COURT:**  Okay.  Thank you.

Mr. deVyver, anything on that score?

**MR. deVYVER:**  No, Your Honor.

**THE COURT:**  Okay.  Now, we have run through -- let me

look at the clock -- yeah, so we've been doing this for about

two hours.  We had a little trouble getting everybody on.  But

essentially, you know, we have been at this for about two

hours.  Which is what I was concerned it was going to take,

and it did.  But I'm also reasonably confident that the -- the

concerns that I have hopefully can be resolved so that you can

keep your settlement as you did enter it.

And I do think it appears favorable to the class, from

what I've seen so far.  That it's fair; that there's no

indication of any collusion of any sort here.  And that it

would be appropriate to approve, if we can take care of the

concerns that I've raised about the release, and then just

cleaning up so that the class gets a clear notice and clear

1   forms to complete.

2       If you don't have anything else, I'm about to conclude the

3   hearing.  And I will say, then, that the deadline for the

4   parties to provide whatever supplemental documents they are

5   going to provide to the Court will be due in three weeks, which

6   is August 14th.

7       And I hope then to be able -- if you do clarify

8   everything, and resolve the concerns, to be able to approve it

9   with a final order on the 21st.

10       Okay.  Ms. Geiger, just to confer with you, to make sure

11   you do not need anything different for your minutes or anything

12   further.

13            **THE CLERK:**  No, Your Honor.  Thank you.

14            **THE COURT:**  Okay.  And Ms. Ball, let me ask you while

15   you're there, how'd we do in terms of your being able to hear

16   everybody after the one glitch?

17      (Reporter response)

18            **THE COURT:**  Okay.  Thank you.  And if you need to

19   check with me on the one matter that remains, as a little bit

20   of a problem, just, give me a call.

21      (Reporter response)

22            **THE COURT:**  All right.  Then, at this time, having

23   exhaustively reviewed the proposed class-action settlement,

24   the Court has made the findings that it has.  We will await

25   the supplemental submissions.  And as far as this case is

1    concerned, we are in recess.

2        Thank you all very much.  Have a good weekend.

3            **MR. LITROWNIK:**  Thank Your Honor.

4            **MR. deVYVER:**  Thank Your Honor.  You, too.

5            **MR. LITROWNIK:**  You, too.

6            **THE CLERK:**  Court is in recess.

7        (Proceedings concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

       I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

———————————————————
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Thursday, August 6, 2020