Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

MITZIE PEREZ and SERGIO          )
BARAJAS, individually, and       )
ANDRES ACOSTA, TERESA DIAZ       )
VEDOY, VICTORIA RODAS, and       )
SAMUEL TABARES VILLAFUERTE,      )
individually and on behalf of    )
all others similarly situated,   )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )   No. 17-cv-0454-MMC
                                 )
WELLS FARGO BANK, N.A.,          )
                                 )
          Defendant.             )
_____)
EDUARDO PEÑA, individually and   )
on behalf of all others          )
similarly situated,              )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   No. 19-cv-4065-MMC
                                 )
WELLS FARGO BANK, N.A.,          )
                                 )
          Defendant.             )
_____)   San Francisco, California
                                     Friday, January 8, 2021

**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**


(Appearances continued on next page)


Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

```
 1   APPEARANCES: (via Zoom Webinar)

 2   For Plaintiffs:
                             OUTTEN & GOLDEN LLP
 3                           One California Street, 12th Floor
                             San Francisco, California 94111
 4                     BY:   RACHEL DEMPSEY, ESQ.

 5                           OUTTEN & GOLDEN LLP
                             685 Third Avenue, 25th Floor
 6                           New York, New York 10017
                       BY:   OSSAI MIAZAD, ESQ.
 7
     For Defendant:
 8                           MCGUIREWOODS LLP
                             Tower Two-Sixty
 9                           260 Forbes Avenue, Suite 1800
                             Pittsburgh, Pennsylvania 15222
10                     BY:   K. ISSAC DEVYVER, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **Friday - January 8, 2021**                              **8:59 a.m.**

2                            **P R O C E E D I N G S**

3                             **---oOo---**

4        **THE CLERK:**  Calling Civil case number 17-454 and

5    19-4065, Mitzie Perez versus Wells Fargo Bank and Eduardo Peña

6    versus Wells Fargo Bank.

7        Will counsel please state your appearances for the record,

8    beginning with plaintiffs' counsel.

9        **MS. DEMPSEY:**  Good morning, Your Honor.  This is

10   Rachel Dempsey, with Outten & Golden, for plaintiffs in Peña

11   and Perez.  And I think Ossai Miazad, who is my colleague, may

12   be having audio issues, but she is here as well.

13       **THE COURT:**  All right.  Thank you.

14       Ms. Miazad, can you hear me?  We can't hear you.  Okay.

15   I'm assuming you don't have the mute on.  So, okay.

16       For the defendant.

17       **MR. DE VYVER:**  Good morning, Your Honor.

18   Isaac de Vyver on behalf of the defendant Wells Fargo.

19       **THE COURT:**  Thank you.

20       This matter is proceeding by way of Zoom.  We're still

21   amidst the pandemic, the CARES Act, General Orders from the

22   Northern District of California, so this is the best we can do.

23       The matter is being reported.  I see Ms. Sullivan is here

24   with us.  She'll let us know if anybody else blocks out

25   audibly, I guess.  And Ms. Geiger, of course, our courtroom

1    deputy clerk.

2        So I'm ready to proceed with the matter.  The motion that

3    we have before the Court at this time is for final approval of

4    a class action settlement, respectively, in each of the two

5    cases, both Perez and Peña.

6        I've gone through the papers.  And all in all the

7    settlement looks workable.  I have a couple of questions about

8    things, and perhaps not going along fully with some of the

9    matters here, but we'll see.

10       The Court is aware of the relief that's being offered in

11   this matter, which generally seems reasonable.  Also, the

12   plaintiffs are obtaining injunctive relief that is of

13   considerable importance in the case.

14       They're going to be considered by Wells Fargo similarly as

15   if they were citizens, didn't have alien status.  And then if

16   they qualify otherwise, fine.  If they don't, they don't.  But

17   they're not getting a leg up, but they're not getting a step

18   down at the get-go either.

19       The way it looks now -- because we didn't have a really

20   large turnout even though the relief is, as I say, substantial

21   and, also, there's not an insignificant monetary payment, yet a

22   number of people did not respond.  It may be that they're just

23   afraid of essentially becoming a matter of record in some way

24   and calling attention to themselves, which they may not want to

25   do.  It's not clear.

1    But we had, in Perez, a decent enough turnout that we

2    don't have to meet the floor of the payment by adding *cy près*

3    contribution.  For Peña, it looks like we probably will have

4    to.

5    And, as you know, I carefully went over the proposed

6    recipients of any *cy près* payment so that we could be assured

7    that those would be appropriate charitable organizations to

8    receive any funds.

9    Yeah, there really was a less than 2 percent return in

10   Peña and about 6 percent in Perez.

11   Let's keep going.

12   As far as the notice, really, a good effort was made here

13   to reach the various class members.  And I think you were quite

14   successful in that regard with 96.2 percent in Peña and

15   98.43 percent in Perez, which is very good.

16   There was a backup notice filed.  There was reminders

17   provided.  So all of that, I think, was excellent in an effort

18   to reach the class members.

19   There are some questions about the timeliness of some of

20   the claims.  I do want to clear that up, if I can, particularly

21   with defendant's counsel.  There's one kind of small group that

22   they're not objecting to, and then there were two other groups

23   that it wasn't clear to me what their position is.  So maybe we

24   can take those up.

25   Let's see.  Hang on for just a minute.  If there was

1  anything that possibly might have been confusing here, it was

2  the number of forms.  I started clearing up at least the idea

3  that there was a combined form that I thought would really be

4  confusing to everyone, but in separating out the forms we ended

5  up with some of the Perez people using the Peña form.

6      In any event, there was apparently 13 of those.  And I

7  wanted to find out from Mr. de Vyver what Wells Fargo's

8  position is as to those people that made timely claims but they

9  were on the form for the other case.

10      **MR. DE VYVER:**  Your Honor, we don't have --

11  Wells Fargo has no objection to those class members being

12  deemed to having made a claim in Perez.

13      **THE COURT:**  All right.  Very good.

14      Now, let me go to the other one I had a question about,

15  not clear on your position.  Let's see here.

16      I guess there were just about, well, maybe 42 claims that

17  just weren't timely.  The plaintiffs' position is, give these

18  people a break, we had COVID, we had all these other problems.

19      What's the defendant's position on those?  And I'm not

20  sure how untimely they were.  If you have some feeling about

21  that, you can let me know that as well.

22      **MR. DE VYVER:**  Your Honor, we're taking no position.

23  We think that 60 days was sufficient time.  But if Your Honor

24  wishes to deem them timely, we're not taking a position on

25  that.  We don't object.

1        **THE COURT:**  All right.  As part of the settlement,

2   there was, as one of the attachments, the document that

3   provided, unless the Court orders otherwise, you have to submit

4   within the 60 days.  I'll go ahead and order otherwise and say

5   that I am deeming them timely filed under the particular

6   circumstances that we're operating under at the moment.

7        Certainly, I get a lot of legal requests from counsel

8   asking for extensions.  These folks aren't, you know, going to

9   know how to do that.

10       Okay.  All right.  So let's go on --

11       **MS. MIAZAD:**  Thank you, Your Honor.

12       **THE COURT:**  Oh, excuse me.

13       **MS. MIAZAD:**  I said thank you, Your Honor.  I was also

14   making sure you could hear me.

15       **THE COURT:**  All right.  Yes, I can --

16       **MS. MIAZAD:**  Thank you.

17       **THE COURT:**  -- Ms. Miazad.  Now, Ms. Miazad, who's

18   going to take the lead for plaintiffs on this matter?  Is it

19   you, now that you're audible, or is it Ms. Dempsey?

20       **MS. MIAZAD:**  I'll be taking the lead.  If it's okay

21   with Your Honor, Ms. Dempsey is prepared to discuss anything

22   that you'd have questions about on the service award, and I'd

23   ask for her to have that opportunity.

24       **THE COURT:**  Sure.

25       **MS. MIAZAD:**  Thank you.

1          **THE COURT:**  Okay.  Fine.

2     So there are a number of factors the Court has to

3     consider:  The strength of the plaintiffs' case, the

4     risk/expense complexity, likely duration of continuing with

5     full bore litigation, the risk of being able to maintain a

6     class action throughout the proceedings, the -- let's see, the

7     amount that was offered, of course very important, the extent

8     of discovery, the stage of the proceedings, the experience of

9     counsel and their views, the presence of any government

10    participant, and the reaction of the class members.  Also, the

11    Court has to make sure that, with respect to the settlement,

12    and particularly the fees as well, that there not be exclusion

13    among the negotiating parties.

14    So the strength of the plaintiffs' case, it's an

15    interesting case.  Of course, there are different claims in the

16    two cases, but both of them do contain a claim under Section

17    1981 that deals with discrimination based on alienage.

18    There was at least a defense here that Wells Fargo could

19    raise that they weren't refusing these particular individuals

20    because they were aliens but because they weren't lawful

21    aliens.  And then we have the whole question of what's DACA and

22    what kind of status that puts people in.  So there's at least

23    an issue here, certainly, that can be raised.

24    The California classes in the cases had a little, perhaps,

25    stronger position because of the language of the California

statute under which the action was also brought.  But, again,
there's a real question as to whether that made a significant
difference.

     So let's just say it's not slam dunk and that if
Wells Fargo had gone to trial and lost, they probably would
have taken the matter up.  So that goes also to risk, expense
and complexity of likely duration of the litigation.

     And in Peña, the case was dismissed with leave to amend.
Wells Fargo -- plaintiff had just filed their, at that point,
their Second Amended Complaint and, you know, I guess, would
have moved again to keep the matter going in some fashion as to
their various positions.

     Then as to Perez, it was a little farther along.
Plaintiffs had filed their motion for class cert.  There were
potentially going to be cross motions for summary judgment.
All of those would have involved extensive motion practice and
cost to everybody.

     The risk of maintaining class action settlement, question
here whether there was a common policy or not.  If there
wasn't, then certification would be hard to prove up, or the
need for it.

     There's also a little bit of a question about identifying
the class members because Wells Fargo didn't have any record
that was particular to DACA recipients, just people who were
not citizens.  And so then out of that big group you're going

1    to have to find the people who might fall within the particular

2    named class.  So that, again, was an impediment that had to be

3    overcome.

4        The amount offered, we've talked about.  The cap in Perez

5    I didn't mention.  It's over 13 million.  And in Peña, it's

6    630,000.

7        The size of the classes is quite different.  The class in

8    Perez is much, much larger.  They had a whole variety of types

9    of loans that were covered as opposed to Peña.

10       There are caps also with respect to, for example, the

11   Unruh Act.  In Perez, the most you can obtain would be $4,000

12   in statutory damages.  So I think a payment that could be

13   anywhere between a little over 2300 and up to 2500, which is,

14   you know, somewhere in the 60 percent range, 58 to 62 percent,

15   is quite good for a class.

16       With their federal claim, they were only seeking nominal

17   damages.  And here $100 is better than just, you know, totally

18   symbolic damages.

19       In Peña, they don't have a California class plaintiff as

20   the named plaintiff, but there are class members.  And, again,

21   we're looking at a quite decent recovery, I think, in their

22   case probably guaranteed at over 26 percent.

23       Again, only the nominal damages under the remainder of

24   their claims, which were 1981 and the ECOA -- or ECOA -- and

25   also the FCRA, Federal Fair Credit Reporting Act.

1        They -- under FCRA, or however you want to pronounce it,

2   FCRA, you can get statutory damages between a hundred and a

3   thousand dollars but only if the violation is willful, which

4   this may be a fight over how you interpret law, not so much

5   just a knowing violation of the law.

6        And a $300 settlement for the national class seems fair.

7   That's about 30 percent of their maximum available.

8        The parties engaged in substantial discovery in Perez.

9   There were nine witnesses that the plaintiff deposed.

10  Wells Fargo deposed all of the named plaintiffs along with

11  several experts.  There were a number of discovery disputes,

12  all that landed on the doorstep of Magistrate Judge Laporte,

13  who left to become a private mediator at JAMS, not necessarily

14  because of this particular case, but she did depart.

15       Peña, in that case there was some discovery.  And, of

16  course, they benefited from the discovery that had already been

17  conducted in Perez, and didn't need to reinvent the wheel.  So

18  I think there was substantial preparation by both sides before

19  any settlement was even attempted in the case.

20       Counsel, from their CVs, appearing for the plaintiffs, and

21  they offered those, they're clearly well-versed in class

22  actions.  And I'm assuming that Wells Fargo did not bring

23  someone in who was not equally experienced.

24       We don't have a government participant.  The required CAFA

25  notice was served on various attorneys general, and they didn't

1   come in with any kind of objection or concern of any sort.

2        Talked about the claim return rate and why that, frankly,

3   might have been.

4        In Perez, as far as opt-outs, there were only two out of

5   92,000 potential class members.  And there were a number of

6   people in that class who submitted, quote/unquote, objection

7   forms.  But, again, I think this was a concern prompted more by

8   the forms themselves, where I think they just felt they had to

9   state why they didn't feel they were fairly treated by

10  Wells Fargo, not -- in the underlying facts of the case, not

11  the settlement itself.  So there were only what I'll call two

12  real objections, and neither of those was well-founded, and I

13  will explain those afterwards.

14       In the Peña case, there weren't any opt-outs, there

15  weren't any objections.  The settlement was reached after

16  several sessions with a private mediator.  And in Perez, there

17  was -- there were, I think, a number of sessions and also about

18  five weeks after of just working with the mediator to try and

19  resolve the case.  And this was a private mediator who had no

20  dog in the fight, so to speak.

21       As far as those two objections, one of them was from an

22  individual who essentially, because she lives in Texas, was not

23  part of the California class.  And I think when she was talking

24  about she was equally discriminated against, her words,

25  "equally discriminated," it sounded like she thought the

1    California plaintiffs were getting a better deal and that that

2    wasn't fair.  But there are reasons for that, and the only

3    monetary claim, really, that was asserted as far as her class

4    was concerned was nominal damages.

5        The California claimants, as I mentioned, are in a little

6    different position than the nonCalifornia plaintiffs because

7    they had a claim under California law that arguably was less

8    subject to challenge on legal grounds.

9        And then the second individual seemed to be objecting to

10   the part of the settlement in which income taxes are being, you

11   know, considered, and she objects to having to pay taxes.  But

12   that's a tax law objection, not a settlement objection, really.

13       So those are overruled, so to speak, those objections.

14       Now, getting to the attorneys' fees, we have quite a

15   sizable award that's being asked for, for fees and costs in

16   Perez.

17       And, Ms. Dempsey, are you going to be taking that, as

18   well, or is that still Ms. Miazad?

19           **MS. MIAZAD:**  I'll be taking that, Your Honor.

20           **THE COURT:**  Okay.  So in this instance the request is

21   being made based on a lodestar calculation, which I think in

22   this case is appropriate.  It's often used as a cross-check,

23   but in this case I think particularly it's appropriate just as

24   a starting point because we do have the injunctive relief.

25   It's of considerable value for these folks, and I think that

1    that comes into play then.

2        So when you take what the plaintiffs had calculated at

3    least up to this point, which was just under 5 million, which

4    is what they're asking for, tack on their costs, you end up

5    with over a $5 million out of pocket, so to speak.  And I think

6    that's supported; although, one can always quibble did you have

7    to spend this much time on this or that or what have you.

8        There were numerous contested motions; although, most of

9    them were challenges to pleadings, so I guess you could say why

10   didn't you just do it right the first time.  But, in any event,

11   we got a pleading that survived.

12       There were a lot of discovery disputes.  And it seems to

13   me that even with the, you know, low turnout on the claims,

14   that this works toward the future, and it just seems to me that

15   this is a valuable settlement and that the award to counsel,

16   which includes costs, would be appropriate.

17       Then in the Peña case, they also were looking at the

18   lodestar, which, again, I think is appropriate for the same

19   reasons.  They come out on a lodestar with somewhat under the

20   500,000 they're asking for.  It was about 434,000.

21       I don't know if that's been pumped up at all since the

22   time the motion was filed.  If you know, Ms. Miazad, you can

23   let me know that.

24       **MS. MIAZAD:**  Certainly, Your Honor.  Those are fees

25   through December 21st, and so all of the work that we've done

```
 1  in preparation for the hearing, and, also, there has been --
 2  because we also had hoped for a higher claim rate, particularly
 3  in Peña, we worked very closely with the settlement
 4  administrator to make sure that there weren't claims that were
 5  filed in Perez.
 6      So we really -- we've been in contact with the settlement
 7  administrator daily since the 21st.  So there have -- I don't
 8  have a number for the Court, but there has been significant
 9  work between the 21st and today.
10      THE COURT:  Ballpark at all, of an additur, just out
11  of curiosity?
12      MS. MIAZAD:  Another 15,000, if I had to guess.
13      THE COURT:  Okay.
14      MS. MIAZAD:  And I think that's going through and --
15      THE COURT:  All right.
16      MS. MIAZAD:  -- through the end we're probably
17  talking, to get this closed out, a similar amount.
18      THE COURT:  Okay.  Given the value of the settlement,
19  the Court feels that a multiplier of -- even without the added
20  work was only a little over 1 percent as a multiplier.
21      I think it's appropriate in this case to award counsel
22  their full amount of fees.  And there was no objection, by the
23  way, by anyone.  And oftentimes in class settlements you will
24  see something, people saying, why am I only getting, well, fill
25  in the blank when they're getting fill in this really long
```

 1    blank.  And nobody objected here in any way.

 2        Now, the service awards I am concerned about.  Not in the

 3    Peña case.  They've only asked for $5,000, and it's only the

 4    one plaintiff who was named.

 5        And I realize that in Perez that you had to have multiple

 6    plaintiffs.  Whether you needed all six or not, I'm not going

 7    to go into, but you needed multiple because you had all

 8    different types of loans.  And there were questions about the

 9    ability to bring a claim if one didn't have a particular type

10    of loan themselves.  But it just seems really high.  I know

11    there was no objection by the other class members, but it just

12    doesn't really, I guess, for lack of a better word, feel right

13    not just because there's six of them but just for the number.

14        And I do note that they did a lot of work, from what

15    you've told me, and that everyone's concerned that they may

16    become a target of scrutiny if people are looking at this case

17    who may do them some harm from the government.  They are in a

18    much more precarious position than the average citizen who just

19    brings a claim.  But, still.

20        So I think you're on at this time, Ms. Dempsey, but I will

21    tell you that I am looking at cutting that to some significant

22    effect.  Okay.

23        **MS. DEMPSEY:**  Your Honor, so, as you know, the key

24    factors to consider in whether to award an incentive award, a

25    service award, and how much, are the time spent on the action

1    by the named plaintiffs and whether that resulted in a

2    significant benefit to the class, and whether they put

3    themselves at personal risk to do so.

4         I think this case is extraordinary and unusual in both of

5    those elements.  So for Perez, it's been going on for almost

6    four years.  These people -- these -- our named plaintiffs have

7    been working on it for four years.

8         They sat for depositions.  They went through discovery,

9    full discovery.  They each responded to, I think, five sets of

10   requests for production, five sets of interrogatories, requests

11   for admissions.  And they put themselves at an unusual level of

12   personal risk in order to do all of that.

13        And some of the discovery got into immigration status,

14   immigration status of their family members.  And it's also

15   worth noting that this case was filed in -- well, it was filed

16   in January 2017.  The remaining plaintiffs joined the case in,

17   I think, March of 2017, if I remember correctly.

18        And that was, I think, a particularly scary time to make

19   public statements about your -- about immigration status.  You

20   know, we have now the benefit of the Supreme Court's ruling in

21   June on the DACA cases, but all of that was very uncertain for

22   almost the entire period, almost the entire pendency of the

23   litigation.

24        And so, in turn, I think that that factor in particular is

25   particularly unusual, and particularly, you know, in a consumer

1    case where the risk of retaliation and personal consequences

2    may be less than, say, in your typical employment case, but

3    this is really unusual in that regard.

4        I personally spent a lot of time working with them and

5    talking to the named plaintiffs, and they've been very brave

6    and very committed and done a lot of really hard work for the

7    class.  And so we -- we respectfully request that be taken into

8    consideration.

9        **THE COURT:**  All right.  Well, you know, if you look at

10    it and you take the number of hours as an average that you say

11    that they spent, and you went to a fair amount of effort to

12    document the work that they've done on the case, and the hours

13    that they've spent, and if you wanted to take, oh, you know, a

14    ballpark of, let's say, 80 hours and, you know, that's making

15    almost $315 an hour.  Mr. Peña would get $83 an hour.  You

16    know, it's just quite a major difference there.

17        I understand the case was older, it was bigger, you know,

18    more went on, some of the work that you did there, and he would

19    have benefited from Mr. -- you know, the plaintiff in Peña

20    would benefit from the work that was done in Perez, and I

21    realize that.

22        It just still seems like -- I don't know, it just doesn't

23    have a good feel.  And if anybody asks, you know, was trying to

24    get an auto loan and they could just take this and go buy a

25    car, and a pretty nice one, so it just didn't quite feel right.

1      I was going to say 15.  What you've done is convince me to

2  make 17.  So I'll make it 17 per plaintiff in that regard.

3  Okay.  So that would be the incentive in the Perez case.

4      Now let's talk about the order.  I can make all kinds of

5  changes at my end.  So unlike the notice, where you really had

6  to go back and work it over yourselves, I can do that, but

7  there are -- let's see.

8      Oh, yes.  There was one other group, and I understand

9  there is no objection here, that there were three Perez class

10  members who submitted an objection but no claim form.  And then

11  after the deadline they submitted a claim form.

12      As I say, everybody had so many things to fill out that --

13  or figure out which one they were supposed to use, and the

14  defendant didn't object to that.  That's fine.

15      But I need to put somewhere in the order that these extra

16  plaintiffs who may not have been technically timely under the

17  settlement are still covered.  And there's a place I thought I

18  could do that.  And I'm just essentially confirming this with

19  you and calling it to your attention.

20      And I can pick the language out, but that on -- let's

21  see -- paragraph 18, if you look at that in the Perez -- you

22  know, if we look at that as to Perez, up near the top, in lines

23  5 to 6 we've got a phrase about the settlement administrator

24  shall validate each claim form as directed in Section 5 of the

25  Agreement.  Now, that's just a procedure essentially telling

1    the claims administrator they've got to make sure these people

2    are valid DACA plaintiffs and not just someone who says they

3    are.

4         There were a couple of things I thought I could add after

5    that, including the three claimants identified in Exhibit E, et

6    cetera, and these other people, and come up with some language,

7    now that I know that all of them can be in it, so that it's

8    just clear that they're part of it.

9         What do you think?  I can do the language.  I don't need

10   you to write it.  I just want to see whether, in an exercise of

11   caution, we should make clear that they are included in the

12   people that are going to be validated.

13        **MS. MIAZAD:**  I think that would be fine, Your Honor.

14   I'm just looking through to make sure that that -- that will

15   mean that, though, the settlement administrator will go through

16   the process of getting the documentation from those

17   individuals.  I think --

18        **THE COURT:**  I want to make sure they're part of the

19   group all the way around.

20        **MS. MIAZAD:**  Right.

21        **THE COURT:**  So I need to find they're timely and

22   then -- which I have.

23        I also just wanted to ask about whether we should put the

24   word "timely" before "claim form."  And the reason is I've

25   looked, and although you folks identify claim form in the

 1   settlement, it's not tied to any timeliness, it's just the

 2   form.

 3       And so I thought maybe we should say "validate each timely

 4   claim form."  We don't want them running around doing forms

 5   that have not been accepted, for example.

 6           MS. MIAZAD:  So that would -- you would strike

 7   "timely" --

 8           THE COURT:  I would just add "timely" between

 9   "validate each" and "claim form."  That's -- let's see where we

10   are.

11           MS. MIAZAD:  And then just clarify that "timely"

12   includes the --

13           THE COURT:  All those people.

14           MS. MIAZAD:  Right.

15           THE COURT:  Yeah.  You know, the three groups.

16           MS. MIAZAD:  Right.

17           THE COURT:  The 42 that, you know, were just -- they

18   got it together on the right thing but didn't submit it on

19   time; the people who used the wrong form; the people, you know,

20   who -- you know, all those people.

21           MS. MIAZAD:  Right.

22           THE COURT:  Okay.  If that seems like a decent plan,

23   then I just want to make sure that they're all a matter of

24   record in the written order.  So, okay.

25       Then here's a question.  On page 6, line 19 -- let me go

 1   back to that -- there's a reference to Exhibit 1,

 2   quote-unquote, hereto.  There is no Exhibit 1 that I could

 3   find.

 4        If you did prepare the exhibit, where in the record is it?

 5   If you didn't give me one, it's probably okay because I know

 6   where in the record the names of the two opt-outs are, and I

 7   can, you know, prepare a kind of fake Exhibit 1 to attach --

 8   you know, prepare an Exhibit 1.

 9        But I just wondered if you know where it is or -- you

10   know, in the interests of time, I won't ask you to just put two

11   names on something titled Exhibit 1.  I can do that.  But if it

12   was somewhere, I thought I'd use it.

13             **MS. MIAZAD:**  I don't -- I don't recall seeing one.

14             **THE COURT:**  Okay.  Nowhere.  All right.

15        Oh, on page 7 you discuss the notices that -- the notice

16   that was given, at 12 to 14.  And I am going to add that it

17   wasn't just that original order that we're talking about, but

18   there was also a supplemental order that you requested.

19        So I wanted to make reference to that, as well, so that it

20   won't just say "The form and means of disseminating the class

21   notice as provided in the order for preliminarily approving

22   settlement and providing for notice."

23        I would say "and the order approving the parties' joint

24   stipulation to modify forms and instructions document to be

25   mailed in notice packet constituted," right.  It had a long

```
 1   title, but that's what I'll add just so it's clear that there
 2   was notice that was in a form that was actually covered by two
 3   separate orders.  Okay.
 4          MS. MIAZAD:  Yes.
 5          THE COURT:  Then there's another one.  Let's see.  I
 6   think there's just a typo here.  On page 8, lines 27 to 28, you
 7   reference, on line 27, paragraph 13 of the order, and I think
 8   you mean 14.  In the Peña order, it says 14, and I think it's
 9   14 that we're talking about.
10          MS. MIAZAD:  14, yes.
11          THE COURT:  I think it's 14.
12          MS. MIAZAD:  I think so as well, Your Honor.
13          THE COURT:  Okay.  Fine.  Just wanted to confirm that
14   with you.
15       There are a couple of things I'm just going to change that
16   are not substantive.  One, there are just a lot of places where
17   there are numbered items, and the number is always at the end
18   of the line before.  I'm just going to drop it down so it
19   actually kind of matches up with the item a little better.
20       There's a small typo here and there.  I have to fill in
21   blanks.  No problem.  In fact, I think there was only one other
22   typo.
23       In the Peña order, we've got that same Exhibit 1.  But
24   there weren't any opt-outs, so I think that we could probably
25   just get rid of that part about opt-outs entirely.
```

1     **MS. MIAZAD:**  Okay.

2     **THE COURT:**  When this was prepared you weren't sure

3  what was going on, I would gather, but now you know.

4     **MS. MIAZAD:**  Right.

5     **THE COURT:**  And then I thought, just like in the Perez

6  order, we ought to add something about the -- let's see -- the

7  modification with respect to notice, that other order.

8     And, let's see, that might be pretty much it.  Again, just

9  going to make that one stylistic change and fill in some

10  blanks.  So I would say that we've probably covered everything,

11  but I want to make sure.

12     Is there anything that any of you wanted to bring up that

13  bears on my decision in this matter, other than what we've

14  already covered?

15     **MR. DE VYVER:**  Your Honor, I just had one on the

16  order.

17     **THE COURT:**  Uh-huh.

18     **MR. DE VYVER:**  It occurs to me, in looking at the

19  order, since we don't -- since the claims haven't been

20  validated yet, we don't know yet what Wells Fargo will be

21  paying out, and so that won't be in the order.

22     So, I guess, what's the best way to handle that, if Your

23  Honor is going to put on a supplemental order or how Your Honor

24  wants to handle that.

25     **THE COURT:**  I don't know.  Does it have to be

incorporated in the order?

      **MR. DE VYVER:**  I don't know that it does.  You know, normally, you know when we enter these orders and so it's normally in there.  If everyone else is comfortable -- I mean, I think at some point it has to be documented what the final payout is once we've validated the claims, but, you know, I could probably be persuaded otherwise.

      **THE COURT:**  Well, if -- I certainly have no objection to making this a matter of formal record and order.

   Do you feel that I need to put that aspect of -- you know, a directive, so to speak, in this order to do that, or I could -- I'd have to look through the order to see where it might fit in.

   And what would you -- how would you describe what you would provide to me for approval?

      **MR. DE VYVER:**  Well, I guess what I'm just thinking from the bank's perspective is once the payment is made, right, the judgment is satisfied.  So it may just be as simple as, once all the payments have been made, we'll do a supplemental notice of the Court that the judgment was satisfied.  I don't even know that it has to be the amount.  I guess I just wanted to be clear, you know, that we have thought about how that will be from the bank's perspective, obviously, because we want the judgment to be marked satisfied.

      **THE COURT:**  Oh, okay.

1          **MS. DEMPSEY:**  Your Honor, we are required to submit --

2     under the Northern District rules, we're required to submit a

3     post distribution accounting -- I believe that's within 21 days

4     of distribution -- which may resolve Mr. de Vyver's concern.

5          **MR. DE VYVER:**  I think that probably does it.  If we

6     had anything else, I would be glad to talk to the other side

7     about it and figure it out, but I think that probably satisfies

8     what my concern was.

9          **THE COURT:**  Okay.  Okay.  All right.  So then at this

10    point is there any reason to add anything to the order?

11         **MR. DE VYVER:**  I don't --

12         **THE COURT:**  And, if so, what would it be?

13         **MR. DE VYVER:**  I don't think so.  And if we need

14    something else, I think we can come back to Your Honor.

15         **THE COURT:**  Okay.  Ms. Miazad, anything that you would

16    want to bring up?

17         **MS. MIAZAD:**  No, Your Honor.  Thank you.

18         **THE COURT:**  Ms. Dempsey?  Anything --

19         **MS. DEMPSEY:**  No.  Thank you, Your Honor.

20         **THE COURT:**  Just out of curiosity, is there anyone

21    listening to this hearing at this time?

22         **MR. DE VYVER:**  Your Honor, my partner, Carla Johnson,

23    is listening, but she did not dial in.  That's -- when you see

24    me look to the left, that's who I'm looking at.

25         **THE COURT:**  Oh, okay.

1          MS. MIAZAD:  -- are on the line.

2          THE COURT:  All right.  Is there anyone who objected

3   to the settlement who is listening in?

4          THE CLERK:  Your Honor, I show 18 attendees.

5          THE COURT:  Okay.  But no one raising their hand as

6   being a directly interested party, as far as I can tell.

7          THE CLERK:  No.

8          THE COURT:  Okay.  So at this time, then, the motion

9   for final approval of the class action settlement in both

10  actions is granted.

11      I do make all the findings that I have indicated on the

12  record now, and they will be incorporated in the formal order

13  to be issued shortly.

14      This was a long, hard battle.  I think you did a fine job

15  in resolving it to the benefit of all parties concerned.

16      That completes our proceeding at this time.  Everybody

17  stay well, and we are now going to be in recess.

18      Thank you.

19          MS. MIAZAD:  Thank you, Your Honor.

20          MR. DE VYVER:  Thank you, Your Honor.

21          MS. DEMPSEY:  Thank you, Your Honor.

22      (At 9:42 a.m. proceedings were adjourned.)

23                      - - - - -

24

25

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    DATE: Tuesday, January 26, 2021

7

8

9                    _Katherine Sullivan_

10    _____

11          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                      U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25